

CNA Plaza 38 South Chicago IL 60685-0001

Tracy L. Smith
Claims Analyst
Home Office Claim
Telephone  312-822-2343
Facsimile  312-817-3473
Internet    tracy.smith@cna.com

September 17, 2003

Robert B. Groseclose        CERTIFIED 70020860000471726820
Cook Schuhmann & Groseclose
714 Fourth Avenue, Suite 200
Fairbanks, Alaska  99701-4470


Re: John Does 1-6 v. Catholic Bishop of Northern Alaska
    Claim number: ER 002418


Dear Mr. Groseclose:

This letter acknowledges receipt of your July 29, 2003 correspondence sent on behalf the Catholic Bishop of Northern Alaska (also referred to herein as the "Diocese of Fairbanks") enclosing an amended complaint filed in the above-referenced matter. The Diocese of Fairbanks asserts that Continental Insurance Company ("Continental") issued general liability coverage to the Diocese sometime during 1974. Based upon the information you have provided and the allegations of the *John Does 1-6* Complaint, Continental will participate in the defense of this matter. However, questions of coverage exist, therefore the defense will be provided under a reservation of rights, including Continental's right to deny coverage to the extent the Diocese is unable to prove the existence, terms, conditions and/or limits of coverage allegedly issued by Continental. We have set forth the background of this claim and a discussion of the alleged Continental coverage below.

I.      *John Does 1-6 V. CATHOLIC BISHOP OF NORTHERN ALASKA, ET AL.*

        A.      Background

Continental acknowledges receipt of the following complaint: *John Does 1-6 v. Catholic Bishop of Northern Alaska and The Society of Jesus, Oregon Province*, Case No. 4BE-03-0177 CI, filed on July 16, 2003, in the Superior Court of the State of Alaska, Fourth Judicial District at Bethel (the "Complaint"). The Complaint alleges the Diocese of Fairbanks has ultimate authority and responsibility for the training, ordination, placement, and, if appropriate, the discipline, removal and recommendation for laicization of all Roman Catholic priests ordained in the Archdiocese. The Complaint alleges the Society of Jesus is responsible for the personnel and operations of the Oregon Province.

John Does 1-6 all generally allege they were sexually molested by Father Jules Convert while they were minors. The Complaint alleges from as early as 1940 through at least 1988, Convert was assigned by the Diocese of Fairbanks and/or the Society of Jesus as resident pastor in several Native Alaskan villages. Convert was the pastor at St. Mary's or Kaltag at all times relevant to the Complaint. Convert is now deceased. The Complaint includes the following allegations specific to each claimant:

John Doe 1 (Gordon Sallison)—John Doe 1 was a member of the Church of the Nativity in St. Mary's, Alaska. Prior to 1977, John Doe 1 was selected by Convert to be an alter boy at the Church of the Nativity. The Complaint alleges that on an unknown date in the winter in late 1976 or early 1977, when John Doe 1 was approximately 13 years old, Convert invited John Doe 1 to spend the night with Convert. When John Doe 1 arrived at Convert's living quarters, Convert allegedly told John Doe 1 that he needed to bathe. After he had bathed, and spent some time with Convert, he was allegedly told that he would have to sleep in his under shorts. John Doe 1 allegedly protested that he always slept in all of his clothes, but was allegedly told by Convert that he would have to remove his clothing. Convert allegedly slept in the same bed next to John Doe 1. The Complaint alleges that twice that night John Doe 1 awoke to discover his penis being fondled by Convert and found that Convert was masturbating. After the second occasion, John Doe 1 got up, dressed himself and went home.

John Doe 2 (Paul Johnson, Jr.)—John Doe 2 was a member of the Church of the Nativity in St. Mary's, Alaska. During 1972 through 1974, John Doe 2 was an alter boy at the Church of the Nativity, having been selected for that service by Convert. The Complaint alleges that on an unknown date in 1972 and 1974, when John Doe 2 was 10 to 12 years old, Convert invited John Doe 2 to spend the night with Convert. When John Doe 2 arrived at Convert's living quarters, Convert played games and generally paid attention to John Doe 2. John Doe 2 was allegedly told that he would have to sleep in his under shorts. Convert allegedly slept in the same bed next to John Doe 2. The Complaint alleges that John Doe 2 awoke to discover his penis being fondled by Convert and found that Convert was masturbating.

John Doe 3 (Louis George, Jr.)—John Doe 3 was a member of the Church of the Nativity in St. Mary's, Alaska. During 1973 and 1974, John Doe 3 was an alter boy at the Church of the Nativity, having been selected for that service by Convert. The Complaint alleges that on two separate occasions in 1973 and 1974, when John Doe 3 was 11 and 12 years old, Convert invited John Doe 3 to spend the night with Convert. When John Doe 3 arrived at Convert's living quarters, Convert played games and generally paid attention to John Doe 3. John Doe 3 was allegedly told that he would have to sleep in his under shorts. Convert allegedly slept in the same bed next to John Doe 3. The Complaint alleges that on each night John Doe 3 awoke to discover his penis being fondled by Convert and found that Convert was masturbating. Each time John Doe 3 allegedly moved Convert's hand away from his penis. Each time Convert allegedly pretended to be asleep.

John Doe 4 (Willie Long)—John Doe 4 was a member of the Church of the Nativity in St. Mary's, Alaska. In 1972 through 1974, John Doe 4 was an alter boy at the Church of the Nativity, having been selected for that service by Convert. The Complaint alleges that on an unknown date in 1972, 1973 or 1974 when John Doe 4 was 6, 7, or 8 years old, Convert invited John Doe 4 to spend the night with Convert. When John Doe 4 arrived at Convert's living quarters, Convert played games and generally paid attention to John Doe 4. John Doe 4 was allegedly told that he would have to sleep in his under shorts. Convert allegedly slept in the same bed next to John Doe 4. The Complaint alleges that John Doe 4 awoke to discover his penis and genitals being fondled by Convert. John Doe 4 was allegedly very frightened by the episode, but Convert allegedly pretended to be asleep. On one occasion, Convert allegedly insisted that John Doe 4 remove all of his clothing so that Convert could bathe John Doe 4. On another occasion, John Doe 4 saw Convert get out of bed in the morning with his genitals "hanging out."

John Doe 5—John Doe 5 was a member of the Church of the Nativity in St. Mary's, Alaska. Between 1972 and 1977, John Doe 5 was an alter boy at the Church of the Nativity, having been selected for that service by Convert. The Complaint alleges that on approximately 12 occasions on unknown dates in 1972, 1973, 1974, 1975, 1976 and 1977, when John Doe 5 was 8 to 13 years old, Convert invited

John Doe 5 to spend the night with Convert. When John Doe 5 arrived at Convert's living quarters, Convert played games and generally paid attention to John Doe 5. John Doe 5 was allegedly told that he would have to sleep in his under shorts. Convert allegedly slept in the same bed next to John Doe 5. The Complaint alleges that each night John Doe 5 awoke to discover his penis and genitals being fondled by Convert. John Doe 5 was very frightened by these episodes, but Convert allegedly pretended to be asleep. On several occasions, John Doe 5 awoke to find that Convert had placed John Doe 5's hand on Convert's erect penis.

John Doe 6—John Doe 6 was a member of the St. Theresa's Catholic Church in Kaltag, Alaska. Between 1956 and 1958, John Doe 6 was an alter boy at St. Theresa's, having been selected for that service by Convert. The Complaint alleges that on approximately 10 occasions, on unknown dates in 1956, 1957 and 1958, when John Doe 6 was 11 to 13 years old, Convert invited John Doe 6 to spend the night with Convert. When John Doe 6 arrived at Convert's living quarters, Convert played games and generally paid attention to John Doe 6. John Doe 6 was allegedly told that he would have to sleep in his under shorts. Convert allegedly slept in the same bed next to John Doe 6. The Complaint alleges that John Doe 6 awoke to discover his penis and genitals being fondled by Convert and masturbated by Convert. When John Doe 6 awoke, Convert pretended to be asleep.

Each of the plaintiffs allege they have suffered the following damages: great injury and harm, including but not limited to, severe emotional distress, great mental anguish, spiritual theft, loss of faith in God and the Catholic Church, loss of social interaction with others in the community, fear of priests, loss of access to the Holy Sacraments of the Roman Catholic Church, including but not limited to Holy Communion and Confession, and other economic and non-economic injury all to his damage in an amount in excess of $50,000.00. The plaintiffs further allege that they have suffered and continue to suffer severe and permanent emotional distress, resulting in physical manifestations, embarrassments, loss of self-esteem, humiliation and psychological injuries, were prevented and will continue to be prevented from performing their normal daily activities and obtaining full enjoyment of life, and have incurred and will continue to incur expenses for medical and psychological treatment, therapy and counseling, and on information and belief, have incurred and will continue to incur loss of income and/or loss of earning capacity.

The Complaint asserts the following claims against the Diocese of Fairbanks: Respondeat Superior, Aided in Agency, Negligent Hiring and Supervision, Tolling of the Statute of Limitations, Equitable Estoppel and Punitive Damages.

B.   Current Status

The parties engaged in a mediation involving the John Doe 1-4 claims on June 3, 2003. (John Does 5 & 6 were added to the amended complaint filed after the mediation.) The mediation took place before any discovery was completed. It appears the plaintiffs' expert psychologist was present at the mediation. The expert was of the opinion that the claimants are understating the nature of the abuse and that extensive counseling and therapy are warranted for these four claimants. Although plaintiffs indicated that they initially valued their claims at $1 million per claimant, plaintiffs demanded $150,000 each at mediation. Defendants offered $10,000 to each plaintiff, which was rejected.

It is our understanding that Catholic Mutual is defending the Diocese against these claims. If this is incorrect, please notify us as soon as possible.

II. ALLEGED CONTINENTAL POLICY

The Diocese of Fairbanks asserts Continental issued coverage to the Diocese under policy number SMP 2 39 06 21 effective some time in 1974. Neither the Diocese nor Continental have been able to locate a copy of the alleged policy. The Diocese provided the following documents purporting to provide evidence of the existence of the alleged policy:

- Correspondence dated February 28, 1974, from the Diocese of Fairbanks to Mr. Julian Robb, Continental Ins. Co. The letter states in part as follows: "Enclosed is a card which indicates that the recommendations made in your letter of February 19th have been complied with." The letter includes typed notations at the bottom as follows:

   Insured: Catholic Bishop of Northern Alaska

   Policy No.: SMP 2 39 06 21

   Location: 1312 Peger Road Fairbanks, Alaska

   The recommendations referred to in your letter of

   February 19, 1974 have been completed.

   Date: February 28, 1974

- Correspondence dated July 30, 1974, from the Diocese of Fairbanks to Supervising Inspector at Hartford Steam Boiler Insurance Co. The letter relates to modifications of certain conditions at two locations, Loyola Hall and the Sisters Residence. The letter further states, "We would like to call to the attention of your office the fact that the Catholic Diocese of Fairbanks is no longer (i.e. as of October 1973) insured through The Catholic Mutual Relief Society of America, but rather through LaBow, Haynes of Alaska, Inc." It appears this letter is in response to the May 31, 1974 letter discussed below.

- Correspondence from The Hartford Steam Boiler Inspection and Insurance Company dated May 31, 1974, to The Catholic Mutual Relief Society of America. This letter notes issues relating to two heating boilers at Loyola Hall and Sisters Residence.

- Correspondence dated March 11, 1974, from Continental Insurance Company to the Diocese of Fairbanks. This letter is in response to the Diocese's February 28 letter. The letter states that water-based paints to do not need to be put in a metal cabinet. The letter is signed by "J. A. Robb, Superintendent, Commercial Multi-Peril."

III. Reservation of Rights

As stated above, Continental agrees to participate in the defense of the *John Does 1-6* Complaint under a reservation of rights. It is our understanding that you are seeking coverage for the claims which allege acts of abuse during the alleged Continental policy period, 1974. It appears the allegations of John Doe 2, John Doe 3, John Doe 4 and John Doe 5 potentially fall within the alleged policy period. It is further our understanding that Catholic Mutual has also agreed to participate in the Diocese's defense with respect to the claims of John Doe 3 and John Doe 4. Please provide us with copies of any other insurers' policies which may be applicable to these claims. Please confirm that you

have provided notice to any insurers which may provide coverage for this claim and provide a copy of such notices and any response received from these insurers.

As indicated above, questions of coverage exist, as such Continental reserves the right to deny or limit coverage to the Diocese of Fairbanks on the following bases:

- Continental reserves the right to deny coverage to the extent that the claims do not allege "bodily injury" under any alleged Continental policy.

- Continental reserves the right to deny coverage to the extent that the claims do not allege an "occurrence" under any alleged Continental policy.

- Continental reserves the right to deny coverage to the extent the claims do not seek "damages" because of "bodily injury" arising out of an "occurrence" under any alleged Continental policy.

- To the extent an "occurrence" is alleged, Continental reserves the right to deny coverage to the extent that the claims do not allege "bodily injury" which occurred during any alleged Continental policy period.

- Continental reserves the right to deny coverage to the extent that the underlying claims do not seek recovery for "damages" within the meaning of any alleged Continental policy.

- Continental reserves the right to deny coverage under any alleged Continental policy to the extent that the alleged injury or damage was expected or intended from the standpoint of the insured.

- Continental reserves the right to deny coverage under any alleged Continental policy to the extent that the claims are not fortuitous.

- Continental reserves the right to deny coverage under any alleged Continental policy to the extent that the claims arise out of intentional acts of the insured.

- Continental reserves the right to deny coverage to the extent the insured has not complied with all of the "Conditions" of any alleged Continental policy.

- Continental reserves the right to deny coverage under any alleged Continental policy for punitive and/or exemplary damages.

- Continental reserves the right to deny coverage under any alleged Continental policy or seek contribution to the extent that there is other applicable insurance.

- Continental reserves the right to obtain reimbursement for amounts expended in the defense, settlement or resolution of uncovered claims.

- Continental reserves its right to deny or limit coverage based on any "Limit of Liability" provisions included in any alleged Continental policy.

- Continental reserves the right to withdraw from the defense if it is determined that the alleged Continental policy does not provide coverage or if all potentially covered claims are dismissed.

- Continental reserves the right to refuse to pay any indemnity expenses in the event the Diocese is unable to prove the policy period, terms, conditions and/or limits of any alleged Continental policy.

Our coverage position is based on facts and issues presently available. This reservation of rights is not meant to be all-inclusive. Continental reserves the right to assert any additional Policy term or condition as to coverage defenses that might be applicable. If you are served with an amended complaint or if you have additional information that you believe would impact the coverage position taken herein, please forward it to us for review. Continental reserves the right to raise Policy terms at any time, as well as all other legal, equitable or contractual rights it may have, and nothing in this letter is to be construed as a waiver of any Policy term or other grounds not expressed in this letter. Continental reserves the right to amend its coverage position upon receipt of any additional information.

No actions previously taken, or hereafter taken, in the investigation and handling of this matter are intended to be nor should be construed as an admission of coverage or a waiver of Continental's rights under the alleged policies. The right to deny coverage in total or in part as further information is received is specifically reserved.

We request that you provide us with all information relating to this claim, including Jules Convert's personnel files and any information or documents which indicate that Jules Convert sexually abused or posed a risk to children at any time.

If you have any questions or wish to discuss this matter, please contact me.

Respectfully,

Tracy L. Smith

cc: Reverend Richard Case
    Catholic Bishop of Northern Alaska
    1316 Peger Road
    Fairbanks, Alaska  99709-5199