# Exhibit C

11/3/05

IN THE SUPERIOR COURT OF THE STATE OF ALASKA

SECOND JUDICIAL DISTRICT AT NOME

| | |
|---|---|
| JANE DOE 2, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| JAMES E. POOLE, S.J.; CATHOLIC BISHOP | ) |
| OF NORTHERN ALASKA; THE SOCIETY | ) |
| OF JESUS, OREGON PROVINCE; and | ) |
| THE SOCIETY OF JESUS, ALASKA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Case No. 2NO-04-83 CI [BJE]

## MEMORANDUM OF COUNSEL IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT AS BEING BARRED BY THE DOCTRINE OF LACHES

### I. INTRODUCTION

Defendant Catholic Bishop of Northern Alaska ("CBNA") earlier filed for

summary judgment based upon the statute of limitations set forth at AS 09.10.070.

Should the court decline to apply AS 09.10.070, and in the alternative to dismissal

upon the applicable statute of limitations, plaintiff's complaint should be dismissed

under the equitable doctrine of laches.

### II. FACTS

Plaintiff alleges that Father James Poole, S.J. ("Poole") sexually molested her

from 1974-1978, when she was ages 12-15.[1]  She asserts that Poole's behavior

consisted of touching, fondling, kissing, and sexual intercourse.[2]  She further alleges

COOK SCHUHMANN
& GROSECLOSE, INC.
714 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRBANKS, AK 99707-0810

(907) 452-1855
FACSIMILE
(907) 452-8154

---

[1] See _Second Amended Complaint_ at ¶¶ 15-17.
[2] See _Id._, ¶¶ 16-17.

EXHIBIT ___C___
Page ___1___ of ___11___

that the abuse occurred on CBNA property.[3] Plaintiff seeks to collect compensatory and punitive damages under multiple theories: sexual abuse of a minor, sexual assault, *respondeat superior*, negligent retention and supervision, "aided in agency," fiduciary fraud, breach of fiduciary duty, hindering prosecution, "fraud and deceit," and spoliation of evidence.[4]

As stated in the accompanying Affidavit of George Bowder, CBNA's Finance Director, CBNA is prejudiced in the two decades delay in plaintiff's filing suit because of 1) the absence of key evidence (including unavailable key witnesses), and 2) CBNA's reliance to its detriment in securing insurance and the extent it took to maintain proof of insurance in the light of the decades old passage of time.

Plaintiff's complaint is barred by the doctrine of laches due to her unreasonable delay in filing suit and the very real prejudice faced by CBNA in defending this decades old claim.

### III. ARGUMENT

#### A. Doctrine of Laches.

Alaskan courts have recognized the doctrine of laches as being an equitable defense applicable when an unreasonable time period has elapsed between the time of the alleged grievance and the moment that the plaintiff brought forward the claim.[5]

---

[3] *Id.* at ¶ 15.  CBNA owns and operates the KNOM radio station.
[4] *See generally* Plaintiff's Second Amended Complaint.  CBNA has separately filed motions seeking summary judgment alternatively, and separately, as to plaintiff's breach of fiduciary responsibility and spoliation theories.
[5] *See Wolff v. Arctic Bowl, Inc.*, 560 P.2d 758, 767 (Alaska 1977); *Bibo v. Jeffrey's*, 770 P.2d 290, 293 (Alaska 1989); *T.P.D. v. A.C.D.*, 981 P.2d 116,120 (Alaska 1999).

COOK SCHUHMANN
: GROSECLOSE, INC.
14 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRP • NKS, AK 99707-0810

.-7) 452-1855
FACSIMILE
(907) 452-8154

Memorandum of Counsel in Support of CBNA's Motion for Summary Judgment Re Laches
Doe 2 v. Poole et al., 2NO-04-83 CI [BLE]
Page 2

EXHIBIT    C
Page    2    of    11

Essentially, the doctrine of laches is used as a protective measure so that defendants will not suffer undue prejudice as a result of unreasonable delay.[6]

The period of delay for laches starts to run when the party discovers or could have discovered the wrong of which she complains or where, in light of any resulting prejudice to the defendant, it becomes reasonable to expect the plaintiff to have acted earlier to bring the matter before the court.[7] Here, the reasonable time period should have started within a few years of when Jane Doe 2 became an adult and was sufficiently aware of her claim as to report the events to others.

### B.    Plaintiff unreasonably delayed in filing suit.

By the early 1980s, when plaintiff was "twenty-something," she had reported the abuse to her cousin.[8] She testified that she had even earlier, when age 15-16, reported the abuse to another priest in confession.[9] Had suit been timely filed within two years of plaintiff's reaching age 18 (by roughly mid-1982), important and critical evidence would have been preserved, while testimony relevant to the case could have been recorded and administered when many key witnesses were available. As it stands now, the complaint filed 22 years later finds many critical witnesses unavailable.[10] CBNA's bishops during the time of Poole's Alaska tenure are all deceased.[11] Plaintiff's "receiving home" guardians or custodians, and her principal

---

[6] Id.
[7] See T.P.D. 981 P.2d at 120.
[8] Jane Doe 2's Deposition at pages135-137.
[9] Jane Doe 2's Deposition at page 289.
[10] See Affidavit of George Bowder, attached.
[11] Id.

COOK SCHUHMANN
: GROSECLOSE, INC.
14 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRBANKS, AK 99707-0810

(907) 452-1855
FACSIMILE
(907) 452-8154

Memorandum of Counsel in Support of CBNA's Motion for Summary Judgment Re Laches
Doe 2 v. Poole et al., 2NO-04-83 CI [BLE]
Page 3

EXHIBIT    C
Page    3    of    17

counselor during the time of alleged abuse are now available.[12]  CBNA has relied to its

detriment upon the absence of certain claims in placing its insurance coverage and in

its records retention practices.[13]  CBNA's insurance information covering the 1975-78

timeframe is incomplete, placing CBNA in peril of not having coverage.[14]

The Alaska Supreme Court has addressed the doctrine of laches in non-

personal injury contexts.[15]  Given that Alaska has had a two year tort statute of

limitations (AS 09.10.070) since statehood, it is not surprising that there is an absence

of cases invoking the equitable doctrine of laches in a personal injury context.  The two

year time limit created a conclusive presumption of prejudice barring later filed

claims.[16]

Because most causes of action are subject to a statute of limitations, laches is

"irrelevant unless it bars the claim before the limitations period expires."[17]  Should

plaintiff be authorized to proceed under the suggestion that her claims are not limited

by AS 09.10.070,[18] then the laches defense is very much relevant to foreclose those

instances when a plaintiff's delay was not excused or when a defendant is prejudiced

by the delay.[19]  Hence, even should a plaintiff's delay be "excused" as being permitted

---

[12] *Id.*

[13] Affidavit of George Bowder.

[14] *Id.*

[15] *See* Note 5 *supra.*

[16] *See Bibo,* 770 P.2d 290.

[17] Laycock, *Modern American Remedies,* p. 932 (1994).

[18] Plaintiff has argued that the 2001 enactment of AS 09.10.065 (as currently codified) entitles her to sue "at any time" for sexual abuse of a minor.  The briefing on the statute of limitations is separately before the court and was argued to the court on September 26, 2005.

[19] *Id.* at 931.

COOK SCHUHMANN
& GROSECLOSE, INC.
14 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRBANKS, AK 99707-0810

(907) 452-1855
FACSIMILE
(907) 452-8154

Memorandum of Counsel in Support of CBNA's Motion for Summary Judgment Re Laches
Doe 2 v. Poole et al., 2NO-04-83 CI [BLE]
Page 4

EXHIBIT ___C___
Page _4_ of _17_

as within a statute of limitations (or no longer subject to a repealed statute) or "permitted" upon the rationale that the claim arose later in time from the precipitating events (as is alleged in particular as to plaintiff's "fraud" claims),[20] the laches defense founded upon resulting prejudice justifies dismissal.

### C.    CBNA is prejudiced by plaintiff's unreasonable delay.

The equitable doctrine of laches has been applied in a variety of contexts, with each case outcome being fact dependent.[21] In this case, because of the extended time that has passed, memories and witnesses concerning the allegations have been lost or destroyed which would be important to mount a defense.[22] For example, plaintiff has taken the deposition of David Bouker, a volunteer at St. Mary's School during the 1960-61 school year, to support her allegations of negligent retention and supervision.[23] Mr. Bouker related having had a discussion with CBNA's Bishop Gleeson about Poole's counseling sessions with girls being longer than Bouker would have expected.[24] Buttressed by Bouker's testimony, plaintiff's complaint asserts that

---

[20] Second Amended Complaint at p. 15.

[21] In *Smith v. The Baptist Foundation of Oklahoma* the court determined that "[l]aches is an equitable defense to stale claims. There is no arbitrary rule for when a claim becomes stale or what delay is excusable. *Application of the doctrine is discretionary depending on the facts and circumstances of each case as justice requires.*" 50 P.3d 1132, 1138 (Ok 2002) (emphasis added). Similarly in *Bill v. Board of Education of Cicero School District*, 812 N.E.2d 604, 610 (Illinois 2004), it was concluded that laches was an acceptable equitable defense.

[22] "The doctrine of laches protects against a proceeding instituted...without diligence and where the delay and thus the fault of one party results in an unfair advantage over his adversary. The existence of laches is primarily determined, not by lapse of time, but by considerations of justice." *See Taylor v. Salt Creek Consol. Oil Co.*, 285 F.532, 538 (Eighth Cir. 1922).

[23] Second Amended Complaint at page 8.

[24] Deposition of David Bouker at pages16-18.

COOK SCHUHMANN
. GROSECLOSE, INC.
14 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRP **KS, AK 99707-0810

. ..) 452-1855
FACSIMILE
(907) 452-8154

Memorandum of Counsel in Support of CBNA's Motion for Summary Judgment Re Laches
Doe 2 v. Poole et al., 2NO-04-83 CI [BLE]
Page 5

EXHIBIT   C
Page   5   of   17

CBNA was apprised in 1960-61 of Poole's behavior sufficient to cause CBNA to remove Poole from service.[25]

Bishop Gleeson was succeeded as bishop by Bishop Whelan in 1968.[26] Bishop Whelan was in turn succeeded as bishop by Bishop Kaniecki in 1985, who served up through Poole's Alaska service, ending in 1986.[27] All three bishops are deceased and were so in 2004 when plaintiff filed her complaint.[28] CBNA is prejudiced in being unable to present evidence by its previous bishops on the rationale or basis for steps taken by Bishop Gleeson, or Bishop Whelan, relating to Fr. Poole's Alaska service. While it is a stretch of logic to equate long counseling sessions with notice of sex abuse, that is nevertheless the foundational point upon which plaintiff's claims CBNA is directly liable to her for Poole's misconduct.

Further prejudice faced by CBNA relates to reconstructing the plaintiff's whereabouts, state of mind, and activities during the 1974-78 period of alleged abuse. Plaintiff has testified to being at the "Nome Receiving Home" and under the care of a certain counselor during the general timeframe of her being in Nome where the alleged abuse occurred. As noted by the accompanying Affidavit of Counsel, this key witness appears to have left Alaska to parts unknown, despite diligent inquiry. Seeking to reconstruct events from over two decades ago is frustrated by diminished or lost memories.[29]

---

[25] <u>Second Amended Complaint</u> at page 8.
[26] Bowder Affidavit.
[27] *Id.*
[28] *Id.*
[29] Affidavit of Counsel.

COOK SCHUHMANN
& GROSECLOSE, INC.
14 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRBANKS, AK 99707-0810

(907) 452-1855
FACSIMILE
(907) 452-8154

Memorandum of Counsel in Support of CBNA's Motion for Summary Judgment Re Laches
Doe 2 v. Poole et al., 2NO-04-83 CI [BLE]
Page 6

EXHIBIT      C
Page    6  of   11

In *State ex rel. Webb, M.D. v. West Virginia Board of Medicine,* [30] it was determined that the doctrine of laches precluded a disciplinary proceeding based upon a doctor's alleged sexual misconduct.[31] In that case, a psychiatrist had engaged in sexual intercourse with a patient, but the complaint arose some 13 years after the alleged misconduct.[32] There was insufficient evidence to explain the delay and there was acknowledged resulting prejudice from the delay.[33]

Plaintiff's complaint is similarly founded upon misconduct of more than two decades. As noted, given plaintiff's acknowledgement of the abuse no later that the early 1980s to her cousin, her delay in filing suit until 2004 is unreasonable. While she has posed the excuse of being unaware of her right to sue CBNA until consulting a lawyer in recent years, that justification is offset in the balancing of considerations by the very real resulting prejudice associated with the delay. The foundational basis of laches was designed to combat this very type of delay.

Laches is applicable "[p]articularly...where witnesses have died or their memories become dim or time and long acquiescence have obscured the nature and character of the trust or the acts of the parties or other circumstances give rise to presumptions unfavorable to its continuance."[34]

CBNA faces real prejudice in the loss of evidence and the ability to address plaintiffs' claims. Memories have faded, recordings have become ~~dilapidated~~ deteriorated, and

---

[30] 506 S.E.2d 830 (W.V. 1998).
[31] *Id.* at 835-36.
[32] *Id.* at 835.
[33] *Id.*
[34] *See O'Bryne v. Scofield,* 212 P.2d 867, 871 (Colo. 1949).

COOK SCHUHMANN
& GROSECLOSE, INC.
714 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRBANKS, AK 99707-0810

(907) 452-1855
FACSIMILE
(907) 452-8154

Memorandum of Counsel in Support of CBNA's Motion for Summary Judgment Re Laches
Doe 2 v. Poole et al., 2NO-04-83 CI [BLE]
Page 7

EXHIBIT C
Page 7 of 17

pertinent information is unavailable.  The customary means of calling pertinent witnesses and producing evidence contemporary to the alleged events is foreclosed by plaintiff's unreasonable delay.

## IV. CONCLUSION

The doctrine of laches is applicable here because it bars untimely claims presented when there has been ensuing prejudice, which could have been otherwise avoided with timely processing.  For the reasons stated, and in the alternative to other bases briefed to the court, the court should hold that plaintiffs' Second Amended Complaint is barred by the doctrine of laches.

DATED at Fairbanks, Alaska, this ___3___ day of November, 2005.

COOK SCHUHMANN & GROSECLOSE, INC.
Attorneys for CBNA

By _____
Robert B. Groseclose #7605032

**CERTIFICATE OF SERVICE**

This is to certify that on the 3rd day of November, 2005, a copy of the foregoing document was provided to the following attorneys/parties of record in the following manner:
___✓__Mail  _____ Hand Delivery  ____ Courier  ____ Telefax

| | |
|---|---|
| Kenneth S. Roosa, Esquire<br>Cooke, Roosa & Valcarce, LLC<br>3700 Jewel Lake Road<br>Anchorage, AK 99502 | John C. Manly, Esquire<br>Manly & McGuire<br>555 Anton Boulevard, Suite 1200<br>Costa Mesa, CA  92626 |
| H. Conner Thomas<br>Lewis & Thomas<br>PO Box 61<br>Nome, Alaska  99762 | James M. Gorski<br>Hughes, Bauman, Pfiffner, Gorski & Seedorf LLC<br>3900 C Street, Suite 1001<br>Anchorage, AK  99503 |
| Timothy M. Lynch, Esquire<br>Lynch & Blum, PC<br>425 G. Street, Suite 320<br>Anchorage, AK 99501 | |

Valerie J. Peel              11-03-05
for Cook Schuhmann & Groseclose, Inc.    Date

COOK SCHUHMANN
& GROSECLOSE, INC.
'14 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRBANKS, AK 99707-0810

...07) 452-1855
FACSIMILE
(907) 452-8154

Memorandum of Counsel in Support of CBNA's Motion for Summary Judgment Re Laches
Doe 2 v. Poole et al., 2NO-04-83 CI [BLE]
Page 8

EXHIBIT ___C___
Page ___8___ of ___17___

Page 134

1  your father?
2    A  Just about him hurting me.
3    Q  Okay.  When you talked to Tom Busch
4  and you said you tried to tell people earlier
5  about Jim Poole, did you -- who besides your
6  mother did you try to tell about Poole?
7    A  When I was -- just -- everybody
8  else -- right now they know, you know, they know
9  last year --
10   Q  Right.
11   A  -- only after because my brother
12  started talking about it in the open.
13   Q  Your brother started talking about
14  Poole?
15   A  Because it was on the radio and my
16  brother knew, you know, who I was talking about,
17  because I didn't tell him his name.  He came up
18  to me and tell me -- my brother say, so I hear
19  Father Poole say he doesn't know you, huh?  Now
20  he don't know you?  I said, yeah.
21   Q  Okay.  Your phone call to Tom Busch,
22  did that occur -- let me try to clear up just
23  one point.
24      When you talked to Tom Busch -- and I
25  don't mean to repeat myself -- but when you

Page 135

1  talked to Tom Busch to report what Poole had
2  done and you said you tried to tell people
3  earlier, were you referring to anybody besides
4  your mother that you had tried to tell earlier
5  about Poole?
6    A  My cousin, Freda.  I told her.  Then
7  she was living at New York, New Jersey.  Right
8  now she's living in Anchorage.
9    Q  What is Freda's full name?
10   A  Freda Irene Dan.
11   Q  Freda -- and when did you try to tell
12  Freda Dan?
13   A  When I was younger.
14   Q  How young?
15   A  Twenty-something.
16   Q  Twenty-something.  And where was she
17  living at the time that you tried to tell her?
18   A  New York, New Jersey.
19   Q  Back east, in other words?
20   A  Yeah.
21   Q  How did you do this?  Was it a
22  telephone call?
23   A  Through letters.
24   Q  Through letters.
25   A  And then, you know, talking when she

Page 136

1  came for visits.  And she said, ooh, did he
2  really do that to you?  Gross.  Because she, you
3  know, said, gross, you know.
4    Q  You used Poole's name?
5    A  Yes.
6    Q  And you told her that Poole had had
7  intercourse with you?
8    A  Uh-huh.
9    Q  And you told her that Poole had had
10  you masturbate him, correct?
11   A  I tried to tell her everything that I
12  was doing because I had nobody else to talk to
13  that would listen to me other than her.
14   Q  Okay.  What does Ms. Dan do for a
15  living?
16   A  She's a -- she's a homemaker.  She's
17  got five kids.
18   Q  And is she -- she's married, I assume?
19   A  She's married.
20   Q  What does her husband do?
21   A  I think he's a carpenter.  He builds
22  things and fix things.
23   Q  Okay.  They live in Anchorage?
24   A  Yes.
25   Q  Okay.  And so you told her this and

Page 137

1  you figure you were 20 or thereabouts?
2    A  Twenty-something, I said.
3    Q  Okay.  Twenty-something.  That's fine.
4  I'm just trying to get the details.  Okay.
5      Did she make any recommendations as to
6  what you should do?
7    A  No.  She just -- the way I told you,
8  she was saying, gross, ooh, he did that to you?
9    Q  Did you tell her that you had an
10  abortion?
11   A  Yeah.
12   Q  And did you tell her that Poole was
13  the father of the baby that was aborted?
14   A  I didn't tell her that.  I tell her --
15  I was, you know, being -- when I said my father
16  did it, it went through all my family and my
17  family didn't believe me.  They hated my guts
18  for that, for saying it.
19   Q  Okay.  Why didn't you tell Ms. Dan --
20  you told her you were having intercourse with
21  Poole.  Why didn't you tell her he was the
22  father?
23   A  I don't know.
24   Q  Okay.  But you did tell her you were
25  having intercourse?

35 (Pages 134 to 137)

bdcc3134-5f07-44b1-80e1-84c6de77c54f

EXHIBIT  C
Page  9  of  17

Page 286

1    Q   Thank you, Ms. Mike.
2        MR. GORSKI:  I have no other
3   questions.
4        MR. LYNCH:  I have no questions.
5        MR. ROOSA:  Okay.  I want to ask you a
6   few questions, Mrs. Mike -- Ms. Mike.
7             EXAMINATION
8    Q   (BY MR. ROOSA)  Were your mother and
9   father Catholic?
10   A   In the beginning we used to go to that
11  one church first, the --
12   Q   St. Bernard's?
13   A   The Protestant church before they
14  changed it to Assembly of God.
15   Q   Okay.
16   A   We were there -- young kids going
17  there, but then if I can remember, we were five
18  or -- I was five going on six.  They wanted
19  to -- our family wanted to go, you know, back to
20  the Catholic Church.
21   Q   Had they been Catholic before they
22  went to this other church?
23   A   I think so, yeah.
24   Q   Now, you were only five or six.  Do
25  you recall at five or six or thereafter being

Page 287

1   baptized in the Catholic Church?
2    A   The day I was born, April 21, 1962,
3   was when they rushed me to the clinic -- I mean
4   to the church to get baptized.
5    Q   Okay.  And you don't remember that, I
6   take it?
7    A   No.
8    Q   Okay.  And who's the first Catholic
9   priest that you knew as your pastor?
10   A   Father Endahl.
11   Q   Father George Endahl?
12   A   Father George Endahl.
13   Q   And to whom did you say your First
14  Confession?
15   A   Father George Endahl.
16   Q   And to whom did you say your First
17  Communion -- have your First Communion?  Excuse
18  me.
19   A   Father George Endahl.
20   Q   And who was the bishop who performed
21  your confirmation?
22   A   Father Bishop Whelan -- not Father
23  Bishop.  Just Bishop Whelan.
24   Q   Bishop Whelan.  Were there any deacons
25  in your village when you were going up?

Page 288

1    A   Yes.
2    Q   Who were they?
3    A   Joseph Lundowski and Anthony Smario
4   (ph).
5    Q   And did you know both of those men?
6    A   Yes, I did.
7        MR. GORSKI:  Who was the second one?
8        MR. ROOSA:  Smario.  Joseph Lundowski
9   and Anton Smario, Anthony Smario.
10   Q   Did you know both of those men?
11   A   Yes, I did.
12   Q   Did either of them assist you in
13  learning your catechism?
14   A   Yes.
15   Q   Who was that?
16   A   Sometimes it was Joseph Lundowski and
17  then he'd go to St. Michael's and then
18  Mr. Smario would take over, along with other
19  helpers from the village, like Joseph Steve
20  would be helping him and Minnie Aluska (ph).
21  They were the helpers, too, because there was a
22  whole bunch of kids.
23   Q   At any point during your life as an
24  adolescent, a teenaged girl, or as a young
25  adult, did you ever discuss what had took

Page 289

1   place -- taken place between you and Father
2   Poole in a confessional setting?
3    A   Yes.  I've said it to Father Endahl
4   trying to get help, you know, because I felt --
5   because I felt dirty and...
6    Q   And when was that?  How old do you
7   think you were?
8    A   Fifteen going on 16.
9    Q   Okay.  And --
10   A   Oh, I think a few weeks after
11  because -- or months, because it was a
12  springtime when I went to church and because I
13  had to practice my, you know -- because they
14  teach us how you have to be -- read like a
15  little book before you're confessing.
16   Q   Is that a book on how to go to
17  confession you're talking about?
18   A   Yes.
19   Q   And when you commenced the confession,
20  do you start by saying, Bless me, Father, for I
21  have sinned?  Is that the --
22   A   Yeah, yeah.
23   Q   Did you tell Father Endahl about this
24  before or after the abortion?
25   A   After the abortion.

73 (Pages 286 to 289)

bdcc3134-5f07-44b1-80e1-84c6de77c54f

EXHIBIT   C
Page  10  of  17

JANE DOE 2 v POOLE, ET AL.

DAVID BOUKER
5/23/2005

**Page 16**

1 Poole, how was it that you knew that he was meeting
2 with girls?
3 A. Oh, you could see the girls in there.
4 Although you couldn't see around the L-shaped
5 office, but you could see them in there as you
6 walked by if the curtain wasn't pulled. And I
7 vaguely recall the curtain being pulled on a couple
8 of occasions.
9 Q. Could you see Father Poole?
10 A. Most of the time just -- most of the time
11 you could see him, yes.
12 Q. Could you hear what they were saying?
13 A. No. The door would be closed.
14 Q. Did Father Poole ever tell you why he was
15 meeting with these kids?
16 A. No.
17 Q. Did you ever ask him?
18 A. No.
19 Q. Did anyone ever ask you about anything that
20 you thought should -- did anybody ever ask you a
21 question that caused you to talk about what you had
22 seen?
23 A. Yes.
24 Q. Who was that person?
25 A. That was Bishop Gleeson.

**Page 17**

1 Q. And when did Bishop Gleeson ask you this?
2 A. I don't recall the exact date. I sort of
3 suspect that it probably would be in the fall of
4 1960 or the spring of 1961 when he came down there.
5 I don't know why he came.
6 And the thing that sort of surprised -- it
7 was the first time I ever met a bishop. And the
8 thing that sort of surprised me was why would he
9 come to me, ostensibly the lowest person on the
10 totem pole, and ask me how things were going and
11 what I thought about the program.
12 Q. Is that what happened?
13 A. Yes.
14 Q. And where were you when he came to you?
15 Physically where were you located?
16 A. I think that we were located in the
17 recreation room of the priests. It was a
18 recreation room, library type of place.
19 Q. Was there anyone there other than you and
20 Bishop Gleeson?
21 A. I don't recall anybody else being there.
22 Q. And to the best of your recollection, what
23 did Bishop Gleeson say to you?
24 A. How are things going, or something like
25 that. The fact of the matter is he asked me if we

**Page 18**

1 could speak in my room.
2 I had a private room, and he wanted to speak
3 in private to me. And he wanted to know how things
4 were going. And I said, "Well, fine."
5 And we engaged in some small talk, and then
6 I said there was one thing that bothered me though.
7 I said there was probably nothing to it, but I
8 thought that these girls of a certain age were
9 spending an inordinate amount of time in Father
10 Poole's office.
11 It didn't look right and all of the girls
12 were of the same age. And I am not a prude, but it
13 did not look right to me.
14 Q. When you say "girls of a certain age," what
15 age do you recall that to be?
16 A. As I vaguely recall, these would be girls 12
17 or 13 years old.
18 Q. What was the bishop's response when you told
19 him what you had observed and what your reaction
20 was?
21 A. He didn't have a response. He just listened
22 to me and nodded. After he left -- and I don't
23 remember how many days he stayed there. It wasn't
24 very long.
25 After he left, I didn't see any change in

**Page 19**

1 this matter of the young girls spending so much
2 time in Father Poole's office.
3 Q. Do you know if the bishop performed any
4 confirmations while he there was, any religious
5 ceremonies of any kind?
6 A. I don't remember.
7 Q. Were you yourself Catholic?
8 A. Yes, I was.
9 Q. So you had met priests and religious people
10 before?
11 A. Yes.
12 Q. This was the first time you had ever met a
13 bishop?
14 A. Yes.
15 Q. Did the bishop say or do anything to
16 acknowledge understanding and hearing what you were
17 saying?
18 A. If he did, at the time, it didn't appear
19 that he did anything about it.
20 Q. And so did you continue to work there as a
21 lay volunteer?
22 A. Yes. I left in, I believe it was the first
23 week of July of 1961.
24 Q. You had been there how long?
25 A. Fifteen months.

7 (Pages 16 to 19)

PACIFIC RIM REPORTING
907-272-4383

EXHIBIT C
Page 11 of 17

IN THE SUPERIOR COURT OF THE STATE OF ALASKA

SECOND JUDICIAL DISTRICT AT NOME

JANE DOE 2,                                    )
                                               )
              Plaintiff,                       )
                                               )
vs.                                            )
                                               )
JAMES E. POOLE, S.J.; CATHOLIC BISHOP          )
OF NORTHERN ALASKA; THE SOCIETY                )
OF JESUS, OREGON PROVINCE; and                 )
THE SOCIETY OF JESUS, ALASKA,                  )
                                               )
              Defendants.                      )
_____)

Case No. 2NO-04-83 CI [BJE]

**AFFIDAVIT OF GEORGE W BOWDER**

STATE OF ALASKA            )
                           )   ss.
FOURTH JUDICIAL DISTRICT   )

        I, George W Bowder, being first duly sworn, state that:

        1.      I am the Finance Director for Catholic Bishop of Northern Alaska

("CBNA"). I began working with CBNA as "Diocesan Treasurer" in 1978, but have since

acquired the title of Finance Director. I submit this affidavit upon personal knowledge

and belief in support of CBNA's Motion to Dismiss Plaintiff's Complaint as Being Barred

by the Doctrine of Laches.

        2.      CBNA's records indicate that CBNA was established in the early 1950s,

and has been served by the following bishops:

        1952 -1968 - Bishop Francis Gleeson, S.J. (died April 30, 1983)

        1968 -1985 - Bishop Robert Whelan, S.J. (died September 15, 2001)

        1985- 2000 - Bishop Michael Kaniecki, S.J. (died August _6_, 2000)

EXHIBIT _C_
Page _12_ of _17_

August 2002-to the present - Bishop Donald Kettler.

2.      CBNA's records of insurance during the 1970s are incomplete. CBNA no longer has copies of the policies available to it over two decades ago, despite diligent search and inquiry. I have sought to reconstruct insurance information from the 1970s. CBNA has been presented with "reservations of rights" by the two carriers it has notified as to the 1970s occurrences claimed under plaintiff's complaint. Those reservations are based in part upon lack of sufficient policy information, which is no longer available though the lapse of the intervening decades. .

DATED this _2nd_ of November, 2005.



George W Bowder

SUBSCRIBED AND SWORN to before me this _2nd_ day of November, 2005.

_Geraldine M. Jauhola_
Notary Public in and for the State of Alaska
My Commission expires: _12/25/2007_

OFFICIAL SEAL
GERALDINE M. JAUHOLA
NOTARY PUBLIC, STATE OF ALASKA
MY COMMISSION EXPIRES 12/25/2007

**CERTIFICATE OF SERVICE**

This is to certify that on the _2nd_ day
of November, 2005, a copy of the foregoing
document was provided to the following attorneys/parties
of record in the following manner:
✓ Mail ____ Hand Delivery ___ Courier ____ Telefax

| Kenneth S. Roosa, Esquire | John C. Manly, Esquire |
|---|---|
| Cooke, Roosa & Valcarce, LLC | Manly & McGuire |
| 3700 Jewel Lake Road | 555 Anton Boulevard, Suite 1200 |
| Anchorage, AK 99502 | Costa Mesa, CA 92626 |
| H. Conner Thomas | James M. Gorski |
| Lewis & Thomas | Hughes, Bauman, Pfiffner, Gorski & Seedorf LLC |
| PO Box 61 | 3900 C Street, Suite 1001 |

Affidavit of George Bowder
Jane Doe 2 vs. James E. Poole, S.J., et al., 2NO-04-83 CI [BJE]
Page 2 of 3

EXHIBIT __C__
Page __13__ of __17__

| Nome, Alaska 99762 | Anchorage, AK 99503 |
|---|---|
| Timothy M. Lynch, Esquire<br>Lynch & Blum, PC<br>425 G. Street, Suite 320<br>Anchorage, AK 99501 | |

*Valerie L. Peel*   11-3-05

for Cook Schuhmann & Groseclose, Inc.   Date

Affidavit of George Bowder
<u>Jane Doe 2 vs. James E. Poole, S.J.</u>, et al., 2NO-04-83 CI [BJE]
Page 3 of 3

EXHIBIT   C
Page  14  of  17

IN THE SUPERIOR COURT OF THE STATE OF ALASKA

SECOND JUDICIAL DISTRICT AT NOME

JANE DOE 2,                                     )
                                                )
                    Plaintiff,                  )
                                                )
vs.                                             )
                                                )
JAMES E. POOLE, S.J.; CATHOLIC BISHOP           )
OF NORTHERN ALASKA; THE SOCIETY                 )
OF JESUS, OREGON PROVINCE; and                  )
THE SOCIETY OF JESUS, ALASKA,                   )
                                                )
                    Defendants.                 )
                                                )

Case No. 2NO-04-83 CI [BJE]

### AFFIDAVIT OF COUNSEL

STATE OF ALASKA            )
                           )    ss.
FOURTH JUDICIAL DISTRICT   )

I, Robert B. Groseclose, being first duly sworn, depose and state:

1.      I represent Catholic Bishop of Northern Alaska ("CBNA") in the above captioned matter.

2.      In the course of her deposition, plaintiff testified to residing at the "Nome Receiving Home" during various times of her alleged abuse.  She testified to being counseled by a number of counselors, including Ernie Collins, who she identified as her principal counselor.

3.      I have personally placed numerous phone calls and engaged the services of others to assist in tracking down Mr. Collins, and others identified by plaintiff as counseling or working with her in 1974-1978.  After considerable effort and inquiry, I

COOK SCHUHMANN
. GROSECLOSE, INC.
14 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRP···KS, AK 99707-0810

·/) 452-1855
FACSIMILE
(907) 452-8154

EXHIBIT  C
Page 15 of 17

reached a deadend in locating Mr. Collins. The last report through his ex-wife was that he had left the country a number of years ago and was unresponsive to messages.

4.    Even in the instances where my office was successful in locating some witnesses named by plaintiff or those suggested by records as having had contact with plaintiff in the 1970s, the passage of time resulted in numerous "I don't remember" or "I have no memory separate from the records" from a number of these individuals, including the medical doctor, Dr. Moser, identified as covering plaintiff's home village during the years in question.

5.    In my nearly 30 years of practice, this case presents challenges uniquely encountered in trying to reconstruct events from many decades ago. The freshness of evidence is simply not there in the manner customarily encountered in cases timely filed. Witnesses are either unavailable or those available have diminished or lost memories eroded with the passage of time.

DATED this __3__ of November, 2005.

_____
Robert B. Groseclose

SUBSCRIBED AND SWORN to before me this 3rd day of November, 2005.

_____
Notary Public in and for the State of Alaska
My Commission expires: 08-26-09

(SEAL)

COOK SCHUHMANN
& GROSECLOSE, INC.
14 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRBANKS, AK 99707-0810

(907) 452-1855
FACSIMILE
(907) 452-8154

Affidavit of Counsel
Jane Doe 2 vs. James E. Poole, S.J., et al., 2NO-04-83 CI [BJE]
Page 2 of 3

EXHIBIT ___C___
Page __16__ of __17__

## CERTIFICATE OF SERVICE

This is to certify that on the ___ day
of November, 2005, a copy of the foregoing
document was provided to the following attorneys/parties
of record in the following manner:
✓ Mail ____ Hand Delivery ____ Courier ____ Telefax

| | |
|---|---|
| Kenneth S. Roosa, Esquire<br>Cooke, Roosa & Valcarce, LLC<br>3700 Jewel Lake Road<br>Anchorage, AK 99502 | John C. Manly, Esquire<br>Manly & McGuire<br>555 Anton Boulevard, Suite 1200<br>Costa Mesa, CA 92626 |
| H. Conner Thomas<br>Lewis & Thomas<br>PO Box 61<br>Nome, Alaska 99762 | James M. Gorski<br>Hughes, Bauman, Pfiffner, Gorski & Seedorf LLC<br>3900 C Street, Suite 1001<br>Anchorage, AK 99503 |
| Timothy M. Lynch, Esquire<br>Lynch & Blum, PC<br>425 G. Street, Suite 320<br>Anchorage, AK 99501 | |

Valerie J. Peel     11-3-05
for Cook Schuhmann & Groseclose, Inc.    Date

COOK SCHUHMANN
& GROSECLOSE, INC.
14 FOURTH AVE., SUITE 200
POST OFFICE BOX 70810
FAIRBANKS, AK 99707-0810

(J7) 452-1855
FACSIMILE
(907) 452-8154

Affidavit of Counsel
Jane Doe 2 vs. James E. Poole, S.J., et al., 2NO-04-83 CI [BJE]
Page 3 of 3

EXHIBIT ___C___
Page __1__ of __1__