# Exhibit G

1

1   IN THE UNITED STATES DISTRICT COURT

2   FOR THE DISTRICT OF ALASKA

3

4   CONTINENTAL INSURANCE COMPANY,)
                                  )
5              Plaintiff,         )
                                  )
6       vs.                       ) No. 3:06-cv-00019 RRB
                                  )
7   CATHOLIC BISHOP OF NORTHERN   )
    ALASKA,                       )
8                                 )
               Defendant.         )
9

**Certified Copy**

10

11              **DEPOSITION OF JULIAN ROBB**

12          Taken in behalf of the Defendant

13               October 4, 2006

14

15

16

17

18

19

20

21

22          MOORE HENDERSON ALLEN & THOMAS
              Professional Court Reporting & Videography

23

24   101 SW Main Street, Suite 280 • Portland, OR 97204    503.226.3313 • 1.800.962.7308 • Fax 503.273.0109

25                                          EXHIBIT  G
                                            Page  1  of  33

2

1          BE IT REMEMBERED that the deposition of

2     JULIAN ROBB was taken before Amy A. Dalton, Court

3     Reporter and Notary Public, on October 4, 2006,

4     commencing at the hour of 10:30 a.m., in the

5     conference room of the Monarch Hotel, in the City

6     of Clackamas, County of Clackamas, State of Oregon.

7

8                           -:-

9

10                        APPEARANCES:

11

12     GRIPPO & ELDEN
            Attorneys at Law
13               By Brian J. Mowbray
                    Counsel for Plaintiff
14

15     COOK SCHUHMANN & GROSECLOSE
            Attorneys at Law
16               By Robert B. Groseclose
                    Counsel for Defendant
17

18

19

20

21

22

23

24

25

EXHIBIT ___G___
Page _2_ of _33_

MOORE  HENDERSON & THOMAS     (503) 226-3313

3

1          COMPUTER INDEX

2
                                                    Page/Line
3     EXAMINATION BY MR. GROSECLOSE:.............. 4    6
      EXAMINATION BY MR. MOWBRAY:................ 97   23
4     EXAMINATION BY MR. GROSECLOSE:............ 110   18

5     (Work history memo, EXB. 1, marked.)........ 11   19
      (Deposition notice, EXB. 2, marked.)........ 72    4
6     (Interoffice communication to Ms. Christopher from
      Mr. Krug dated 2-20-75, EXB. 3, marked.).... 72    5
7     (Letter to Mr. Gorski from Ms. Smith dated
      8-24-04, EXB. 4, marked.).................. 80   23
8     (LaBow Haynes memo, EXB. 5, marked.)........ 87   11
      (Telephone request dated 2-6-75, EXB. 6,
9     marked.)................................... 89    7
      (Letter to Mr. Robb from Father Mueller dated
10    2-28-74, EXB. 7, marked.).................. 96   19
      (Accounting forms, EXB. 8, marked.)........ 96   22
11    (Personal injury liability insurance
      endorsement, EXB. 9, marked.)............. 108    8

12

13

14

15

16

17

18

19

20

21

22

23

24

25                                    EXHIBIT  G
                                      Page  3  of  33

MOORE  HENDERSON  &  THOMAS    (503) 226-3313

4

**JULIAN ROBB**

1

2  was thereupon produced as a witness in behalf of

3  the Defendant and, having first been duly sworn,

4  was examined and testified under oath as follows:

5

6  **EXAMINATION BY MR. GROSECLOSE:**

7     Q.   Mr. Robb, I'm Bob Groseclose.  I

8  represent the Catholic Bishop of Northern Alaska,

9  which is a party in litigation that's pending in

10  Alaska.

11       Did you get a copy of the notice of

12  taking deposition?

13     A.   Yes, I did.

14     Q.   And in that it referred to some

15  documents, if you had any such things in your

16  possession, if you could bring those with you.

17     A.   Correct.

18     Q.   Were there any such items?

19     A.   No.  I have nothing from -- you know,

20  anything that would be pertinent.  The only thing I

21  could find, actually, was an inland marine

22  manual --

23     Q.   Okay.

24     A.   -- prior to Continental even.  It was in

25  the Loyality Group, which was a predecessor.

EXHIBIT G

Page 4 of 35

21

1    From the -- looking at these, those numbers under

2    "Type" would be the type of policy, 1 being a fire

3    policy, 3 being a -- a -- and I can't remember what

4    "FC" was.  It might have been a fidelity policy.

5    6 being an SMP.  9 being a liability policy.  10

6    being a Workers' Compensation.

7        Q.    Okay.

8        A.    So your "Type" is -- is a code on the

9    accounting system alluding to the type of coverage

10   or the type of policy that was issued.

11       Q.    So SMP, I'm told, is -- stands for

12   special multiperil?

13       A.    That is correct.

14       Q.    And what -- explain what you know that to

15   be.

16       A.    As I mentioned before, there were

17   different departments for each type of coverage,

18   property, inland marine, casualty, fidelity, bonds,

19   boiler machinery.  All policies are filed with the

20   state departments, so ISO came up with a special

21   multiperil policy which included more than one

22   item.  And by virtue of that, expenses were

23   reduced, so premiums could also be reduced.

24       Q.    ISO stands for?

25       A.    Insurance Services Offices, which is a

EXHIBIT ___G___
Page __5__ of __33__

22

1    group which does the filings for forms and types of

2    coverages.

3        Q.    So if the policy was filed with the state

4    department -- and you're referring to the

5    department of every state, so Alaska's insurance

6    commissioner, is that what you're referring to?

7        A.    That is correct.  But these are forms,

8    not policies.

9        Q.    So explain the difference.  The "form"

10   being what?

11       A.    A policy is a combination of insuring

12   agreements.  Those insuring agreements are forms.

13       Q.    Okay.

14       A.    Each being specific, each being for some

15   purpose.

16       Q.    So -- an insurance form would be -- this

17   is my example, or if you chose to give me -- well,

18   maybe I'll approach it that way.  Give me an

19   example of an insurance form in the way you've used

20   the term.

21       A.    A fire coverage form providing fire --

22       Q.    Okay.

23       A.    -- insurance.

24       Q.    So another example would be an auto

25   coverage?

EXHIBIT  G
Page  6  of  33

23

1       A.    Correct.

2       Q.    So then the policy if -- if I want

3   insurance for fire and auto, then my policy would

4   be a combination of those two forms?

5       A.    Even a -- yes.  Even a fire policy, going

6   back further, again, you'd have a -- a property

7   declaration which would give the coverages, the

8   exclusions, the conditions of the fire; then you

9   might have an extended coverage form that would go

10  on it which would provide additional coverages;

11  then you might have a vandalism and malicious

12  mischief endorsement, which would provide

13  vandalism, which, again, is an extension; you could

14  have an additional perils.  And all of those

15  would -- then would form the fire policy.

16      Q.    Okay.  So back to CBNA.INS.362.  Do you

17  have an opinion, under the entry for Catholic

18  Bishop of Northern Alaska, what form of liability

19  policy the number that begins with an L --

20  actually, there's two of them -- would be

21  embracing?

22      A.    Would you ask that again, please?

23      Q.    If you drop roughly two-thirds of the way

24  down the page there, under Catholic Bishop of

25  Northern Alaska, you'll see the number 21251 on the

EXHIBIT    G
Page   7   of   33

29

1      A.    Correct.

2      Q.    And it references a letter from Father

3   Mueller of February 28th, which I'm trying to

4   recall if we have that in our packet here.  Yes, we

5   do.  CBNA.INS.345 appears to be a letter of

6   February 20, 1974, to you by Father Mueller --

7   Mueller, perhaps -- is that right?

8      A.    Yes.

9      Q.    Apart from what you see here in this

10  exchange, do you have any memory of dealing with

11  the Diocese of Fairbanks or CBNA, as I often refer

12  to it, Catholic Bishop of Northern Alaska?

13     A.    I do not.

14     Q.    Your title on your -- your letter is

15  superintendent commercial multiperil.  Do you know

16  if -- if you were at that time also handling the

17  boiler underwriting?

18     A.    Yes.

19     Q.    On -- in Father Mueller's letter to you,

20  he references an SM -- a number that is SMP

21  2390621.  Is that a number that appears to you to

22  be a Continental number?

23     A.    We wrote policies with the SMP symbol.

24  It is very possible.

25     Q.    When you wrote those policies, how is the

EXHIBIT    G
Page   8   of   33

51

1    with any particular LaBow Haynes personnel?  And,

2    if so, who?

3        A.    All my dealings limited that they be with

4    LaBow Haynes and would have been in Seattle, not

5    out of Alaska.

6        Q.    Did you ever deal with a Jim McKeown,

7    M-C-K-E-O-W-N?

8        A.    I recognize the name, but I don't think I

9    have.  I wouldn't guarantee one way or the other.

10       Q.    Okay.  In the packet you have there is

11   also what I believe is a LaBow Haynes tabulation,

12   but I'm not -- but I better ask the question

13   first.  It's CBNA.INS.365, and it starts with LaBow

14   Haynes Company of Alaska.

15           Do you have that in front you have?

16       A.    Yes.

17       Q.    Do you recognize this to be an accounting

18   form from Continental or do you otherwise know the

19   source?

20       A.    I cannot really say.  It is possible.  It

21   shows an agent code and a code number 54, which

22   would have been an Alaskan agent, so it is

23   possible, but I can't swear to it.

24       Q.    So in the upper left where you reference

25   an agent code of 54, that's a number you know that

EXHIBIT    G
Page   9   of   33

52

1    Continental used for agents --

2        A.    That was an agency code that Continental

3    used, however it could be LaBow Haynes used that

4    number, also, because that is their accounting

5    number, so I have no recollection of -- of this

6    form at all.

7        Q.    Okay.

8        A.    No.

9        Q.    As we work through the form, the very

10    first column under "Policy," I can't quite read the

11    word at the very top.  It might be "symbol" and

12    then "Number"?

13        A.    Pardon?  Oh, okay.  Yes.

14        Q.    Is that what it is --

15        A.    Yes.

16        Q.    -- "Symbol"?

17        A.    Yes.

18        Q.    And beneath that, if you could explain

19    what you understand the -- the coding to mean.  The

20    first one I see is a CBP.

21        A.    Comprehensive business policy.

22        Q.    And then the next one is a BND?

23        A.    That's a bond.

24        Q.    All right.  And then we -- and then as we

25    drop down the page, we then come to the SMP?

EXHIBIT ___G___
Page 10 of 33

53

1      A.   Special multiperil policy.

2      Q.   Okay.  And as we work -- well, just to

3   complete that column, beneath that's an "L," which

4   I think you've indicated was liability?

5      A.   Correct.

6      Q.   "WC" is Workers' Comp.?

7      A.   Correct.

8      Q.   What about that next one, which it looks

9   like is an 85H?

10      A.   I'm not sure, but I believe that was a

11   computer-generated personal auto policy.

12      Q.   Maybe that's not an "8," but a "B."

13      A.   I think so.  I think it's an 85H, and I

14   think that was -- you know, I'm guessing here, but

15   I think it was personal lines.  At that time we had

16   a personal lines department, and I wasn't involved

17   in that.

18      Q.   Okay.  And then the "F" beneath that is

19   fire?

20      A.   Fire, yes.

21      Q.   Using the -- the entries there for

22   Catholic Bishop, to the -- the right of Catholic

23   Bishop is a column that at the top, if I'm reading

24   that correctly, is "Source," S-O-U hyphen R-C-E; is

25   that right?

EXHIBIT ___G___
Page __11__ of _33_

54

1      A.    It would appear so.

2      Q.    What do you -- and it's blank throughout

3    this one page, but do you have any reason to know

4    what that is seeking?

5      A.    I have no idea.  Again, I'm not sure of

6    what form -- if this was a Continental form or not,

7    but I have no idea of the source.

8      Q.    And then the next column over at the top,

9    I'm not sure -- looks like a CO?

10     A.    Company.

11     Q.    And then --

12     A.    It's a company code number for which

13   company the policy was issued in.  Continental had

14   a number of policies -- a number of companies.

15     Q.    But I -- what's peculiar to me is that

16   the same number, with minor exception, is assigned

17   to all of these, even though the insureds are --

18   vary from my client, Catholic Bishop, to other

19   entries that don't appear to have any affiliation

20   with Catholic Bishop, and they all have the same 70

21   number.

22     A.    I would correct myself on that.  That is

23   company -- I mean, insurance company number.

24   Excuse me.

25     Q.    Oh.

EXHIBIT  G
Page  12  of  33

64

1    on a specific policy basis.

2        Q.   Okay.  And do you know if Continental did

3    that?  Did they go --

4        A.   Well, I have no recollection.  I mean, I

5    have no idea of what their structure was.  But for

6    catastrophe type of coverages, every company does

7    that.

8            MR. GROSECLOSE:  Okay.  Okay.

9            Well, let me look through my notes.

10   Maybe now would be a good time for a break.

11               (Recess was taken:  12:03 - 12:14.)

12

13   BY MR. GROSECLOSE:   (Continuing)

14       Q.   Mr. Robb, let me hand you what I

15   understand -- well, it's referenced as CIC 03854

16   through 03855.  I believe it's part of your

17   packet.  Or, excuse me, it goes beyond that.  3854,

18   3855, 3856.  Let's take those three first as a --

19   because I'm trying to determine if they are --

20   duplicate the same thing or if they're -- just what

21   they might be.

22           Tell me, to the extent you know, what --

23   what these are?

24       A.   Insurance forms.

25       Q.   Do you know if they're Continental's?

EXHIBIT ___G___
Page 13 of 33

MOORE  HENDERSON & THOMAS     (503) 226-3313

65

1      A.    These are ISO standard --

2      Q.    And they --

3      A.    -- forms.

4      Q.    It's coded at the -- at least the first

5   page, 3854 is coded in the upper right "MLB 220."

6   Is MLB --

7      A.    That's the ISO number.

8      Q.    I'm trying to find some reference to ISO

9   on this.  Do you know that they use the MLB

10  numbers?

11     A.    See that symbol (indicating)?

12     Q.    No.  Which one?

13     A.    The symbol up here in the corner

14  (indicating).

15     Q.    Oh, okay.

16     A.    That's an ISO form.

17     Q.    Okay.  That little -- that circle with --

18     A.    That's their copyright form.

19     Q.    All right.  And then if I'm looking at

20  these correctly, 3855 is the second page following

21  3854, but then --

22     A.    That is correct.  That's the back side.

23     Q.    Okay.  And this is personal injury

24  liability insurance endorsement, meaning would this

25  be the type of policy that would have an L prefix,

EXHIBIT ____G____
Page 14 of 33

MOORE  HENDERSON & THOMAS      (503) 226-3313

66

1    or what would the prefix be that would come with

2    this type of form?

3        A.    The MLB was a multifunction -- or an SMP

4    type form.

5        Q.    Do you know to what extent an SMP form

6    would vary from this?

7        A.    SMP was the symbol of the policy, special

8    multiperil policy, containing MLB forms.

9        Q.    Okay.  So if we had to reconstruct an SMP

10   policy, setting aside for purposes of my question

11   what the coverage limit is, but just the -- the

12   standard phrasing that was commonly encountered in

13   the -- in the mid-'70s, would this approximate that

14   or is there a more specific source you can refer us

15   to?

16       A.    This is only one portion of the policy of

17   the general liability section.  This is not the

18   primary general liability coverage.

19       Q.    Okay.

20       A.    This is an extension to it.

21       Q.    Assume you were assigned a scavenger

22   hunt, if you will, to go out -- here we are 33

23   years later, but your mission is to reconstruct an

24   SMP policy of -- of the type commonly seen by you

25   at the Continental office in the mid-'70s.  How

EXHIBIT ___G___

Page _15_ of _33_

67

1   would you go about doing that?

2       A.   Commonly seen by me?  Each policy is an

3   individual policy with general conditions, but can

4   be anything, so you can't go out and say,

5   "Construct me an SMP policy," because you don't

6   have any idea what coverages would have been in

7   that policy.

8       Q.   Okay.

9       A.   Now, if you were to try to get the forms,

10  I would assume -- and this is strictly an

11  assumption -- that you would find somebody that's

12  a member of ISO and go back and -- and see if they

13  have copies of forms of 1974.  Again, I don't

14  know.  I tried.

15      Q.   Oh, you tried in this case to do that?

16      A.   I tried to -- to see what ISO had.  And

17  since I'm not a member of ISO, I couldn't get past

18  the first door, so you'd have to be a member of --

19      Q.   Are memberships on an individual basis or

20  company?

21      A.   No.  No.  Companies.

22      Q.   So presumably, Continental or CNA,

23  whatever form it's known as now --

24      A.   I'm guessing.  I don't know.

25      Q.   -- would have access to that?

EXHIBIT   G
Page  16  of  33

70

1    comes up with the forms from a legal standpoint and

2    files them with the states, and then the companies

3    pay them to use their forms.

4        Q.    Okay.    Okay.

5        A.    So they're the controlling function

6    that -- that does all the legwork for the

7    companies --

8        Q.    So if --

9        A.    -- so they're all fairly consistent in

10   their coverages.

11       Q.    So if the State of Alaska, Department of

12   Insurance, in Juneau, perhaps Anchorage, has

13   records back to the '70s, one might hope that if

14   they found the ISO-submitted forms for that era, we

15   would then have the type of language used for

16   different types of coverage?  We could --

17       A.    That's out of the realm of my

18   expertise --

19       Q.    Okay.

20       A.    -- but, you know, it -- it's possible.

21       Q.    But what I understand you to say is, even

22   if we found that, to put together the SMP policy

23   that Catholic Bishop had would require more than

24   just what the generic form language would be?

25       A.    That's correct.  Because there's so many

EXHIBIT ___G___
Page __17_ of _33_

71

1    individual forms that could have been used and

2    could have been attached, and the edition dates

3    could have been different and the edition dates

4    would make some difference in the -- in the

5    coverages.  So without knowing exactly which form

6    was used, you could not reconstruct it.

7        Q.    Okay.

8        A.    Or it would be real imposs -- improbable

9    to reconstruct it.

10        Q.    Included in your packet is a document --

11    well, I don't see a number on this one.  Maybe I'm

12    just overlooking it.  It's the --

13        A.    Yes.

14        Q.    I guess we better put a sticker on this

15    one unless it's -- yeah.  I'm not finding it.

16            MR. GROSECLOSE:  So, Madam Court

17    Reporter, if I could -- we'll call this exhibit --

18

19    BY MR. GROSECLOSE:   (Continuing)

20        Q.    What I'm going to do, Mr. Robb, is,

21    Exhibit 2 is going to be the notice of deposition

22    that cover the items requested of you, which I

23    understand you have nothing on?

24        A.    I have nothing.

25        Q.    All right.

EXHIBIT  G
Page 12 of 33

98

1    related to retirement, right?

2        A.    Yes.    That is retirement.

3        Q.    Okay.    And you've never been hired to do

4    any consulting work for CNA?

5        A.    No.    That is correct.

6        Q.    Okay.    And just so I'm clear, you don't

7    recall having any interaction with the Catholic

8    Bishop of Northern Alaska despite seeing the

9    correspondence?

10        A.    When -- no, I do not.    When you first

11    called me, I would have almost sworn that I had

12    never even written to them.    I just have no

13    recollection of that.

14        Q.    And you recall having interactions with

15    LaBow Haynes of Seattle, but not LaBow Haynes of

16    Alaska; is that right?

17        A.    I can't guarantee I never dealt with

18    them, but I had very little contact with Alaska

19    LaBow Haynes.

20        Q.    Okay.    Is it fair to say that every

21    policy is different?

22        A.    It's fair to say that every policy has --

23    the primary coverages are the same, and then from

24    there on, you get whatever coverages or whatever

25    things that you want.    So not every policy is

EXHIBIT  G
Page 19 of 33

99

1     different, but not every policy is the same.

2         Q.    Right.

3             So it -- in order to know what was

4     covered under a policy, you would need to see the

5     policy?

6         A.    That is correct.

7         Q.    When you were referring to ISO forms,

8     tell me if this is correct, you wouldn't have a

9     sample policy; you would have forms that you would

10    use to create the policy, but the forms you would

11    use would be dependent on the coverages sought by

12    the insured?

13        A.    That is correct.  There is no such thing

14    as a sample or a template-type policy.

15        Q.    So depending on what types of coverages

16    the insured wants, you would get different forms

17    and then create the policy?

18        A.    That is correct.

19        Q.    Did policies have standard sets of

20    limits?

21        A.    They have generally used -- or -- let's

22    rephrase that.  No, to answer the question.  They

23    have typical types of coverages, but you could go

24    anywhere from one to 100 different formats or

25    limits.

EXHIBIT ___G___
Page _20_ of _33_

100

1       Q.   Earlier you mentioned that there was an

2   ISO application form for when an insured is seeking

3   coverage and they're filling out an application?

4       A.   As I recall -- I can't picture it in my

5   mind, but, as I recall, there was an SMP or a --

6   ISO number MLB, I believe, of a SMP policy, but

7   I -- you know, I -- I think so, but I can't really

8   recall it.

9       Q.   When you're writing or underwriting a

10  policy, do you look at -- you look at the risks of

11  the entity seeking insurance, right?

12      A.   We look at the exposures for that

13  particular entity, yes.

14      Q.   So in writing the policy, it's very

15  dependent upon the exposures of the particular

16  insured?

17      A.   Correct.

18      Q.   Earlier you said that policy terms were

19  generally one or three years, is that right, for

20  SMPs?

21      A.   In this time frame, yes, for SMPs, yes.

22      Q.   But to know how long a policy was for for

23  a particular insured, you would need to see the

24  policy?

25      A.   Correct.

EXHIBIT   G
Page  21  of  33

101

1      Q.  Do you recall how long Continental kept

2  policies back in the '70s?

3      A.  Not specifically.  I know at one time we

4  were keeping fire policies for three years,

5  liability policies for seven years, but I don't

6  know exactly the time frame those were

7  established.  They may have been in the '50s and

8  the '60s.  After that time, policies were then

9  transferred to other units to be stored.  So from

10  that time on, I don't know.

11      Q.  Okay.  Do you ever recall any policies

12  being put onto microfiche?

13      A.  We had no facilities in any of the

14  offices that I've been in to put things on

15  microfiche.

16      Q.  So --

17      A.  I have no recollection.

18      Q.  All right.  I want to go through a few of

19  the documents that Mr. Groseclose showed you.  I

20  guess it's probably best to work from the exhibits

21  now.  I thing it's your Exhibit No. 7, the

22  correspondence between you and Father Mueller.

23      A.  Yes.

24      Q.  Okay.  And I'm specifically looking at

25  the February 28th, 1974, letter.

EXHIBIT G
Page 22 of 33

102

1      A.   Yes.

2      Q.   Is there anything in this letter that

3   suggests that Continental issued the Catholic

4   Bishop of Northern Alaska general liability

5   coverage?  And, actually, for this question, since

6   earlier we discussed that maybe the card was

7   attached to the bottom of the page and the letter

8   was at the top, just stick to the top portion of

9   the page.

10      A.   This recommendation is for property only

11   and there is no indication that there would be

12   liability coverage or that there was liability

13   coverage.

14      Q.   Would you look at the letter from -- I

15   guess it's the March 11th, 1974, letter.

16      A.   Yes.

17      Q.   Is there anything in this letter that

18   suggests that Continental issued CBNA general

19   liability coverage?

20      A.   No.

21      Q.   What type of coverage does it look like

22   was provided?

23      A.   It's referring to flammable paints, which

24   is a fire hazard, so it would be liability

25   coverage.

EXHIBIT ___CI___
Page _25_ of _33_

103

1          Q.    Could you take a look at Exhibit No. 3.

2          A.    Okay.

3          Q.    Is there anything on this document that

4    suggests that Continental provided the Catholic

5    Bishop of Northern Alaska with general liability

6    coverage?

7          A.    The handwriting or the letter itself?

8          Q.    Any part of it.

9          A.    It would indicate that an SMP is referred

10   to, and an SMP contains liability coverage.

11         Q.    And where are you referring to the -- the

12   SMP that refers to --

13         A.    That was a note written by Evelyn to

14   Paul.

15         Q.    The -- at the bottom of the page?

16         A.    At the bottom of the page.

17         Q.    And does anything in that portion

18   reference the Catholic Bishop of Northern Alaska?

19         A.    No.

20         Q.    So do you believe that portion refers to

21   general -- or suggests that there's general

22   liability coverage for the Catholic Bishop of

23   Northern Alaska?

24         A.    The question again?

25         Q.    The bottom portion of the page where you

EXHIBIT ___G___
Page _24_ of _33_

104

1    referred -- where it refers to the SMP, is there

2    anything in this portion, the handwritten portion,

3    that suggests that Continental issued a policy that

4    contained general liability coverage to the

5    Catholic Bishop of Northern Alaska?

6        A.   No.

7        Q.   Is there anything that suggests what the

8    limits would have been if they had issued it?

9        A.   No.

10        Q.   And I'm sorry to go back.  I -- on

11    Exhibit 7, again, the two letters, the February

12    28th letter.

13        A.   Yes.

14        Q.   Is there anything to suggest what the

15    limits would have been for any policies that

16    Continental may have issued CBNA?

17        A.   No.

18        Q.   Is there anything that suggests the dates

19    of any policies?

20        A.   No.

21        Q.   For the March 11th letter, is there

22    anything that suggests the limits of liability --

23        A.   No.

24        Q.   -- of any policies issued?

25        And what about dates?

EXHIBIT __G__
Page _25_ of _33_

105

1       A.    No.

2       Q.    Can you take a look at Exhibit 8.  I

3    think that's the one with the collection of what

4    you describe as accounting forms.

5       A.    It would be an internal accounting

6    record, yes.

7       Q.    Okay.  Did you frequently see documents

8    of this type when you were working for Continental?

9       A.    Not frequently, no.

10       Q.    Did you ever create documents of this

11    type?

12       A.    No.

13       Q.    So when you were providing information

14    regarding what the different category headings were

15    or the types of information captured in the

16    different fields, what were you basing that on?

17       A.    On other records and reports that we

18    would have that would use the same terminology as

19    of effective dates, as of the type of policy

20    transactions.

21       Q.    You suggested that perhaps the effective

22    dates -- there are a number of them for --

23    actually, on the first page, CBNA.INS.362.  There

24    are two entries for the Catholic Bishop of Northern

25    Alaska, and then there are different effective

EXHIBIT ___G___
Page _26_ of _33_

MOORE HENDERSON & THOMAS    (503) 226-3313

110

1        A.    (Complied.)

2        Q.    And you see where it says, "Bodily injury

3    liability and property damage liability"?

4        A.    Yes.

5        Q.    And then there's amounts in the blanks

6    next to each occurrence and aggregate?

7        A.    Yes.

8        Q.    Are those also numbers that would be

9    added in once the insured requested coverage?

10       A.    That is correct.

11       Q.    So there was no standard limit for bodily

12   injury liability or property damage liability

13   right?

14       A.    No.

15            MR. MOWBRAY:   We can go off the record.

16                (Discussion held off the record.)

17

18   EXAMINATION BY MR. GROSECLOSE:

19       Q.    Mr. Robb, one page that I inadvertently

20   omitted to add but what we've since added to I

21   believe it's Exhibit 8, is the very last page,

22   CBNA.INS.369.  And am I correct that this form is

23   also a Continental Insurance Company

24   accounting-type form or is this -- would this be

25   different than the other ones that preceded it as

EXHIBIT  G
Page 27 of 33

111

1    under Exhibit 8?

2         A.    Again, not being in the accounting

3    department, I -- I can't really say for sure, but

4    this to me would be the note -- the billing that

5    the insured -- that the agent would get as opposed

6    to the previous one, which was the -- Continental's

7    internal billing or internal papers.

8         Q.    And this -- this includes both SMP

9    policies for Catholic Bishop of Northern Alaska,

10   does it not?  Look at the top --

11        A.    Would you re --

12        Q.    It -- it --

13        A.    -- repeat that, please.

14        Q.    Yeah.  I'm sorry.

15             The tabulation that this represents --

16        A.    Uh-huh.

17        Q.    -- 369 includes a Catholic Bishop of

18   Northern Alaska SMP policy 2390621, which is

19   referenced in two places on the upper part of that

20   sheet, right?

21        A.    Correct.

22        Q.    The first reference has an effective date

23   of 2-74, there's an invoice number, and then an

24   invoice date of 3-19, and we can't -- I can't make

25   out what that last column is, something G-R-P-R-E.

EXHIBIT _____ _Cx_
Page _28_ of _33_

112

1     A.   This is only a portion of the form, and

2  that would have been cross premium, I'm sure.

3     Q.   Okay.

4     A.   But that's, again, an assumption that I

5  can't recall.

6     Q.   Maybe we already have this, then, in.  Do

7  you have the actual Exhibit 8 still there?  Maybe

8  we can -- maybe this already shows up on the

9  earlier page.

10        **MR. MOWBRAY:**  Here's the preceding page.

11        **MR. GROSECLOSE:**  Well, let me see.

12

13  **BY MR. GROSECLOSE:**  (Continuing)

14     Q.   So, Mr. Robb, were you able to determine

15  whether what is cut off on Page 369 appears in the

16  earlier pages that we looked at?

17     A.   That was a question?

18     Q.   Yes.

19     A.   What was the question?

20     Q.   If you have Exhibit 8 there in front of

21  you --

22     A.   Yes.

23     Q.   -- if I could come around and look.

24     A.   Yes, I do.

25     Q.   So Exhibit 8 in it's entirety --

EXHIBIT $G$
Page 29 of 33

116

1    I'm trying to recall how you phrased it as to

2    coverages.  In the mid-'70s, is it fair for me to

3    assume that underwriting a risk to a church was a

4    relatively safe undertaking compared to other

5    assureds that can walk in the door?

6         A.    A safe underwriting?

7         Q.    Well --

8              MR. MOWBRAY:  Object to the form.

9

10   BY MR. GROSECLOSE:  (Continuing)

11        Q.    In terms of risk rating when you would

12   rate -- rate the insurability of someone, would --

13   would you go through the risk analysis?  Was a

14   church not on -- on the lower end of the scale

15   of -- in terms of the risk the carrier would

16   undertake?

17        A.    Religious institutions have their own

18   problems from the standpoint of various things that

19   they're involved in, every one of them being

20   different.  So from that standpoint, they would

21   have been underwritten more carefully than, say,

22   the Joe's Grocery next door.

23        Q.    Okay.  How much of that risk analysis

24   would you task yourself with on the fire side?  And

25   by that I mean, I can understand and appreciate

EXHIBIT ___G___
Page 30 of 33

MOORE HENDERSON & THOMAS    (503) 226-3313

115

1    Q.    And how would you then interpret the

2    reference to Fairbanks coverage?  Would it be

3    property or would it be liability or would it be a

4    combination?

5    A.    There's no way to tell from this and

6    there's no way to determine what Fairbanks coverage

7    is as respects to the Archdiocese of Anchorage.

8    Q.    Okay.  Because, in your mind, you don't

9    know the geographic twists between what the

10   Archdiocese of Anchorage includes?

11   A.    That is correct.

12   Q.    Okay.  And then if we looked at -- but if

13   we know from the typed part that there are three

14   policies, we know from Evelyn's note to Paul that

15   there are three policies with SMP prefixes; is that

16   true?

17        MR. MOWBRAY:  Object to form and

18   foundation.

19

20   BY MR. GROSECLOSE:  (Continuing)

21   Q.    Is that right, Mr. Robb?

22   A.    That would appear to be three policies.

23   Q.    Okay.  You mentioned that although you --

24   each policy can be different, that there were

25   patterns -- maybe that's not the word you used.

EXHIBIT __G__
Page _31_ of _33_

117

1    where, if you're providing fire insurance coverage

2    on wooden structures in rural Alaska, some -- some

3    warning flags would be going up, right?

4         A.    That is correct.

5         Q.    Did you involve yourself in that risk

6    analysis?

7         A.    The underwriter's job is to involve

8    himself in all risk analysis for writing a specific

9    insured, yes.

10        Q.    As you look back from what fragmentary

11   evidence we have here, is there -- do you have a

12   sense of -- of the SMP package that -- that would

13   have been -- that might have crossed your desk, how

14   much of that would have been a fire analysis versus

15   some other kind of analysis fire risk?

16             MR. MOWBRAY:   Object to -- object to

17   form.

18             THE WITNESS:   I still don't quite get the

19   question.

20

21   BY MR. GROSECLOSE:   (Continuing)

22        Q.    Okay.  Fair enough.  It's not a

23   reflection on you.  It's a reflection on me, so it

24   just means I've got to ask it better, and I'll try.

25             I understood you earlier to explain that

EXHIBIT ___G___
Page __32_ of __33__

118

1    an SMP policy can be a combination of what might,

2    through a different form of packaging, be isolated

3    as a fire insurance policy, a liability policy, a

4    boiler policy, and maybe even a Workers' Comp.

5    policy, right?

6        A.   Yes, except for the Workers' Comp.

7        Q.   Oh, except for the Workers' Comp.?

8        A.   Does not cover automobile or Workers'

9    Comp.

10        Q.   Okay.  And you, as an underwriter, then,

11    would have the ultimate say, and do you want to

12    commit your company to take on the risks that may

13    come with this particular proposal?

14        A.   That's correct.

15        Q.   And you then would go through a risk

16    analysis, I'm assuming, of something -- of some

17    sort?

18        A.   Yes.

19        Q.   You'd refer to actuarial tables maybe?

20        A.   No.

21        Q.   Or insurance-compiled risk factors?

22        A.   No.

23        Q.   "No"?

24        A.   No.  We would use our experience in what

25    we had done in the past and base our -- our

EXHIBIT G

Page 33 of 33