Deposition of George Bowder
Taken December 12, 2006

Continental Insurance Co. vs. Catholic Bishop of Alaska
Case No. 3:06-cv-19-RRB

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

CONTINENTAL INSURANCE COMPANY,  )
                                )
        Plaintiff,               )
                                )
vs.                             )
                                )
CATHOLIC BISHOP OF NORTHERN     )
ALASKA,                         )
                                )
        Defendant.              )
_____)
Case No. 3:06-cv-19-RRB

DEPOSITION OF GEORGE BOWDER
Taken Tuesday, December 12, 2006
From the hour of 2:13 p.m. to 4:25 p.m.
Pages 1 through 95, inclusive
Volume 1
Taken by Counsel for Plaintiff
At
Offices of Cook, Schuhmann & Groseclose
714 Fourth Avenue, Suite 200
Fairbanks, Alaska 99701

Reported by:
CAROL A. McCUE, RMR
Heartland Court Reporters

---

**Page 2**

APPEARANCES

For Plaintiff:
    GARY A. ZIPKIN, ESQ.
    GUESS & RUDD
    510 L Street, Suite 700
    Anchorage, Alaska 99501
    907-973-2200

For Defendant:
    ROBERT B. GROSECLOSE, ESQ.
    COOK, SCHUHMANN & GROSECLOSE
    714 Fourth Avenue, Suite 200
    Fairbanks, Alaska 99701
    907-452-1855

Also Present:
    RONNIE ROSENBERG

Witness:
    GEORGE BOWDER
    December 12, 2006

Reported by:
    CAROL A. McCUE, RMR
    Heartland Court Reporters

BE IT KNOWN that the deposition of the above-named witness was taken this date in the foregoing action before Carol A. McCue, Registered Merit Reporter and Notary Public within and for the State of Alaska.

---

**Page 3**

INDEX
WITNESS: GEORGE BOWDER                December 12, 2006
EXAMINATION                                         Page
Direct Examination by Mr. Zipkin................4

EXHIBITS
Exhibit No.                                  Page Marked
1:  1-page document, letter to
    Mr. Julian Robb from Rev.
    Francis E. Mueller, SJ, dated
    2/28/75.....................................20

2:  1-page document, letter to
    Chancery Office from J. A.
    Robb dated 3/11/74..........................21

3:  1-page document, letter to
    Mr. C. L. Fields from Rev.
    Francis E. Mueller, SJ, dated
    7/30/74.....................................23

4:  1-page document, letter to
    Reverend Francis Mueller, SJ,
    From Robert L. Whelan, SJ,
    Bishop, dated 11/7/73.......................29

5:  7-page document, letter to
    Robert B. Groseclose from
    Tracy L. Smith, CNA, dated
    9/17/03.....................................32

6:  1-page document, hand-drawn
    document prepared by witness
    Diocese of Fairbanks
    Organizational Chart........................76

---

**Page 4**

1       P R O C E E D I N G S
2       (The following proceedings commenced
3       at 2:13 p.m., December 12, 2006.)
4       (Witness sworn.)
5           GEORGE BOWDER,
6  being called as a witness, having been first duly sworn
7  to state the truth, the whole truth, and nothing but
8  the truth, testified under oath as follows:
9           DIRECT EXAMINATION
10 BY MR. ZIPKIN:
11     Q.   Good afternoon.
12     A.   Good afternoon.
13     Q.   If you could please state your full name for
14 the record.
15     A.   My name is George W. Bowder, B-O-W-D-E-R.
16     Q.   Mr. Bowder, my name is Gary Zipkin,
17 I represent Continental Insurance Company. I'll be
18 asking you questions here today. If I ask any question
19 that isn't clear and understandable, please let me
20 know. I'll do my best to get you a clear question. Is
21 that agreeable?
22     A.   It's agreeable.
23     Q.   And so we get the best possible transcript, I
24 ask that you answer audibly and in English, as opposed
25 to a shrug or a nod; is that agreeable?

Case 3:06-cv-00019-TMB   Document 47-9   Filed 10/01/2007   Page 2 of 10

Deposition of George Bowder
Taken December 12, 2006

Continental Insurance Co. vs. Catholic Bishop of Alaska
Case No. 3:06-cv-19-RRB

Page 5

1   A.   It's agreeable.
2   Q.   Thank you. You are the current finance
3   officer?
4   A.   Director of Finance at the Bishop's office.
5   Q.   Director of Finance is the title?
6   A.   That's correct.
7   Q.   At the Bishop's office?
8   A.   That's right.
9   Q.   Here in Fairbanks?
10  A.   That's correct.
11  Q.   And according to the Marsh Report that we have
12  been given, it says you've held this position since
13  1978?
14  A.   That's correct.
15  Q.   And it says in this report that you have been
16  responsible for all financial and personnel matters
17  from 1978 to present?
18  A.   That's correct.
19  Q.   Do you have any other responsibilities?
20  A.   A number of other responsibilities, not
21  necessarily related to the office. I'm a deacon
22  assigned to St. Raphael's Catholic Church, which is
23  also here in Fairbanks. That's been since 2003.
24  Q.   Any other responsibilities?
25  A.   I'm also the treasurer for the insurance

Page 6

1   division for the Alaska Catholic Conference, have that
2   position because of my Director of Finance position for
3   the diocese.
4   Q.   To your knowledge, how long has the Alaska
5   Catholic Conference existed?
6   A.   I would only guess as to how long it has been
7   there. We've been working completely underneath of
8   their authority since February of last year. Prior to
9   that, we were working as a loose affiliation or
10  association. We were called something different. The
11  term was Tri-Di. That might have been used in previous
12  discussions.
13  Q.   Not by me.
14  A.   Okay.
15  Q.   Can you explain what that means?
16  A.   Three diocese, Tri-Di.
17  Q.   And I think you said that you're working under
18  their authority, meaning the Alaska Catholic
19  Conference?
20  A.   Catholic -- that's right.
21  Q.   Since February of '06? Is that what you --
22  A.   Yes. Actually, February of '05 is when that
23  became formal. They brought all of the insurance work
24  that had previously been done as an association or
25  affiliation of three diocese underneath the wings of

Page 7

1   that corporate heading, the Alaska Conference of
2   Catholic Bishops. So that's a corporate title.
3   Q.   All right. So have you been treasurer for the
4   Alaska Catholic Conference since February of '05?
5   A.   I was actually the insurance division
6   director, not treasurer.
7   Q.   Oh, okay. I thought you said something about
8   a treasurer for insurance.
9   A.   That was the Tri-Di term. They changed it
10  when it became ACCB. I can understand.
11  Q.   Okay.
12  A.   Yes.
13  Q.   Who were the other officers of the conference?
14  A.   Was the Director of Finance for the
15  Archdiocese of Anchorage, was the Chairman of the
16  Tri-Di group, and also an Assistant Director under
17  ACCB. The Director of Finance for the Diocese of
18  Juneau was the Secretary, and the three of us together
19  did the administrative work for Tri-Di, and now we do
20  it for the insurance division of ACCB.
21  Q.   All right. But the names, can you -- for
22  example, the chairman of Tri-Di, who is that?
23  A.   Currently, that's Sister Charlotte Davenport
24  out of Anchorage, and Jim Donaghey is the one out of
25  Juneau. They are both Directors of Finance for each of

Page 8

1   those diocese.
2   Q.   Can you spell Mr. Donaghey's last name?
3   A.   I'm not good at that, but I could probably get
4   it for you. It's a Irish spelling, and I'm terrible at
5   the spelling of his last name, but I could give it a --
6   oh, I better not. I'll butcher it. I wouldn't want to
7   embarrass myself.
8   Q.   Prior to February of '05 --
9   A.   Right.
10  Q.   -- insurance for, let's say, Juneau diocese
11  was handled by Juneau, or Tri-Di?
12  A.   Yes.
13  Q.   Tri-Di?
14  A.   Yes.
15  Q.   Okay. And they are -- okay. And how long
16  has -- how long did Tri-Di operate?
17  A.   Started in April -- formally, set up in April
18  of 1983.
19  Q.   Up until February of '05?
20  A.   That's correct.
21  Q.   According to the Marsh Report again, I'm
22  referring to Page 2 of this report, I'll just --
23  A.   Is there a copy of that so I could look at it?
24  Q.   Yeah. Absolutely. Great. We can all read
25  along here.

Case 3:06-cv-00019-TMB   Document 47-9   Filed 10/01/2007   Page 3 of 10

Deposition of George Bowder
Taken December 12, 2006

Continental Insurance Co. vs. Catholic Bishop of Alaska
Case No. 3:06-cv-19-RRB

Page 9

1  A.  Page 2?
2  Q.  Yeah, Page 2. At the bottom of the page,
3  under a section called Interview of Former Diocesan
4  Personnel?
5  A.  Diocesan.
6  Q.  Diocesan?
7  A.  There you go.
8  Q.  D-I-O-C-E-S-A-N.
9  A.  Right.
10 Q.  It talks about you.
11 A.  All right.
12 Q.  And it gives your title. Here it says finance
13 office director, but that's -- we've clarified that?
14 A.  That's right.
15 Q.  It says you've held the position since 1978.
16 A.  That's right.
17 Q.  And responsible for all financial and
18 personnel matters. And it says at the time that
19 Mr. Bowder took the position, there did not appear to
20 be an established insurance program. Is that a fair
21 statement?
22 A.  "Established" would be how to describe, did
23 they have a set person that handled insurance as
24 different than anybody else? No, they did not. It was
25 a duty that was along with all the other bookkeeping

Page 10

1  duties. They did not have a formal Director of Finance
2  office at that time, they had a treasurer and a
3  bookkeeper. And the bookkeeper paid the bills and the
4  treasurer worked out some of the details.
5  Q.  If we go back to 1978 --
6  A.  Yes.
7  Q.  -- do you recall who the treasurer was at that
8  time?
9  A.  Mr. Charles Stack.
10 Q.  Just like it sounds?
11 A.  Yeah, S-T-A-C-K.
12 Q.  Is he alive, do you know?
13 A.  Yes, and he lives at Salem, Oregon. He was
14 there from '75 to '78, latter part of '75 to '78.
15         MR. GROSECLOSE: You don't mean in Salem,
16 Oregon, he was there from '75 to '78?
17         THE WITNESS: No, he was at the diocese from
18 '75 to '78.
19 BY MR. ZIPKIN:
20 Q.  Have you spoken with Mr. Stack about any
21 issues relating to insurance for the Catholic Bishop of
22 Northern Alaska in the 1970s at all?
23 A.  Yeah. When I first started, I conversed with
24 him because he was my predecessor, and we kind of
25 shared notes and compared details to try to find out

Page 11

1  where things were at, yes.
2  Q.  Have you spoken with him in the last year and
3  a half?
4  A.  Not about insurance matters, about other
5  items.
6  Q.  Do you happen to have an address for him in
7  Salem?
8  A.  I -- I know where -- what his address is, but
9  it would be at my office. I wouldn't be able to access
10 it. It says George Stack here, and that's incorrect.
11 On the second -- Page 3.
12 Q.  Should be Charles?
13 A.  That should say Charles Stack.
14 Q.  So when you took over and you conversed with
15 him in 1978 or so --
16 A.  Uh-hum.
17 Q.  -- did you learn at that time that he had
18 taken responsibility for obtaining or procuring
19 insurance for the CBNA?
20 A.  He told me that he worked with the former
21 Chancellor, Father Frank Mueller, and so I did a good
22 bit of coordination with Father Frank Mueller for
23 insurance matters. Charles told me that he basically
24 received the bills, made sure that they were paid in a
25 timely fashion. He wasn't in charge of obtaining or

Page 12

1  negotiating anything. And that Father Frank Mueller,
2  along with then Bishop Whelan were the ones that worked
3  out the details.
4  Q.  All right. And do you recall meeting and
5  chatting with Father Mueller?
6  A.  Father Frank? Yes.
7  Q.  About insurance matters?
8  A.  Oh, yeah. A number of times.
9  Q.  A number of times?
10 A.  He was there for a good, long while after
11 Charles left.
12 Q.  And has he passed away?
13 A.  Yes.
14 Q.  Do you know when he passed away?
15 A.  Let's see.
16 Q.  Approximately.
17 A.  Late '90s. I believe that's the time frame.
18 Q.  All right. What do you recall, if anything,
19 from conversations with Father Frank about insurance
20 for CBNA -- if I can refer to it as CBNA?
21 A.  That's fine.
22 Q.  -- in the mid '70s?
23 A.  Well, he had advised that they had coverage
24 several times with what's called, in his terminology,
25 secular carriers as opposed to church carriers, that

3 (Pages 9 to 12)

Heartland Court Reporters
Carol A. McCue, RMR
E-mail: carol.mccue@acsalaska.net
Telephone: 907-452-6727
Fax: 907-488-7701

Deposition of George Bowder  
Taken December 12, 2006

Continental Insurance Co. vs. Catholic Bishop of Alaska  
Case No. 3:06-cv-19-RRB

Page 13

1  they were constantly seeking a way to hold the cost of
2  insurance.
3      And that one of the things that he had been
4  tasked with, either by the Bishop or the finance
5  committee, and later I discerned that it was the
6  finance committee that was kind of the driving force
7  behind this, that the coverage that they were seeking
8  to place was to eventually get all of the diocesan
9  properties, not just local properties, the road
10 properties.
11     See, when I came in, there was the appearance
12 for me that there was a lack of property coverage for
13 some of our more remote locations. And he said that
14 they had been seeking to get that added, but that the
15 liability coverage they had been able to obtain was at,
16 like, the $2 million level, and I said, well, and why
17 is that.
18     And it was determined that the finance
19 committee was pretty adamant that that level be arrived
20 at probably due to some discussions with Bishop Whelan,
21 but I don't know that for sure.
22     But I do know that their position when I
23 arrived was not to be satisfied with the $2 million
24 level of coverage in excess of underlying coverages,
25 which were normally between 500,000 and a million for

Page 14

1  underlying coverages at that time when I arrived there.
2      They said what we're seeking to do is to add a
3  $10 million excess liability layer on top of the
4  underlying coverage that we have for auto insurance and
5  the underlying coverage for general comp on property.
6      So Frank explained that we had moved at
7  several different points, that we had had coverage with
8  Catholic Mutual, and that we had had coverage with --
9  through the Kohler Agency with a Continental Coverage,
10 we had had coverage with another company, and I
11 can't -- I was trying to remember the name of it at
12 this point. Well, I know that State Farm was a player
13 in it because they held the auto policy when I arrived.
14     So it was my plan, in talking with Frank, that
15 we would try to return back to Catholic Mutual because
16 they were seeking to combine coverages, get the
17 workers' comp, get the auto coverage, then add their
18 own liability and their own property so we would have
19 it all in one bucket through one broker.
20  Q.   All right. You said a great many things in
21 there --
22  A.   Yes.
23  Q.   -- and I want to concentrate on them, clarify.
24  A.   Clarify them? Okay.
25  Q.   That's fine. I think you said you learned

Page 15

1  from or through Father Frank that at one point
2  insurance was placed through or with Continental
3  Insurance through the Kohler Agency. We just deposed
4  Mr. Kohler who has told us he was never an agent for
5  Continental and could not have sold the Continental
6  policy. So do you still stick with the testimony that
7  you just gave?
8  A.   It's the only one that I know. I mean, that
9  would be the best I could find out. Whether -- my
10 understanding is that it was Kohler that Father Frank
11 talked to us about. Now, it could have been another
12 brokerage in town, but I don't know who that would have
13 been.
14     The only other broker that I had direct
15 contact with as a result of Father Frank's work would
16 have been the State Farm agent which we did our auto
17 insurance through, and that would have been George
18 Walton, and he and Dick Randolph were State Farm
19 agents, Dick Randolph, I believe, still is an agent
20 here in town. George has retired and I'm not sure he's
21 alive.
22     MR. GROSECLOSE: I think he passed on.
23     THE WITNESS: I think he passed on.
24 BY MR. ZIPKIN:
25  Q.   But in terms of learning about prior insurance

Page 16

1  before you arrived in '78 --
2  A.   Yes.
3  Q.   -- apparently, no one ever mentioned LaBow,
4  Haynes as an insurance agency?
5  A.   LaBow, Haynes was out of Anchorage.
6  Q.   Yes.
7  A.   And I think the referral -- see, we went to
8  them as my contact with Frank Matulich. Frank Matulich
9  was the Director of Finance for the Archdiocese of
10 Anchorage, another partner that was, early on, helpful
11 in us trying to fill in the pictures of where we should
12 go and where we shouldn't.
13     And we contacted -- or I contacted Frank and
14 then we started working with LaBow, Haynes
15 representatives, one in particular, Juanita Brown was a
16 party that we participated in interaction with for a
17 good period of time.
18     So whether Frank or my misunderstanding of
19 Frank, but I know that working with Frank Matulich, we
20 made contact through Juanita Brown, we let several
21 coverages after I was there, how much we -- "we," the
22 Diocese of Fairbanks and the Archdiocese of Anchorage,
23 let through LaBow, Haynes, I only discovered through
24 some further looking in the records. And that's in my
25 own ledgers where I went to do some discovery in the

Deposition of George Bowder
Taken December 12, 2006

Continental Insurance Co. vs. Catholic Bishop of Alaska
Case No. 3:06-cv-19-RRB

Page 17

1 diocesan ledgers.
2  Q. Okay. As I understand it, and it's also
3 discussed in the Marsh Report, at Page 5, for example,
4 it says that based on conversations with you --
5  A. Okay.
6  Q. -- Marsh understands -- this is in the middle
7 of the page -- that the majority of CBNA historic
8 records are maintained in several file cabinets located
9 in the chancery and in George Bowder's office?
10  A. That's correct.
11  Q. That's all correct?
12  A. Uh-hum. That's correct.
13  Q. And I take it you would have been asked or I
14 assume you have searched through those?
15  A. I have searched through those files and in
16 through our archive files, as well, to locate things.
17 And then we've spoken with other persons at the small
18 church downtown here to see if there was possibly some
19 because that was the historic church in town. And also
20 we searched -- had a search done through files at the
21 Catholic schools, as well.
22  Q. Okay. And have you been able to locate any
23 copies of actual insurance policies that would have
24 provided liability coverage of any kind for CBNA in the
25 1970s all the way through, say, 1980?

Page 18

1  A. The only thing that I recall is one item, it
2 was not a policy, it was in reference to a special
3 multi-peril policy with a policy number saying
4 Continental Insurance or CNA Insurance on it, and it
5 was a letter that was written by Father Frank Mueller.
6 And we pulled that out of the file, it has
7 correspondence to a person, and then behind it is a
8 copy of a letter from the insurance agent. So those
9 are the ones that -- that we pulled out.
10       When I found that from LaBow, Haynes, then I
11 went down and went through the ledger and found policy
12 costs and stuff in our own ledgers.
13  Q. Okay. And I -- have you looked at any of
14 these documents in preparation for today's deposition?
15  A. I did but sometime ago. Not in today's
16 deposition, but as we were trying to find them, I was
17 looking through them at that time. You mean recent
18 looking at them?
19  Q. How about in the last hour before your
20 deposition started?
21  A. I went through the folder that Robert had, and
22 I don't know if that -- one of those letters from
23 Father Frank Mueller was in that file. But there were
24 several other items was in a -- in a folder, as well.
25  Q. Okay. But one of the letters was in the

Page 19

1 folders that you looked at?
2  A. Yes.
3  Q. Okay. The letter that you found when you did
4 your search?
5  A. When I did the search for Father Case; that's
6 correct.
7       MR. GROSECLOSE: I showed him, just for the
8 record, the Robb deposition exhibits.
9       MR. ZIPKIN: Yeah. Well, I mean, I have
10 copies of many things, but I don't know exactly what
11 you showed him until -- until I see it.
12       MR. GROSECLOSE: Here are the Robb deposition
13 exhibits.
14       MR. ZIPKIN: Thank you very much.
15 BY MR. ZIPKIN:
16  Q. Let me show you what has been marked as Robb
17 Exhibit 1, a collection, 1, 2, et cetera. Are these
18 documents that you've seen in the last hour?
19  A. Yes. The one that I looked at that rang for
20 me was this letter right here sent to Mr. Julian Robb,
21 in 1974, and this was the one that I brought up
22 pointing out the fact that it had special multi-peril
23 reference policy number, and then it said our location,
24 and then it said Frank Mueller again down at the
25 bottom. And then behind had a reference, March 11th,

Page 20

1 1974, response from Julian Robb from Continental
2 Insurance Company. That's the one that I was speaking
3 specifically about.
4       MR. ZIPKIN: Okay. So let's make that
5 exhibit...
6       THE REPORTER: Exhibit 1.
7       (Exhibit 1 marked.)
8 BY MR. ZIPKIN:
9  Q. The court reporter has handed you Exhibit 1,
10 which is a copy of a letter in February of '74 from
11 Reverend Mueller?
12  A. Uh-hum.
13  Q. To Julian Robb, R-O-B-B, at Continental
14 Insurance. Is this the letter you were referring to or
15 a different one?
16  A. This is the letter I was referring to.
17  Q. All right. And this letter below where
18 there's a place for a signature, of course there is no
19 signature on this copy.
20  A. True.
21  Q. References the policy you were talking about,
22 SMP, and looks like 2390621?
23  A. It's not copied, but it's -- that's close
24 enough.
25  Q. Okay. Okay. And are you saying that when you

5 (Pages 17 to 20)

Heartland Court Reporters
Carol A. McCue, RMR
E-mail: carol.mccue@acsalaska.net
Telephone: 907-452-6727
Fax: 907-488-7701

Deposition of George Bowder  
Taken December 12, 2006

Continental Insurance Co. vs. Catholic Bishop of Alaska  
Case No. 3:06-cv-19-RRB

## Page 21

1  found that letter, you also found a response?
2     A.   There was a copy of a letter right behind it.
3     Q.   Okay.  See if I'm on track with you or not.
4     A.   Yeah.
5     Q.   If we need to go into these exhibits, we will.
6         (Exhibit 2 marked.)
7  BY ATTY1:
8     Q.   Showing you Exhibit 2?
9     A.   That's the one.
10    Q.   Okay.  March 11, 1974, letter to the Chancery
11 Office from a J. A. Robb, from Continental Insurance,
12 right?
13    A.   That's correct.
14    Q.   Okay.  And the letter discusses water-based
15 paints and where they should be stored; is that right?
16    A.   That's correct.
17    Q.   All right.  So it may be that I'm just hearing
18 slowly or thinking slowly, I want to make sure I follow
19 what you said.  You found these two letters in one of
20 the cabinets?
21    A.   Uh-hum.
22    Q.   Right?  Did you find anything else that
23 related to this possible coverage or policy issued by
24 Continental?
25    A.   Not in the letter files, but in the ledgers

## Page 22

1  for the diocese where we made payment to LaBow, Haynes
2  in reference.  So that's the only place that I have
3  been able to connect the time frames going back to how
4  the bookkeepers had recorded the entries on our side.
5     Q.   Now -- and we marked as an exhibit to
6  Mr. Kohler's deposition some account current
7  information, it's called account current.  Are these
8  the ledgers you're talking about or different ledgers?
9     A.   No, no.  This...
10    Q.   These are the kinds of documents that an
11 agency would have?
12    A.   No, no.
13    Q.   So you're not talking about this?
14    A.   No.  This looks like from LaBow, Haynes or
15 from a brokerage house, but no.  What we referenced on
16 our books is back in that same date time frame the
17 checks going from our offices to LaBow, Haynes for
18 coverage.
19    Q.   All right.  Are those checks part of this
20 Exhibit 1?
21    A.   Not that I'm aware of, no.  I didn't see
22 anything.
23    Q.   Are they anywhere in this room?
24    A.   I'm not sure.
25    Q.   Have you seen them in the last hour and a

## Page 23

1  half?
2     A.   No.  No, I have not.
3     Q.   Have you seen them in the last year?
4     A.   Not in the last year for me.  I did this
5  research, I think it was like almost two years ago, if
6  I recall correct.  I don't know how long ago it was
7  that we were doing the research for this.
8         MR. GROSECLOSE:  Do you want to take a minute?
9         MR. ZIPKIN:  Yeah.  I just want to make sure
10 we're all working off the same deck of cards.
11        MR. GROSECLOSE:  Let me pull up Tracy.
12        MR. ZIPKIN:  Let's go off record.
13        (Off record, recess from
14        2:37 p.m. to 2:43 p.m.)
15        (Exhibit 3 marked.)
16        THE REPORTER:  Back on record.
17 BY MR. ZIPKIN:
18    Q.   Were you able to find a copy of the letter
19 that Mr. Groseclose referenced as having at least
20 mentioned the various items that you perhaps had found?
21    A.   Yes, I did find that.
22    Q.   Can we identify that letter better in terms of
23 the date and the author?  Which --
24    A.   This is dated September 17th, 2003, Tracy L.
25 Smith, claims analysis, home office claims.  And that's

## Page 24

1  CNA.
2         MR. ZIPKIN:  All right.  I think I do have
3  that letter.
4         MR. GROSECLOSE:  It's addressed to me.
5         THE WITNESS:  Yes.
6         MR. ZIPKIN:  Okay.  I have that.
7         THE WITNESS:  Then there's attachments.  It
8  says, alleged -- alleged Continental policy on Page 4
9  of 7 is the paragraph identified as Paragraph 2.
10        MR. ZIPKIN:  Oh.  Very good.  So I do have
11 that one.  Let's mark -- well, we've already marked
12 another exhibit.  We'll get there in a minute.  We'll
13 get there in a minute.
14        Since I've already marked this one, let's go
15 with this one next.  And here's a copy, Mr. Groseclose.
16        MR. GROSECLOSE:  Thank you.
17 BY MR. ZIPKIN:
18    Q.   This is Exhibit 3, it is a letter dated
19 July 30, I believe it is, 1974, to a C. L. Fields,
20 F-I-E-L-D-S, someone at Hartford Steam.  You made
21 reference to this, I think, off the record.
22    A.   Yes, I did.  Yes, I did.
23    Q.   This is from Father Frank, as you refer to
24 him?
25    A.   Right.

6 (Pages 21 to 24)

Heartland Court Reporters  
Carol A. McCue, RMR     E-mail: carol.mccue@acsalaska.net     Telephone: 907-452-6727  
Fax: 907-488-7701

Case 3:06-cv-00019-TMB    Document 47-9    Filed 10/01/2007    Page 7 of 10

Deposition of George Bowder  
Taken December 12, 2006

Continental Insurance Co. vs. Catholic Bishop of Alaska  
Case No. 3:06-cv-19-RRB

Page 25

1  Q.  And it references the Loyola Hall and the --
2  is it called Slater or Slaters Residence?
3  A.  Sisters.  Sisters Residence.
4  Q.  Sisters Residence.  I'm sorry.  Okay.
5      Now, at the bottom of this letter, there's
6  this P.S., which says, We would like to call to the
7  attention of your office the fact that the Catholic
8  Diocese of Fairbanks is no longer -- then it has
9  parentheses -- i.e., as of October 1973, closed parend,
10 insured through the Catholic Mutual Relief Society of
11 America, but rather through LaBow -- that's L-A,
12 capital B-O-W -- Haynes of Alaska, Inc.
13     Do you see that?
14 A.  I do.
15 Q.  And is that consistent with what you were told
16 by Father Frank?
17 A.  Yeah, that would be consistent.  There --
18 Q.  All right.  So --
19 A.  Yeah.
20 Q.  Okay.  So back in October of 1973, CBNA
21 changed from being insured through the Catholic Mutual
22 Relief Society to coverage through LaBow, Haynes?
23 A.  That's my understanding.  If I understood, and
24 to clarify, there was several shifts to and from.  And
25 in my understanding from Frank, they were with Catholic

Page 26

1  Relief Services, like, in the late '60s.  They went
2  over to LaBow, Haynes then, and I don't have the exact
3  amount of time, they left LaBow, Haynes and went to
4  Catholic Mutual, and then they went back to LaBow,
5  Haynes.
6      I showed up on the front and we went away from
7  Catholic Mutual for a short period of time and were
8  with LaBow, Haynes, and then I believe it was in '79,
9  I'd have to check the records again, I believe it was
10 in April of 1979 is when we went back on to Catholic
11 Mutual Relief again.
12 Q.  For the third time?
13 A.  Yes.  And we have been with Catholic Mutual --
14 well, there was another time.  So it was actually four
15 times.  Because we went back to Catholic Mutual, I
16 think, in 1986 or '87, there was another break in there
17 after we were together because we could not come up
18 with the costs for Catholic Relief Society.
19     We were constantly trying to maintain these
20 levels of coverages working together as three diocese,
21 in many cases.
22     As I was telling you before, from '83 on, we
23 worked as a loose affiliation or joint venture called
24 Tri-Di.  Prior to that, even though we didn't have that
25 direct written agreement which we had from '83 forward,

Page 27

1  going back we were talking with Frank Matulich, it was
2  very apparent because he was the CFO for a period of
3  time, from like 1974 to 1985, I think, he was the
4  Director of Finance for not only Anchorage, but also
5  assisted with the Juneau situation because they were a
6  vacancee for a period of time.  Does that make sense?
7  Q.  Yes.  I sort of follow.
8  A.  Okay.  All right.
9  Q.  So if you go back to the '60s, a time when you
10 weren't around --
11 A.  Yeah.
12 Q.  -- there was insurance through the Catholic
13 Mutual Relief Society, I guess we can call them CMRS.
14 Is that okay?
15 A.  Just Catholic Mutual, CM.
16 Q.  Any reference to CM, that's what we mean.
17 A.  There you go.
18 Q.  And then the first change over to LaBow,
19 Haynes occurred in October '73, as far as you know?
20 A.  I don't know if that was the first change.  I
21 really don't know.  I just knew that for at least two
22 times prior to my arrival, they had shifted away from
23 LaBow, Haynes to Catholic Mutual, and then shifted back
24 to Catholic Mutual when the rates -- because their
25 desire, their desire was, if possible, to get coverage

Page 28

1  through Catholic Mutual if they could afford it.
2      And when the market was soft and we could save
3  money as a missionary diocese, Frank was telling me, we
4  needed to save our premium dollars and apply them to
5  the missions, and when the liability market was soft,
6  Catholic Mutual would not always follow that softness
7  in the market.  They were a pretty level carrier.
8      I mean, they just kept their rates pretty
9  constant, even in the investment climate that was
10 sometimes out there permits you to buy liability
11 coverage for 10 cents on the dollar, or 10 cents on a
12 hundred.
13     I mean, we were able to obtain some of that
14 coverage, and that's why we moved, as the three
15 diocese, when we did in the late '70s or the '80s, we
16 moved for a period of time away from Catholic Mutual
17 because we couldn't afford their dollars.
18 Q.  Right.  Took advantage of market conditions?
19 A.  Market conditions.
20     Now, we have realized, from the mid '80s
21 forward, the tremendous benefit, we believe, of staying
22 with that carrier when we can.  And we've been able to
23 do so.
24 Q.  When you say "that carrier," who do you mean?
25 A.  Catholic Mutual, yes.

7 (Pages 25 to 28)

Heartland Court Reporters  
Carol A. McCue, RMR  
E-mail: carol.mccue@acsalaska.net  
Telephone: 907-452-6727  
Fax: 907-488-7701

Deposition of George Bowder
Taken December 12, 2006

Continental Insurance Co. vs. Catholic Bishop of Alaska
Case No. 3:06-cv-19-RRB

Page 29

1    MR. ZIPKIN: All right. So since we're on
2 this point, let's mark Exhibit 4.
3    (Exhibit 4 marked.)
4 BY MR. ZIPKIN:
5    Q. Because Exhibit 3, the letter from
6 Father Frank, as you say, and --
7    A. Oh, okay. Yeah. This is another one. Yes.
8    Q. That was in July of '74, if I see it right.
9 This one is dated November 7 of '73. And this also
10 confirms, right, that as of October 14 of '73 --
11    A. Uh-hum.
12    Q. -- CBNA transferred their policies from
13 Catholic Mutual to -- through -- to get, as you might
14 say, secular coverage from LaBow, Haynes?
15    A. That's right. That is correct. The coverage
16 we have under LaBow, Haynes is equal to or better than
17 that which we had previously. If you have any
18 questions, you can talk to Brother Art Lopilato.
19    Q. L-O-P-I-L-A-T-O.
20    A. Right.
21    Q. Is he still alive?
22    A. He's not alive. He died in the late '90s,
23 working at that time down in the Kenai Peninsula area
24 for the Archdiocese of Anchorage.
25    Q. All right. Now, you made reference before we

Page 30

1 went off the record to ledgers, and I was just trying
2 to make sure I understood what that was, and if we
3 actually had them in the room.
4    Apparently we don't have them in the room and
5 they may not be anywhere present in Mr. Groseclose's
6 office or mine, for all I know. When you were making
7 reference to ledgers, are these check registers?
8    A. These are manual, what's called journal
9 registers. And since it's a dual bookkeeping system,
10 you not only have the journals, but you also have the
11 actual ledger where you distribute it.
12    So I have the journal ledger and an actual
13 account ledger. And so one of them is a cash
14 disbursement ledger, the other is a cash receipt ledger
15 and a journal ledger, and out of those ledgers, you
16 then post to the individual accounts for the various
17 needs within the diocese.
18    Q. All right. And are you saying that there was
19 a time when you looked through those journal ledgers --
20    A. Ledgers.
21    Q. -- those account ledgers and you saw
22 references to --
23    A. LaBow, Haynes.
24    Q. -- LaBow, Haynes, as in payments of
25 premiums --

Page 31

1    A. Premiums, insurance premiums being made. That
2 is correct.
3    Q. Okay. And those original ledgers still exist
4 in your office?
5    A. They do. Or the archives at our chancery
6 anyway.
7    Q. Okay. And as I understand, Mr. Groseclose has
8 tasked you with recreating --
9    A. Copies of those.
10    Q. -- copies of those relevant registers?
11    A. To what we're talking about; that's correct.
12    Q. Ledgers/registers.
13    A. That's right.
14    Q. Okay. And would any of the ledgers or
15 registers, to your knowledge, reference actual policy
16 numbers?
17    A. Some could have. I do not recollect. I was
18 going through an awful lot of pages. But I could not
19 positively say that it references a specific policy. I
20 may discover that it does, but I don't want to promise
21 you that.
22    MR. ZIPKIN: Okay. Since we are marking
23 paper, let's mark this 5th.
24    (Off record, recess from
25    2:56 p.m. to 2:57 p.m.)

Page 32

1    (Exhibit 5 marked.)
2 BY MR. ZIPKIN:
3    Q. Okay. So Exhibit 5 you have in front of you?
4    A. I do.
5    Q. This is the September 17th, 2003, letter from
6 Tracy --
7    A. From Tracy. Yes.
8    Q. -- Smith.
9    A. That is correct.
10    Q. Claims analyst with CNA.
11    A. Right.
12    Q. Okay. And you made reference to this letter
13 especially at Page 4.
14    A. Uh-hum.
15    Q. Under the heading, alleged Continental policy,
16 there is reference to the correspondence that we have
17 already referenced, right?
18    A. That is correct.
19    Q. Okay. And I guess the first question is, I
20 mean, are there any other documents, to your knowledge,
21 other than the ones referenced here, other than the
22 ones we've actually looked at today, and other than
23 these ledger, slash, journal documents that you're
24 going to help us get copies of --
25    A. Right.

8 (Pages 29 to 32)

Heartland Court Reporters
Carol A. McCue, RMR        E-mail: carol.mccue@acsalaska.net        Telephone: 907-452-6727
                                                                    Fax: 907-488-7701

Deposition of George Bowder  
Taken December 12, 2006

Continental Insurance Co. vs. Catholic Bishop of Alaska  
Case No. 3:06-cv-19-RRB

Page 33

1  Q. -- that, to your knowledge, relate to, you
2  know, documents you have seen, documents that you have
3  pulled that relate to insurance coverage for CBNA, from
4  any source, in the '70s?
5  A. Not that I'm aware of.
6  Q. Just bear with me here.
7  A. Uh-hum.
8  Q. Can you describe CBNA's record retention
9  policies from the time that you first joined in '78?
10  A. On a general basis or in the finance?
11  Q. Let's go general first, then see where it
12  takes us.
13  A. Okay. I would say that when I arrived in
14  1978, the document retention program that Father Frank
15  Mueller had in place was you should try to keep
16  everything at least seven years. And there were some
17  things that -- payroll items in particular that you
18  would try to keep in perpetuity that sometimes gets
19  cumbersome.
20       The archives which he was also charged with
21  taking care of, he would try to keep copies of all of
22  the correspondence that the Bishop would have or direct
23  offices would have, and so that's where we discovered
24  some of Bishop Whelan's correspondence.
25       As far as the business office went, the hard

Page 34

1  copies of checks, the hard copies of receipts, those
2  were kept underneath the standard document retention
3  program of six years, except for payroll and what's
4  called capital asset ledgers, which again, were kept
5  during the longevity for which you had the property,
6  and then for six years after you might have disposed of
7  that property.
8       So that was the general retention program and
9  is pretty close to what we try to do even today,
10  although we're being asked not to limit ourselves to
11  six years any longer, while we're -- got a whole bunch
12  of things pending, we're being asks to maintain our
13  ledger copies until matters are settled.
14  Q. Okay. I thank you for that because it's very
15  helpful. So it sounds like there would be a
16  correspondence file for the Bishop --
17  A. That's right.
18  Q. -- that is kept in perpetuity as a hard copy?
19  A. They would try to, yeah. I would think. I
20  mean, we have stuff from Bishop Gleason that goes way
21  back to when he was here early on. Yes.
22  Q. And I apologize for my limited knowledge of
23  the Catholic Church.
24  A. That's okay.
25  Q. But does a bishop basically stay as bishop

Page 35

1  until death? Is it a lifetime appointment?
2  A. Well, no. It's while he's the Ordinary of the
3  diocese, and that's until somebody is named as his
4  successor. And so you have an acting role of bishop
5  and that's called the Ordinary, the one that's in the
6  official capacity of operating and making the
7  decisions.
8       And so when Bishop Gleason was the Ordinary,
9  they had what's called those master correspondence
10  files. Those are the communications that he might have
11  had while he was in the office. And then Bishop Whelan
12  succeeded him and all of Bishop Gleason's items would
13  go to the archive. And then successively,
14  Bishop Whelan's would later go to the archives. And
15  following that, Bishop Kaniecki's would go to the
16  archives.
17       And when you go through those items, if they
18  were business-related items, in many cases, then you
19  would say, is this item over six years or more, and if
20  it is, then you say, well, that's a business-related
21  item, that occurred over six years ago, don't have to
22  keep that.
23  Q. It's not an appropriate archival item?
24  A. Yeah, that's the role of the archivist to go
25  through those.

Page 36

1  Q. Now, obviously, some survive even if they deal
2  with the storage of paint?
3  A. And I'm -- I'm assuming as anyone, when you're
4  paging through these and going through this, there's
5  many items that maybe had some other flavor of care
6  that Father Frank wanted to keep because rather than
7  throw it away, Father Frank's policy was to keep it.
8       Now, I knew that there was two, three, four
9  successors in that archivist role to Father Frank, and
10  their policies weren't necessarily quite the same as
11  Father Frank's, as far as retention.
12       Some of them would just say, if it's business
13  related, it strictly adheres to this six-year rule.
14  And so if they did a review, I mean, space is a
15  premium. And so if they did a review, they could have
16  thrown away any number of things.
17       And if I had my druthers, we have not thrown
18  away a single insurance policy since probably 1990. So
19  we've got like 16 years of insurance policies. Too bad
20  we don't have copies of all the insurance policies from
21  the date that I arrived there or even prior to, but we
22  don't have them all.
23  Q. Okay. So do you know whether anyone has gone
24  through these archived correspondence files to see if
25  there is anything in there that would reveal

9 (Pages 33 to 36)

Heartland Court Reporters  
Carol A. McCue, RMR  
E-mail: carol.mccue@acsalaska.net  
Telephone: 907-452-6727  
Fax: 907-488-7701

Case 3:06-cv-00019-TMB   Document 47-9   Filed 10/01/2007   Page 10 of 10

Deposition of George Bowder  
Taken December 12, 2006

Continental Insurance Co. vs. Catholic Bishop of Alaska  
Case No. 3:06-cv-19-RRB

### Page 37

```
 1  information about insurance in the '70s?
 2     A.   I believe they have, yes.
 3     Q.   Is that something you yourself did or somebody
 4  else?
 5     A.   I did some.  I would -- I would call my search
 6  periphery.  I am not an in-depth, detailed-type person,
 7  and I certainly don't have the patience, nor do I have
 8  the time, but we did have some people go through the
 9  files, yes.
10     Q.   Okay.  Ms. Rosenberg, did she go through those
11  files?
12     A.   I believe she went through some of the files,
13  yes.
14     Q.   Anybody else whose name you know?
15     A.   We had -- we had a lady -- was her name Susan?
16  Did she go through the files?
17          MS. ROSENBERG:  Can I answer?
18          MR. ZIPKIN:  Well, I won't stop you.
19          THE WITNESS:  I wasn't there to see it.  I
20  know that we contracted --
21          MS. ROSENBERG:  Suzanne Yorgey is the
22  insurance archeologist.  It's just...
23          THE WITNESS:  So Marsh -- the Marsh lady.
24          MR. ZIPKIN:  We'll get her name because it's
25  at the end of this report.  We're real close.
```

### Page 38

```
 1          THE REPORTER:  Could you say it once more?
 2  Sorry.
 3          MR. ZIPKIN:  Suzanna Yorgey, Y-O-R-G-E-Y.
 4  Suzanna with a Z in it.
 5          THE WITNESS:  And I -- and I know prior to
 6  that we probably had various archivists that have gone,
 7  but not specifically in answer to your question,
 8  looking for insurance.
 9          MR. ZIPKIN:  Okay.  Very good.
10  BY MR. ZIPKIN:
11     Q.   Earlier you spoke about an umbrella or excess
12  policy, I believe you made reference to that.
13     A.   Okay.
14     Q.   I'm hoping I'm not getting my depositions
15  mixed up, but I thought you made reference to the fact
16  that there was some sort of excess liability insurance
17  coverage for CBNA in place when you first arrived
18  in '78; is that right?
19     A.   That's correct.
20     Q.   Do you know who the carrier was, the insurance
21  carrier?
22     A.   I would only be guessing.  No, I do not know.
23     Q.   And have you ever seen any piece of paper or
24  any note or anything in writing anyhow, anywhere, that
25  might suggest who the insurance carrier would have been
```

### Page 39

```
 1  who provided excess umbrella liability coverage as of
 2  1978?
 3     A.   Not in writing, only through discussions with
 4  Father Frank Mueller and/or Frank Matulich from the
 5  Archdiocese of Anchorage.
 6     Q.   All right.  And what have either of them told
 7  you about that?
 8     A.   That when I first arrived, that we had the
 9  coverage with the LaBow, Haynes brokerage company.  And
10  they didn't tell me who the carrier was, all I knew, I
11  needed to get -- I needed to make sure that my checks
12  went to LaBow, Haynes so that the Archdiocese of
13  Anchorage wouldn't be covering our premiums.  So we had
14  to make our premiums to LaBow, Haynes.
15     Q.   So you knew the name of the agency?
16     A.   That's right.
17     Q.   But not the name of insurance company?
18     A.   That's right.  And I later would pick that up
19  over time because when we got together at the
20  Archdiocese of Anchorage, the Diocese Juneau person
21  coming in, I coming in, then we were able to cover
22  notes, what are we actually buying here.  I was still
23  pretty new on the scene, but I knew I needed to pay for
24  it.
25     Q.   Okay.
```

### Page 40

```
 1     A.   Yeah.
 2     Q.   And did you ever learn or did anyone ever
 3  suggest the name of the actual insurance company
 4  providing umbrella or excess liability insurance, not
 5  your primary?
 6     A.   Only -- only in passing when we were
 7  discussing the matter at the Archdiocese of Anchorage
 8  with Frank Matulich at that time, did he indicate that
 9  we had cover with Continental as a group of diocese,
10  all three diocese.  And I didn't ask him for how long,
11  I just knew that I needed to pay it for the current
12  premium time frame.
13          And then what we were looking for then, was
14  this the best policy because we were meeting to deal
15  with budgetary issues, and where were we going to stay
16  when we went forward.  And that's when we were moving.
17  Because I got there in '78, we were moving to have our
18  changeover on an April 15th date of 1979.
19          So my understanding is that it was most likely
20  Continental.  That's -- that's after almost a 30-year
21  recollection.  That's the best I can do.
22     Q.   From what you've said earlier, I take it that
23  you do understand the difference between a primary
24  insurance policy --
25     A.   Oh, very definitely.
```

10 (Pages 37 to 40)

Heartland Court Reporters  
Carol A. McCue, RMR    E-mail: carol.mccue@acsalaska.net    Telephone: 907-452-6727    Fax: 907-488-7701