Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

---

**Page 1**

```
 1            IN THE UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF ALASKA
 3
   CONTINENTAL INSURANCE COMPANY,)
 4                              )
              Plaintiff,        )
 5                              )
        vs.                     )  No. 3:06-cv-00019 RRB
 6                              )
   CATHOLIC BISHOP OF NORTHERN  )
 7  ALASKA,                     )
                                )
 8            Defendant.        )
 9
10
11            DEPOSITION OF JULIAN ROBB
12         Taken in behalf of the Defendant
13               October 4, 2006
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 2**

```
 1            BE IT REMEMBERED that the deposition of
 2  JULIAN ROBB was taken before Amy A. Dalton, Court
 3  Reporter and Notary Public, on October 4, 2006,
 4  commencing at the hour of 10:30 a.m., in the
 5  conference room of the Monarch Hotel, in the City
 6  of Clackamas, County of Clackamas, State of Oregon.
 7
 8                      -:-
 9
10                  APPEARANCES:
11
12  GRIPPO & ELDEN
        Attorneys at Law
13      By Brian J. Mowbray
              Counsel for Plaintiff
14
15  COOK SCHUHMANN & GROSECLOSE
        Attorneys at Law
16      By Robert B. Groseclose
              Counsel for Defendant
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
                    COMPUTER INDEX

                                            Page/Li
EXAMINATION BY MR. GROSECLOSE:.............  4   6
EXAMINATION BY MR. MOWBRAY:................ 97  23
EXAMINATION BY MR. GROSECLOSE:............ 110  18
(Work history memo, EXB. 1, marked.)....... 11  19
(Deposition notice, EXB. 2, marked.)....... 72   4
(Interoffice communication to Ms. Christopher from
Mr. Krug dated 2-20-75, EXB. 3, marked.)... 72   5
(Letter to Mr. Gorski from Ms. Smith dated
8-24-04, EXB. 4, marked.)................... 80  23
(LaBow Haynes memo, EXB. 5, marked.)....... 87  11
(Telephone request dated 2-6-75, EXB. 6,
marked.).................................... 89   7
(Letter to Mr. Robb from Father Mueller dated
2-28-74, EXB. 7, marked.)................... 96  19
(Accounting forms, EXB. 8, marked.)........ 96  22
(Personal injury liability insurance
endorsement, EXB. 9, marked.)............. 108   8
```

**Page 4**

```
 1                  JULIAN ROBB
 2  was thereupon produced as a witness in behalf of
 3  the Defendant and, having first been duly sworn,
 4  was examined and testified under oath as follows:
 5
 6  EXAMINATION BY MR. GROSECLOSE:
 7       Q.  Mr. Robb, I'm Bob Groseclose.  I
 8  represent the Catholic Bishop of Northern Alaska,
 9  which is a party in litigation that's pending in
10  Alaska.
11           Did you get a copy of the notice of
12  taking deposition?
13       A.  Yes, I did.
14       Q.  And in that it referred to some
15  documents, if you had any such things in your
16  possession, if you could bring those with you.
17       A.  Correct.
18       Q.  Were there any such items?
19       A.  No.  I have nothing from -- you know,
20  anything that would be pertinent.  The only thing I
21  could find, actually, was an inland marine
22  manual --
23       Q.  Okay.
24       A.  -- prior to Continental even.  It was in
25  the Loyality Group, which was a predecessor.
```

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

---

5

1    Q.   Okay.  Well, before we get too far, let
2  me cover some basics.
3         Could you state your full name for the
4  record.
5    A.   **Julian Robb.**
6    Q.   And do you use a middle initial or middle
7  name?
8    A.   **"A" is my middle initial.**
9    Q.   Your address for the record.
10   A.   **13582 Southeast 151st Terrace, Clackamas,**
11 **Oregon 97015.**
12   Q.   And how long have you lived in Oregon?
13   A.   **Well, which time?**
14   Q.   Well, why don't we start with, where are
15 you from?
16   A.   **Where am I --**
17   Q.   Where were you raised?
18   A.   **Where was I born?**
19   Q.   Yeah.
20   A.   **In Neal, Kansas.  Moved out to Portland**
21 **in 1942.**
22   Q.   Okay.
23   A.   **Yeah, 1942.  Went to school in Portland,**
24 **got married in Portland, had kids in Portland.**
25 **Then was transferred to Great Falls, and then to**

---

6

1  **Seattle, and then to Sacramento, and then I came**
2  **back home.**
3    Q.   Okay.
4    A.   **And I've been here ten years now, second**
5  **time.**
6    Q.   Have you been deposed before?
7    A.   **Pardon?**
8    Q.   Have you ever been deposed before?
9    A.   **Yes.**
10   Q.   And on what occasions were those?
11   A.   **I haven't any recollection.  They were**
12 **just meetings like this on certain insurance**
13 **transactions.**
14   Q.   More than five years ago?
15   A.   **Oh, yes.**
16   Q.   Well, as you maybe recall from that
17 process, I'll be asking questions.  The court
18 reporter will be recording what transpires.  So to
19 that extent, to avoid talking over one another,
20 it's helpful if -- if I remember to let you finish
21 your answer, and vice versa, if you remember to let
22 me finish a question.
23   A.   **All right.**
24   Q.   I sometimes have a halting way of
25 delivering a question because I maybe get partway

---

7

1  into it and switch gears, so bear with me.  If you
2  think you're anticipating my question, be sure to
3  let it get totally out.
4         The other ground rule is, it's -- because
5  it's a recorded session, is having an audible
6  answer and an understandable, audible answer.
7    A.   **Yes.**
8    Q.   If you nod your head, I might understand
9  that.  Because in a conversational way, it's easy
10 to lapse into that.
11   A.   **Yes.  I understand.**
12   Q.   I think, before we went on the record, I
13 mentioned we can take breaks at any time.  So, by
14 all means, let me know if you wish to do that;
15 otherwise, generally we break on the hour or
16 thereabouts.
17        You're represented, is that right, by
18 Mr. Mowbray?
19   A.   **I guess you'd call it representation.**
20        MR. MOWBRAY:  Yes.
21
22 BY MR. GROSECLOSE:  (Continuing)
23   Q.   Okay.  And are you currently employed?
24   A.   **No.**
25   Q.   When were you last employed,

---

8

1  approximately?
2    A.   **By an insurance company or employed,**
3  **period?**
4    Q.   Well, let's -- let's start with employed,
5  period, because I -- what I'd like to also gather
6  is kind of your background, both education and
7  employment history, so however we kind of weave
8  that into it.
9         I understand you're an insurance person
10 by work experience?
11   A.   **That is correct.**
12   Q.   And are there other trades you've also
13 pursued?
14   A.   **Well, once the -- once the CNA took over**
15 **the Continental, my position was eliminated, you**
16 **might say.**
17   Q.   When did that happen?
18   A.   **And I was retired in 19 -- in November of**
19 **1994.**
20   Q.   And when did -- is that when CNA, then,
21 took over CIC, as I'll refer to Continental?
22   A.   **They were in that era, yes.**
23   Q.   When did you start with Continental?
24   A.   **Well, I actually started in 1952 with**
25 **Loyality Group.**

---

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

                                                                                    9

1       Q.    Loyality?

2       A.    Loyality, L-O-Y-A-L-I-T-Y.

3       Q.    Based where?

4       A.    Here in Portland.

5       Q.    Okay.  And is Loyality -- do you know

6   where it's headquartered?

7       A.    It was Newark, New Jersey, at that time.

8       Q.    Does it still go by that name?

9       A.    Well, it was Loyality Group, and it was

10  purchased or merged with the America Four Group,

11  which later changed its name to the Continental

12  Insurance Group.

13      Q.    Okay.

14      A.    So it's all one complete operation, but

15  the Loyality Group and the America Four name is no

16  longer used.

17      Q.    All right.  Maybe before we -- let's fill

18  in the time period before '52.  You mentioned your

19  background is Kansas and then Portland.  What's

20  your date of birth, if I might ask?

21      A.    March 29th, 1935.

22      Q.    And what -- you finished high school in

23  Portland?

24      A.    Yes.

25      Q.    Any college or post-high-school

                                                                                    10

1   education?

2       A.    I started with Loyality Group before I

3   graduated from high school.  I went to work with

4   them when I graduated.  I later took some courses

5   at Portland -- what was Portland State Extension at

6   that time; did not graduate.  I have about one year

7   of equivalent college.

8       Q.    Okay.  Your major or focus was what?

9       A.    Didn't get into that.  It was primarily

10  business, though.  Most of my courses were business

11  courses.

12      Q.    Okay.  And so -- and what was your first

13  position with Loyality?

14      A.    I was a rate clerk.

15      Q.    And what does that mean?

16      A.    That's when applications came in, why,

17  you'd do the rating on them at that time by hand,

18  multiplying with pen and pencil, coming up with a

19  premium.

20      Q.    Okay.  And then did you remain with

21  Loyality through the successive renames or mergers

22  that you outlined?

23      A.    All -- all the mergers up to the point,

24  then I got disenchanted and quit in June of 1976.

25      Q.    And at that time it was Continental,

                                                                                    11

1   wasn't it?

2       A.    It was Continental at that time, yes.

3       Q.    You were working in Seattle at that time.

4       A.    Yes.

5       Q.    When was it you moved to Seattle?

6       A.    February of 1966.

7       Q.    You're referring to a note.  Is that sort

8   of a resume?

9       A.    This is just something that I knew I was

10  going to need, so I reconstructed all my pertinent

11  times.

12      Q.    Okay.  Well, if we could, maybe I could

13  just make this a --

14      A.    You can have it.

15      Q.    -- an exhibit to the depo.

16      A.    I have it in my own --

17           MR. GROSECLOSE:  So you -- we'll refer to

18  this as Exhibit 1, Madam Court Reporter.

19           (Work history memo, EXB. 1, marked.)

20

21  BY MR. GROSECLOSE:  (Continuing)

22      Q.    Beginning as a rate clerk -- when -- I'm

23  sorry.  When -- when did you take on other

24  responsibilities beyond rate clerk?

25      A.    Well, at that time it was a small -- or

                                                                                    12

1   not small, but it was not an enormous company, and

2   so you did your work as you were required to.  And

3   if there was free time, if you didn't have anything

4   to do, well, then I jumped from one place to

5   another.  So I really don't have any dates or

6   anything because I kind of helped out in this

7   department, and I helped out in that department.

8       Q.    Uh-huh.

9       A.    I was in the fire department with

10  residential and commercial for, oh, I don't know,

11  maybe -- let's see -- three years.  And then I went

12  into the auto -- automobile department -- all

13  departments were separate at that time -- and

14  worked there for a year or two.  Then I went to the

15  inland marine department, became the inland marine

16  underwriter.  And then when things got slow, I

17  worked with the casualty department.

18      Q.    Does inland marine mean what it presumes

19  to state, namely --

20      A.    Coverages --

21      Q.    -- shipping in --

22      A.    -- coverages --

23      Q.    -- inside --

24      A.    Excuse me.

25      Q.    -- the ocean?

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

13

```
1      A.    Coverage that is usually confined to
2  transit --
3      Q.  ' Okay.
4      A.    -- so, yes.
5      Q.    Okay.
6      A.    Motor transportation, jewelry floaters,
7  camera floaters, those kind of things, fine arts,
8  things that move around.
9      Q.    So it's not -- it's not the boat itself?
10      A.    No.  No.  It's -- boats have transit and
11  these are transit in -- inland.  That's where it
12  gets the inland marine.
13      Q.    Okay.
14      A.    Property in transit.
15      Q.    They come to the country by a boat, but
16  after they hit the shore, then they become inland
17  marine?
18      A.    Doesn't -- doesn't have to come to --
19  inland marine does not necessarily mean marine
20  shipments.  It's anything that is in transit on
21  land.
22      Q.    Okay.  Claims versus underwriting, how
23  much of the functions that you've described so far
24  were in one category or the other?
25      A.    Claims department is an entirely
```

14

```
1  different unit.  It has nothing to do with
2  underwriting.  They're two separate departments.
3      Q.    So everything you've -- you have covered
4  up to this point was on the underwriting side?
5      A.    On the underwriting side.  Never in the
6  claims department.
7      Q.    Okay.  And is what we've described as
8  taking on such functions as -- as where the need
9  arose, does that cover you up through June of '76?
10      A.    Well, in -- let's see.  When Continental
11  took over the Loyality Group, they were involved in
12  boiler machinery.  And so about 1963, we'll say, I
13  got involved in boiler machinery.
14      Q.    For the Loyality Group?
15      A.    Well, it would be Continental then.
16      Q.    All right.
17      A.    Because when they merged, they had
18  boiler.  We never knew what a boiler was in the
19  Loyality Group.
20          In 1964 they promoted me to a multiple
21  'ines underwriter and transferred me to Great
22  ʃalls, Montana.
23      Q.    And how long were you in Great Falls?
24      A.    What, a year and a half, two years.  Two
25  years.  About a year and a half.
```

15

```
1      Q.    And then what function did you take on in
2  Seattle in 1967?
3      A.    When I first came back, I was still a
4  multiple lines underwriter but doing boiler
5  machinery underwriting.
6          And within six to eight months, then went
7  back to the commercial lines and did CPD.
8      Q.    Which stands for what?
9      A.    Commercial multiperil department, which
10  then became a separate department.
11      Q.    Separate from?
12      A.    Well, excuse me.  Not a separate
13  department but an individual department, like
14  casualty, auto, and these were packages -- all
15  package policies.
16      Q.    Okay.  What was your title or capacity at
17  the time you quit in June of 1976?
18      A.    Not certain, because my title and -- and
19  functions, as you can tell, changed quite a bit.
20  It was probably senior underwriter at that time.  I
21  believe that's what it was.  Because during this
22  time we had a lot of things that were combined.  We
23  brought some people up from San Francisco.  We
24  combined all the northern -- I left -- I was
25  transferred from Great Falls to Seattle because
```

16

```
1  they closed down the underwriting portion of the
2  Great Falls office and just had field people --
3  field reps there.
4      Q.    In underwriting or claims or this was all
5  underwriting?
6      A.    This was all underwriting.
7      Q.    Okay.  So when you say they had field
8  people there, how -- how do you differentiate field
9  people after the change you've described compared
10  to when you were there?
11      A.    The field people are representatives of
12  the company that call on agents, appoint agents,
13  make sure the collections are done from the
14  agencies.  They are the go-between between the
15  company and the agents.
16      Q.    Okay.  Up until that point, had you had
17  any involvement with Alaska-based coverages or
18  Alaska-based insureds in Alaska?
19      A.    Up to what point?
20      Q.    1976.
21      A.    Prior to being transferred to Seattle,
22  no.  In fact, at first I wasn't really involved in
23  Alaska at all.
24      Q.    So that takes you up to '66, then.  So
25  prior to '66, you had no involvement with Alaska?
```

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

---

**17**

1      A.    That's correct.

2      Q.    But beginning with your transfer to

3  Seattle in '66, you were introduced to matters

4  involving Alaska?

5      A.    My recollection is hazy, but, in

6  generalities, I believe that we had an agent who

7  was a recording agent that handled Alaska.

8      Q.    Do you remember who that was?

9      A.    No, I -- I do not.

10     Q.    And by "recording agent," would that be a

11  company or would that be an individual?

12     A.    It would be an agent that was given

13  underwriting responsibility as opposed to the

14  company doing it.  And he handled Alaska.  I don't

15  know when that was -- relationship was terminated.

16  But upon the termination of that, then all the

17  underwriters got involved in Alaska business.

18     Q.    Okay.  Do you know LaBow Haynes?

19     A.    I'm aware of LaBow Haynes of Seattle.

20     Q.    Were they agents for Continental?

21     A.    They were actually brokers.

22     Q.    And describe the difference.

23     A.    An agent is a person who is licensed by

24  an insurance company to sell insurance to the

25  general public.  The broker is the representative

---

**18**

1  of an insured who goes out and gets insurance from

2  companies; sometimes licensed, sometimes not.

3      Q.    So they would come to Continental --

4      A.    Yes.

5      Q.    -- LaBow Haynes would, and say, "We -- we

6  basically have a customer with insurance needs, and

7  we wish to market their needs with you.  Give us a

8  quote"?

9      A.    That is correct.

10     Q.    Is that kind of how it works?

11          And then they would, in turn, take a fee

12  from -- from the company, from the insurance

13  company that -- in the event insurance is placed?

14     A.    Yes.  There is a commission involved that

15  comes --

16     Q.    Okay.

17     A.    -- that goes to the agent or broker.

18  Same manner in both cases.

19     Q.    Okay.  In the documents that I gave you

20  in advance of the deposition, maybe we can look at

21  one.  It has a number in the lower right-hand

22  corner of CBNA.INS.362.  And what I'm looking at

23  is -- it appears to be kind of a computer printout

24  sheet, and then the upper left-hand corner it has

25  the name "Continental Insurance Company," and

---

**19**

1  beneath that it has "As of 4-30-74," the far

2  right-hand upper part says, "Page 23," and

3  handwritten above that it says, "Page 1 of 2."

4      Do you have that in front of you?

5      A.    I do.

6      Q.    Do you know if that is -- whose file

7  might have generated this?  Would this be LaBow

8  Haynes or would this be Continental?

9      A.    This is an account -- currents accounting

10  sheet that -- that is a printout for LaBow Haynes

11  of Alaska.

12     Q.    Prepared by whom, do you presume?

13     A.    Continental Insurance accounting

14  department.

15     Q.    Okay.  And so the purpose of this was to

16  show those policies placed with Continental by

17  LaBow Haynes or through LaBow Haynes?

18     A.    The actual purpose of this form is to

19  keep a record of what we billed LaBow Haynes for

20  the policies that they have sold and whether we've

21  collected it and at what commissions.

22     Q.    Okay.  As we work down that page -- or

23  maybe before we start down, along -- across the

24  top, it has some numbers there.  Do you know what

25  the 99999 is -- represents?

---

**20**

1      A.    No, I do not.

2      Q.    And then as -- as we come down further,

3  it has a column entitled "Assured," which I'm

4  assuming is the -- the insured or the company or

5  person that has insurance with Continental; is that

6  right?

7      A.    That is correct.

8      Q.    And then the next column to the right of

9  that has "Type," and then there's a number in

10  that.

11          What does that mean, if you know?

12     A.    I do not know.

13     Q.    The pattern that I detect in the way this

14  one sheet is put together is the -- the number

15  assigned under "Type" progresses kind of -- up top

16  is a number 1, although there are -- the numbers

17  aren't fully in sequence because I don't see a

18  number 2, but then there's a 3.  And we get down

19  to -- Diocese of Juneau is a number 6, and beneath

20  that, Corporation of Catholic Archbishop is a 6.

21  Diocese of Juneau is a 6.  And then further down

22  it looks like my client is listed as a number 9.

23     A.    Okay.  This is speculation.  I'm not

24  aware -- I'm not absolutely sure, but this is an

25  accounting form, and these are accounting records.

---

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

21

1  From the -- looking at these, those numbers under
2  "Type" would be the type of policy, 1 being a fire
3  _olicy, 3 being a -- a -- and I can't remember what
4  "FC" was.  It might have been a fidelity policy.
5  6 being an SMP.  9 being a liability policy.  10
6  being a Workers' Compensation.
7      Q.  Okay.
8      A.  So your "Type" is -- is a code on the
9  accounting system alluding to the type of coverage
10 or the type of policy that was issued.
11     Q.  So SMP, I'm told, is -- stands for
12 special multiperil?
13     A.  That is correct.
14     Q.  And what -- explain what you know that to
15 be.
16     A.  As I mentioned before, there were
17 different departments for each type of coverage,
18 property, inland marine, casualty, fidelity, bonds,
19 boiler machinery.  All policies are filed with the
20 state departments, so ISO came up with a special
21 multiperil policy which included more than one
22 item.  And by virtue of that, expenses were
23 reduced, so premiums could also be reduced.
24     Q.  ISO stands for?
25     A.  Insurance Services Offices, which is a

22

1  group which does the filings for forms and types of
2  coverages.
3      Q.  So if the policy was filed with the state
4  department -- and you're referring to the
5  department of every state, so Alaska's insurance
6  commissioner, is that what you're referring to?
7      A.  That is correct.  But these are forms,
8  not policies.
9      Q.  So explain the difference.  The "form"
10 being what?
11     A.  A policy is a combination of insuring
12 agreements.  Those insuring agreements are forms.
13     Q.  Okay.
14     A.  Each being specific, each being for some
15 purpose.
16     Q.  So -- an insurance form would be -- this
17 is my example, or if you chose to give me -- well,
18 maybe I'll approach it that way.  Give me an
19 example of an insurance form in the way you've used
20 the term.
21     A.  A fire coverage form providing fire --
22     Q.  Okay.
23     A.  -- insurance.
24     Q.  So another example would be an auto
25 coverage?

23

1      A.  Correct.
2      Q.  So then the policy if -- if I want
3  insurance for fire and auto, then my policy would
4  be a combination of those two forms?
5      A.  Even a -- yes.  Even a fire policy, going
6  back further, again, you'd have a -- a property
7  declaration which would give the coverages, the
8  exclusions, the conditions of the fire; then you
9  might have an extended coverage form that would go
10 on it which would provide additional coverages;
11 then you might have a vandalism and malicious
12 mischief endorsement, which would provide
13 vandalism, which, again, is an extension; you could
14 have an additional perils.  And all of those
15 would -- then would form the fire policy.
16     Q.  Okay.  So back to CBNA.INS.362.  Do you
17 have an opinion, under the entry for Catholic
18 Bishop of Northern Alaska, what form of liability
19 policy the number that begins with an L --
20 actually, there's two of them -- would be
21 embracing?
22     A.  Would you ask that again, please?
23     Q.  If you drop roughly two-thirds of the way
24 down the page there, under Catholic Bishop of
25 Northern Alaska, you'll see the number 21251 on the

24

1  far left-hand side.
2      A.  Yes.
3      Q.  And then -- and I might ask, what does
4  that number mean?  Is that just kind of an assigned
5  customer number?
6      A.  The 21251, I have no idea.  Again, this
7  is an accounting entry and a lot of these would be
8  accounting codes --
9      Q.  Okay.
10     A.  -- that would mean something to the --
11     Q.  The accountant?
12     A.  -- collection agent -- collection
13 department.
14     Q.  Okay.  And that is of Continental
15 Insurance?
16     A.  Yes.  Yes.
17     Q.  Would that be in the Seattle area at the
18 time, do you think?
19     A.  No.  This probably would have been in San
20 Francisco.
21     Q.  And you know that because, what, the --
22 Continental divided up their accounting office with
23 the West Coast and some other eastern-based office?
24     A.  The companies were separated by
25 departments, the eastern department, middle

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

25

1  department, the western department, the Pacific
2  Coast department. And the main office for that
3  region did the accounting --
4      Q.   Okay.
5      A.   -- and it was San Francisco at that time.
6      Q.   Okay. All right.
7           And that included Alaska?
8      A.   That included Alaska.
9      Q.   Do you know, by chance, who was in charge
10 of accounting at that time?
11     A.   No.
12     Q.   Do you know where their records would
13 be --
14     A.   No.
15     Q.   -- at this point in time?
16     A.   I would have no idea since I was never
17 involved in them.
18     Q.   Do you know if they're still -- well,
19 we've got a couple of mergers that have occurred,
20 or acquisitions, since then, correct?
21     A.   That's correct.
22     Q.   Do you happen to know now, currently,
23 if -- if it's CNA Finance Corp., if -- if that's
24 the latest --
25     A.   I have --

26

1      Q.   -- entity?
2      A.   -- no idea of the operations of CNA.
3      Q.   Okay. So your last real memory was upon
4  retiring in '94, and by that I mean memory of --
5      A.   Correct.
6      Q.   -- of CNA --
7      A.   The operations, yes.
8      Q.   -- and what previously had been
9  Continental?
10     A.   Yes. When CNA took over, they decimated
11 the staffs and changed all the departments, and I
12 have no idea what went on after that.
13     Q.   Okay. All right.
14          Back to No. 362. So the "L" number
15 that's like the third or fourth column over, my
16 question was: Do you know what form the "L" prefix
17 would embrace?
18     A.   The "L" policy was the general liability
19 policy. But what forms were on that policy, I
20 could not tell you.
21     Q.   And describe for me what you mean by
22 "general liability." What -- what would that
23 cover, generally speaking?
24     A.   Bodily injury and property damage arising
25 out of an accident.

27

1      Q.   An accident stemming from a job site,
2  automobile, boiler --
3      A.   General liability -- excuse me.
4      Q.   Okay. Yeah. I'm just trying to compare
5  it and contrast it to say an auto policy or a
6  boiler policy or a Workers' Comp. policy or --
7      A.   Bodily injury and property damage arising
8  out of an occurrence at a specific location. In
9  other words, liability arousing -- arising out of
10 an operation or -- or location, not auto.
11     Q.   Okay. And if it was a company or an
12 institution, or in my client's case, a diocese,
13 would that be specific to a particular church or
14 the companies or branch, if you're a for-profit
15 company, or would it be for the company generally?
16     A.   Want to rephrase that?
17     Q.   If Joe's Barber Shop has five barber
18 locations in Portland --
19     A.   Okay.
20     Q.   -- and Joe's comes to you and wants a
21 general liability policy, would you know -- would
22 you treat that as kind of a one form to cover the
23 five different Portland-based barber locations or
24 would you aggregate it and say, "Here's one policy,
25 and it covers you in all places," or does it

28

1  depend?
2      A.   Depends.
3      Q.   Okay.
4      A.   It's up to the insured and the agent as
5  to what coverage they request. Generally speaking,
6  a policy will cover all exposures of an insured in
7  one policy, but that is not necessarily a firm
8  rule.
9      Q.   Okay. What -- and this might jump around
10 a little bit, but, nevertheless, it might help the
11 flow of the questioning and -- and your
12 involvement. In the packet you have there, there's
13 a letter that you signed. I've got to get the
14 number here. Bear with me just a minute.
15     A.   347.
16     Q.   347. Thank you.
17          And this is a letter by you, March 11,
18 1974, to Chancery Office, Diocese of Fairbanks; is
19 that right?
20     A.   That is correct.
21     Q.   And your letter -- I mean, it speaks f
22 itself so I'm not going to read it, but generally
23 addresses questions -- or it addresses, rather,
24 something about paint storage.
25          Is that fair to say?

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

29

1    A.    Correct.

2    Q.    And it references a letter from Father
3    Mueller of February 28th, which I'm trying to
4    recall if we have that in our packet here.  Yes, we
5    do.  CBNA.INS.345 appears to be a letter of
6    February 20, 1974, to you by Father Mueller --
7    Mueller, perhaps -- is that right?

8    A.    Yes.

9    Q.    Apart from what you see here in this
10   exchange, do you have any memory of dealing with
11   the Diocese of Fairbanks or CBNA, as I often refer
12   to it, Catholic Bishop of Northern Alaska?

13   A.    I do not.

14   Q.    Your title on your -- your letter is
15   superintendent commercial multiperil.  Do you know
16   if -- if you were at that time also handling the
17   boiler underwriting?

18   A.    Yes.

19   Q.    On -- in Father Mueller's letter to you,
20   he references an SM -- a number that is SMP
21   2390621.  Is that a number that appears to you to
22   be a Continental number?

23   A.    We wrote policies with the SMP symbol.
24   It is very possible.

25   Q.    When you wrote those policies, how is the

30

1    numbering configured or how were the numbers chosen
2    and used?

3    A.    They were assigned by the company and
4    they were printed out.  And, as far as I know,
5    there was no specific coding that those numbers
6    provided.

7    Q.    When you say "by the" -- "assigned by the
8    company" --

9    A.    Continental Insurance.

10   Q.    -- would that be your Seattle office
11   itself or was there kind of a mission control, if I
12   can use that term, somewhere else in the country
13   that dealt with that?

14   A.    They were nationwide provided someplace.
15   Probably home office provided all policies for all
16   departments for all offices.

17   Q.    And where was the home office then?

18   A.    New York.

19   Q.    New York, New York?

20   A.    New York, New York.

21   Q.    Do you have a memory of any insurance
22   issues or insurance communications with CBNA or the
23   Fairbanks diocese earlier than this letter exchange
24   we have?

25   A.    It is unusual to write directly to an

31

1    insured, but I don't have any recollection of -- of
2    it at all.

3    Q.    Okay.  When you say it's unusual, is that
4    because if they have a broker, you'd normally go
5    through the broker?

6    A.    That is correct.

7    Q.    And you'd expect them to go to the
8    broker?

9    A.    That is correct.

10   Q.    Do you know if LaBow Haynes itself had
11   any -- well, was there anything about the LaBow
12   Haynes structuring or operation that would explain
13   the insured coming directly to Continental as this
14   exchange reflects?

15   A.    If I might expound a little bit on this,
16   this is a recommendation usually made by an
17   engineer.  An engineer is a person who goes out and
18   inspects the property or premises for purposes of
19   insurance.  We had a -- our representative in
20   Anchorage that handled most of Alaska.

21   Q.    Do you remember that person's name?

22   A.    Evelyn Christopher.

23   Q.    Was she based up there?

24   A.    She was based up there, yes.

25   Q.    Anchorage or --

32

1    A.    Anchorage.

2    Q.    Okay.  Do you know if she's still living
3    or still there?

4    A.    I was just informed that she's in a
5    nursing home somewhere --

6    Q.    Okay.

7    A.    -- with dementia.

8    Q.    Yeah.  I think --

9    A.    I was not even aware of that.

10   Q.    Okay.

11   A.    Back to what I was saying, generally we
12   had our own engineers do this, but in February, in
13   Alaska, in Fairbanks, we probably hired an
14   independent person to go out and survey that.  Our
15   engineers would send out this card that is referred
16   to requesting compliance with recommendations.  In
17   this particular case, and I'm guessing, but it
18   seems reasonable to me that since this was a -- a
19   non-employee that made the recommendations, that
20   our engineering department probably made the
21   recommendation, and I got involved to make sure it
22   was complied with.

23   Q.    Well, the opening paragraph of
24   Mr. Mueller's letter to you says, "Enclosed is the
25   card which indicates that the recommendations made

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

33

1  in your letter of February 19th have been complied
2  with."
3      A.    Yes.
4      Q.    Was it your practice to -- consistent
5  with what you've said where you have some
6  engineer's involvement or -- then transmit a --
7  kind of a checklist or a card?
8      A.    The normal procedure would have been, the
9  engineer would have gone out to the premises, made
10 recommendations, wrote the letter to the insured,
11 enclosed the card saying that these recommendations
12 were complied with.  That is the card that we're
13 referring to here.  It's saying, "I did all these
14 recommendations."
15     Q.    But -- but your -- would the card then
16 have your return office address on it?
17     A.    Yes.  Correct.  And normally that is all
18 done by the engineering department.  And the only
19 time the underwriter gets involved is if they
20 weren't complied with.  Then the underwriter would
21 go to the agent and say, "We got a problem."  But
22 in this case -- as I say, this is unusual.  I don't
23 really recall this, but this makes sense because of
24 the way we were set up then, the time frame that --
25 February, that I'm sure that I did do what the

34

1  engineer normally would do.  And, again, this is a
2  property recommendation, not -- not anything else.
3      Q.    Okay.  Do you know, in composing your
4  response to Father Mueller, whether that is
5  something that you would have had engineering input
6  on or was this something that would have been the
7  type of knowledge you would have accumulated at
8  that point in time and would have been passing
9  along independent of an engineer's input?
10     A.    This is a normal type of situation that
11 nonflammable paints would not necessarily be
12 confined to a metal cabinet.  However, generally
13 speaking, we talk to our engineers and make sure
14 that we're all talking the same language, so I
15 could have consulted with our local engineer.  I
16 have no recollection of that.
17         I might also specify the fact that it's
18 rather unusual that I would have written a letter
19 or that any underwriter would have written a letter
20 not indicating a policy number.  That just is not
21 done.
22     Q.    So you're -- what you're saying is you're
23 being critical of your own letter?
24     A.    No.  I may not have had a policy number.
25     Q.    All right.  So if Father Mueller writes

35

1  to you and indicates a policy number and you write
2  back without referencing that policy, if this
3  wasn't an insured of yours, you probably would have
4  pointed that out, wouldn't you?
5      A.    The normal business letter never shows
6  noted information in the bottom.  It's usually in
7  the heading.  In other words, the letter I got, you
8  don't have a -- the letter I got, and I don't know
9  that that information was on the original letter --
10     Q.    You're referring to 345 --
11     A.    345.
12     Q.    -- Mueller's letter to you?
13     A.    Correct.  The bottom portion of that
14 letter.  Because if I had gotten that letter with
15 that policy number on it, I would have referred to
16 that policy number.
17     Q.    Now that you've -- look at the bottom
18 half of the -- below the -- Father Mueller's
19 letter.  He's saying above that, "Enclosed is the
20 card which indicates that the recommendations made
21 in your letter of February 19th have been complied
22 with," and then what I see on the bottom portion of
23 345 is -- it says, "Insured:  Catholic Bishops,"
24 plural -- which is the phrasing they used -- "of
25 Northern Alaska.  Policy number:  SMP 2390621.

36

1  Location:  1312 Peger Road, Fairbanks.  The
2  recommendations referred to in your letter of
3  February 19th, 1974, have been completed," and then
4  "February 28th, 1974."  You know, it occurred to
5  me, in the lower left there seems to be a little
6  printing reference of some sort.  I'm wondering if
7  the card itself, whoever might have made this file
8  copy that we're both holding here --
9      A.    Yes.
10     Q.    -- might have taken the card, put the
11 card and the letter on the same --
12     A.    I think you're right.
13     Q.    -- Xerox machine and copied it?
14     A.    That does look like the card.
15     Q.    Okay.  And would that be a card of the
16 type -- you know, I realize we can't see the color
17 of the card or know its true size, but do you have
18 a recollection, was it kind of an index card, the
19 standard three-by-five sort of thing or --
20     A.    It would be a postcard type --
21     Q.    Okay.
22     A.    -- because it probably had our address ___
23 it to be used as a postcard so they could just send
24 it in.
25     Q.    Okay.  And it seems -- yeah.  In looking

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

37

1  at it, it has "Date," and then typed in above the
2  ate, and then to the right of that, I can't quite
3  read it. Is that -- do you see what I'm referring
4  to? It has "Reverend Francis." Just right there
5  above "Francis," it has what looks like a
6  preprinted word of some sort.
7  A.    Can't make it out.
8  Q.    "Insured"?
9  A.    It's possible.
10  Q.    I need my handy magnifying glass.
11      Do you know if representative samples of
12  those types of cards, if we wanted to obtain one,
13  where we might have luck doing so?
14  A.    I would have no idea.
15  Q.    Do you have any idea of files from
16  Continental after '94, when you left, where they
17  ended up?
18  A.    I have no idea.
19  Q.    Do you know what policy for file
20  retention was while you were there?
21  A.    It was continually changing, so when are
22  you referring to?
23  Q.    Well, up until '94.
24  A.    I have no idea. At that point the files
25  ere shipped for -- in a storage unit, and I have

38

1  no idea what -- who handled it or where they went.
2  Q.    Do you know where Iron Mountain is --
3  A.    No.
4  Q.    -- or where that is?
5  A.    I know that name, but I don't know where
6  it is. I know they have a lot of -- several
7  locations.
8  Q.    Is Iron Mountain a company or is that a
9  place?
10  A.    Yes. It's a company.
11  Q.    Okay.
12  A.    I think it might have been a place at one
13  time, and that's where it got its name. But, as
14  far as I know, it is a -- a company.
15  Q.    That stores files?
16  A.    That stores files for everybody, banks,
17  you know, institutions, insurance companies. It's
18  a storage facility.
19  Q.    But it's not -- it's got various
20  locations geographically?
21  A.    As far as I am aware of, yes. I don't --
22  I don't think it would be all one location.
23      MR. GROSECLOSE: If I might ask,
24  Mr. Mowbray, do you know in the -- I realize Laura
25  McNally's the one that signed the interrogatory

39

1  responses referring to Iron Mountain, but do you
2  know if there is a location that was denoted by
3  that?
4      MR. MOWBRAY: I'm not sure on the
5  responses if there are. I know that Iron Mountain
6  has several locations.
7      MR. GROSECLOSE: Okay.
8
9  BY MR. GROSECLOSE: (Continuing)
10  Q.    Okay. Do you know if -- if the form or
11  the card that we're referring to was a standard
12  insurance-type form that many companies were using
13  or was this unique, by your experience, to
14  Continental?
15  A.    This card is our doing, indicated by the
16  policy -- by the number in the corner. It's PAC,
17  which would be Pacific, liability department, and a
18  form number.
19  Q.    Okay.
20  A.    So it would have been developed by
21  Continental.
22  Q.    Referring back to your comment about the
23  unusualness of your sending a letter without
24  referring to the policy number -- I'm referring to
25  CBNA.INS.347 -- if you were to assume that Father

40

1  Mueller's letter enclosed what is the bottom half
2  that was in the form of a card, does that shed any
3  further light on the absence in your letter of a
4  reference to a policy number?
5  A.    No. Since there were two separate pieces
6  of paper, it's possible that I had given the card
7  to somebody or it -- it was not with the file that
8  I was reading, because the files would have been in
9  Alaska at that time, I think.
10  Q.    Do you know if that time --
11  A.    I can't recall.
12  Q.    When you -- when you drafted a letter,
13  was it your practice during that time period to
14  dictate it or were you --
15  A.    Yes.
16  Q.    How would you prepare it?
17  A.    It would be on a Dictaphone or --
18  Q.    Okay.
19  A.    -- a telephone. I think -- I don't --
20  well, at that time we probably had a telephone
21  system that was a -- tied into the -- we'd dial a
22  number and dictate a letter, and it would come back
23  to us.
24  Q.    Would these cards be routed to a
25  different department?

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

**41**

1    A.    Generally, they went to the engineering
2    department.
3        Q.    Which you were not in?
4        A.    That's correct.
5        Q.    Would they -- do you know if they were
6    down the hall?
7        A.    At that time, I do not recall.
8        Q.    Different building or --
9        A.    No.    It would have been the same
10    building.    We were almost always in the same
11    building.    Usually in the same room, but not
12    always.
13        Q.    Okay.    So that -- so Father Mueller's
14    letter could have come back, the card would have
15    gone to engineering --
16        A.    That is possible.
17        Q.    -- the letter comes to, you see the
18    letter, you respond to the letter?
19        A.    More than likely, that is what happened.
20        Q.    Okay.    I know we've referred to this in
21    the discussion on general liability coverage versus
22    SMP, but I'm trying to get a sense of it -- if
23    we -- if we assume from the record, that is,
24    CBNA.INS.362 that we referred to earlier, that
25    there was a liability policy or two -- perhaps two,

**42**

1    L4420683 and L6376707, for CBNA, what would you --
2    what would your opinion be as to the nature of
3    coverage embraced by an SMP policy as distinct from
4    the general liability policy?
5        MR. MOWBRAY:    Objection; calls for
6    speculation.
7
8    BY MR. GROSECLOSE:    (Continuing)
9        Q.    Do you have an opinion as to what that
10    would be?
11        A.    What --
12        Q.    Do you --
13        A.    -- the liability policy would be?
14        Q.    Yeah.    Or what -- what the type of
15    coverages are that the SMP, which we've established
16    means special multiperil, compared to general
17    liability, what is it that would fall under one
18    versus the other?    And maybe to put this in a
19    context, Father Mueller's referring -- writing
20    about a checklist that includes paint storage.
21    Would that be a fire issue as distinct from a
22    slip-and-fall-on-premises issue?
23        A.    That is correct.    That is a fire issue.
24        Q.    And would the fire issue -- then, I
25    guess, kind of compounding the question in my mind

**43**

1    is -- is, would fire hazards be covered in a
2    special multiperil?
3        A.    Yes.
4        Q.    So would special multiperil, then, cover
5    a fire policy for a specific location?
6        A.    Fire coverage would be all specific, yes.
7        Q.    So if -- if -- if I ask you to assume
8    that CBNA owns property north of the Alaska range
9    that includes multiple different church locations
10    with separate parishes and church buildings and --
11    in each area, if the bishop at the time wanted fire
12    coverage, would he get a special-multiperil-type
13    policy or would he get a fire policy specific to
14    each location?
15        A.    If he wanted just fire, he could get a
16    fire policy for each location or he could get a
17    location that covered all locations for fire under
18    a fire policy.    Okay.    And then if he wanted more than
19        Q.    Okay.    And then if he wanted more than
20    just fire and include it in the same package, would
21    that be special multiperil?
22        A.    That is correct.
23        Q.    And would special multiperil also be kind
24    of the lumping, then, of general liability with
25    fire?

**44**

1        A.    Correct.
2        Q.    Referring back to CBNA.INS.362, that's
3    the computer printout there, the effective date of
4    the first policy referenced there for Catholic
5    Bishop of Northern Alaska is effective -- it has
6    under the "Effective" -- the "EFF" column, which I
7    assume means the effective date of the policy?
8        A.    That's correct.
9        Q.    And then under the "EFF," there are
10    actually two columns, one is date and one is
11    invoice number; is that right?
12        A.    Correct.
13        Q.    So the first one has an effective date of
14    3-74, which I assume is March of '74?
15        A.    Correct.
16        Q.    And what I don't see, and I was in hopes
17    you could help me with -- maybe it's there and I'm
18    just not seeing it -- is if the effective date is
19    there, when is the term -- the end date?
20        A.    This is an accounting form strictly for
21    accounting purposes.    The 3-74 is the date of the
22    transaction, not necessarily the policy.
23        Q.    Okay.
24        A.    And being $37, it can't be much of a
25    transaction, so it would have been an endorsement

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

45

1  to a policy. We have no idea of the effective date
2  f -- nor the expiration date of that policy.
3      Q.  And the next one down being 9-73 and a
4  $23 amount, must be something equally deminimus,
5  then?
6      A.  That is correct.
7      Q.  And -- and just out of curiosity, under
8  the "Commission rate," I notice there's kind of a
9  variation from the very top entry of the 25 percent
10 to -- to 20 percent, and then down to 15, and then
11 10.
12      Do you know how those were assigned or
13 those different rates were assigned?
14      A.  Commissions were based on an agreement
15 between the insured -- between the company and
16 their agents and brokers, and it was a schedule of
17 commissions for different types of property,
18 different types of cover -- different types of
19 insurance policies and different types of
20 coverages.
21      Q.  So one way, I guess, to approach what the
22 type of coverage might be would be to get that rate
23 schedule and know what was included by a 15 percent
24 or a 10 percent, right?
25          MR. MOWBRAY:  Calls for -- objection;

46

1  calls for speculation.
2          THE WITNESS:  Or it could have been
3  negotiated.
4
5  BY MR. GROSECLOSE:  (Continuing)
6      Q.  Oh.
7      A.  So, no, I would have no idea.  I don't
8  remember.  I don't remember any of the commission
9  rates, but I do know there was a commission form.
10     Q.  Okay.  Is it -- would it make sense for
11 CBNA to have had at the same time for the same
12 periods of coverage both a general liability policy
13 and an SMP policy?
14     A.  It is a possibility.
15     Q.  But if I understood you earlier, one
16 would think if there was an SMP policy, that would
17 be all-encompassing?
18     A.  I have no idea what the named insured is
19 and, therefore, there may have been something that
20 was not covered by the one policy and a separate
21 policy was issued.
22     Q.  Okay.
23     A.  It could be for a specific operation, it
24 could be for a temporary --- what am I trying to
25 say? -- temporary operation on a temporary meeting

47

1  hall or, you know, it could be anything.
2      Q.  Okay.  Let's look at the next page, if we
3  could, which is 363 on that same sheet.
4      A.  (Complied.)
5      Q.  And I gather this -- this is also a
6  Continental Insurance Company accounting document?
7      A.  That is correct.
8      Q.  So it's not one that would have been
9  generated by your office?
10     A.  No.
11     Q.  This also, if I suggest to you, and I'll
12 represent that it does, unless it's pointed out
13 differently to me -- maybe I'm reading the numbers
14 wrong -- but it looks like compared to the
15 preceding page, 362, that the Catholic Bishop of
16 Northern Alaska, Policy No. L4420683, is also
17 referenced five times, by my count, under the
18 Catholic Bishop of Northern Alaska, and that same
19 number is counted under Diocese of Juneau three
20 times, and I guess I'm wondering, if the Diocese of
21 Juneau is also included under that same number,
22 would that mean it is a co-insured under that same
23 policy?
24     A.  Co-insured?
25     Q.  Or -- yeah.  Co-insured or --

48

1      A.  What do you mean by "co-insured"?
2      Q.  A co-insured meaning they're also an
3  insured.
4      A.  I can't answer that question.
5      Q.  Or maybe to ask it differently is is
6  under what circumstances would the same number be
7  assigned to two different named insureds or
8  assureds?
9      A.  Generally, they would not.  You would
10 have a named insured -- well, I'll rephrase that.
11 Yeah.  Generally, you would have a named insured,
12 and that's the name that would be used on the
13 contracts.
14     Q.  Do you see what I'm referring to?
15     A.  Yes, I see what you're referring to.
16     Q.  And you agree that it does have the same
17 number under Juneau as it does for Catholic Bishop
18 of Northern Alaska?
19     A.  Yeah, it does.
20     Q.  Okay.  And these all begin with, looks
21 like, date -- effective dates -- well, there's --
22 there's some on page 363, but the first entry for
23 Catholic Bishop of Northern Alaska is May of '74,
24 its effective date, with that same policy number,
25 and then beneath that effective date, same policy

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

49

1  number of 11-73.

2      A.  As I indicated before, the effective

3  date -- this is an accounting form.  The effective

4  date is the effective date of the transaction, not

5  of the policy.

6      Q.  Okay.  So, in other words, this would be

7  a -- the date they would note the premium being

8  received?

9      A.  No.  This is a date that an endorsement

10  was more than likely issued on that particular

11  policy charging a premium.

12      Q.  Okay.

13      A.  And it becomes an accounting transaction,

14  and that is the date of the transaction.

15      Q.  So it looks like just for CBNA alone,

16  there were five different type of transactions

17  that -- roughly within a six-month time period,

18  from November '73 to May of '74?

19      A.  Correct.

20      Q.  And you have -- can you rule cut that

21  this is not an automobile insurance-type policy

22  using the L reference?  I mean, is that generally

23  the case that an L policy would not be automobile?

24      A.  That is correct.

25      Q.  Just out of curiosity, what is an auto

50

1  policy prefix?

2      A.  "A."

3          MR. GROSECLOSE:  Okay.  Well, we've been

4  going roughly an hour.  If you want to -- should we

5  take a break?

6          MR. MOWBRAY:  It's up to you.

7          THE WITNESS:  Doesn't matter with me.  We

8  can continue.

9          MR. GROSECLOSE:  Well, if you want, we

10  can continue on.

11          And just let me know if the court

12  reporter needs a break as well, and we can do that,

13  too.

14

15  BY MR. GROSECLOSE:  (Continuing)

16      Q.  There's an indication under the

17  accounting form of 363 referring to Catholic

18  Archbishop.  Did you personally have any dealings

19  with either the Archdiocese of Anchorage or the

20  Diocese of Juneau?

21      A.  I have no recollection of ever insuring

22  or working on the policies for --

23      Q.  Okay.

24      A.  -- any Catholic organization in Alaska.

25      Q.  Do you have a recollection of working

51

1  with any particular LaBow Haynes personnel?  And,

2  if so, who?

3      A.  All my dealings limited that they be wit...

4  LaBow Haynes and would have been in Seattle, not

5  out of Alaska.

6      Q.  Did you ever deal with a Jim McKeown,

7  M-C-K-E-O-W-N?

8      A.  I recognize the name, but I don't think I

9  have.  I wouldn't guarantee one way or the other.

10      Q.  Okay.  In the packet you have there is

11  also what I believe is a LaBow Haynes tabulation,

12  but I'm not -- but I better ask the question

13  first.  It's CBNA.INS.365, and it starts with LaBow

14  Haynes Company of Alaska.

15          Do you have that in front you have?

16      A.  Yes.

17      Q.  Do you recognize this to be an accounting

18  form from Continental or do you otherwise know the

19  source?

20      A.  I cannot really say.  It is possible.  It

21  shows an agent code and a code number 54, which

22  would have been an Alaskan agent, so it is

23  possible, but I can't swear to it.

24      Q.  So in the upper left where you reference

25  an agent code of 54, that's a number you know the

52

1  Continental used for agents --

2      A.  That was an agency code that Continental

3  used, however it could be LaBow Haynes used that

4  number, also, because that is their accounting

5  number, so I have no recollection of -- of this

6  form at all.

7      Q.  Okay.

8      A.  No.

9      Q.  As we work through the form, the very

10  first column under "Policy," I can't quite read the

11  word at the very top.  It might be "symbol" and

12  then "Number"?

13      A.  Pardon?  Oh, okay.  Yes.

14      Q.  Is that what it is --

15      A.  Yes.

16      Q.  -- "Symbol"?

17      A.  Yes.

18      Q.  And beneath that, if you could explain

19  what you understand the -- the coding to mean.  The

20  first one I see is a CBP.

21      A.  Comprehensive business policy.

22      Q.  And then the next one is a BND?

23      A.  That's a bond.

24      Q.  All right.  And then we -- and then as we

25  drop down the page, we then come to the SMP?

Julian Robb                                                                October 4, 2006
Continental Insurance vs. Catholic Bishop of N. Alaska

53

1       A.      Special multiperil policy.
2       Q.      Okay.  And as we work -- well, just to
3   complete that column, beneath that's an "L," which
4   I think you've indicated was liability?
5       A.      Correct.
6       Q.      "WC" is Workers' Comp.?
7       A.      Correct.
8       Q.      What about that next one, which it looks
9   like is an 85H?
10      A.      I'm not sure, but I believe that was a
11  computer-generated personal auto policy.
12      Q.      Maybe that's not an "8," but a "B."
13      A.      I think so.  I think it's an 85H, and I
14  think that was -- you know, I'm guessing here, but
15  I think it was personal lines.  At that time we had
16  a personal lines department, and I wasn't involved
17  in that.
18      Q.      Okay.  And then the "F" beneath that is
19  fire?
20      A.      Fire, yes.
21      Q.      Using the -- the entries there for
22  Catholic Bishop, to the -- the right of Catholic
23  Bishop is a column that at the top, if I'm reading
24  that correctly, is "Source," S-O-U hyphen R-C-E; is
25  that right?

54

1       A.      It would appear so.
2       Q.      What do you -- and it's blank throughout
3   this one page, but do you have any reason to know
4   what that is seeking?
5       A.      I have no idea.  Again, I'm not sure of
6   what form -- if this was a Continental form or not,
7   but I have no idea of the source.
8       Q.      And then the next column over at the top,
9   I'm not sure -- looks like a CO?
10      A.      Company.
11      Q.      And then --
12      A.      It's a company code number for which
13  company the policy was issued in.  Continental had
14  a number of policies -- a number of companies.
15      Q.      But I -- what's peculiar to me is that
16  the same number, with minor exception, is assigned
17  to all of these, even though the insureds are --
18  vary from my client, Catholic Bishop, to other
19  entries that don't appear to have any affiliation
20  with Catholic Bishop, and they all have the same 70
21  number.
22      A.      I would correct myself on that.  That is
23  company -- I mean, insurance company number.
24  Excuse me.
25      Q.      Oh.

55

1       A.      Yeah.  Like Continental Insurance, Glen's
2   Falls, Fireman's Fund -- or not Fireman's Fund,
3   but Fireman's Insurance, Milwaukie Insurance.  All
4   of them had different symbols, and that was a code
5   number for a company.  I think that was
6   Continental.  I don't remember exactly.
7       Q.      Okay.  So does that, then, better explain
8   that this was a Continental roster compared to
9   LaBow Haynes?  I mean, would Continental be wanting
10  to code its own --
11      A.      That is a possibility, yes.
12      Q.      And then next to -- next to "CO," it
13  looks like "Line" is the next column, L-I-N-E, if
14  I'm reading that right?
15      A.      Yes.
16      Q.      And what do you understand that to mean?
17      A.      A code number for the type of coverage.
18      Q.      So an 0 -- does an 07 mean something to
19  you?  That's the number that's beneath --
20      A.      I believe 07 was the --
21      Q.      SMP?
22      A.      -- SMP.
23      Q.      Okay.  And then -- and when you say that
24  that's unique or that -- that's the coding
25  Continental used or was that a coding that you knew

56

1   insurance companies, no matter where, they were
2   agreed that was the code for an SMP?  Was it
3   industry-wide, in other words?
4       A.      That would have been Continental's.
5       Q.      Okay.
6       A.      No.  I don't think it was --
7       Q.      Okay.
8       A.      I'm really not sure, but I'm trying to
9   remember.  I think it was a Continental number.
10      Q.      And then the next column, T-R-A-N, is
11  that it?
12      A.      Transaction.
13      Q.      And what do -- what would -- what do you
14  understand that to mean?
15      A.      Original policy endorsement, cancelation,
16  return.  I don't know the code numbers for that,
17  but each one of them had their own symbol for the
18  type of transaction that that represents.
19      Q.      So like under Catholic Bishop, there's a
20  3, then a 1, then a 3, 3, 3, 1.  Oh, I'm sorry.
21  That ends at 3.  The next one was a different
22  entity or that number -- the last one I mentioned
23  was a different entity.  And if they all use the
24  same policy number -- well, yeah.  Can you make
25  any --

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

57

```
1        A.    Not --
2        Q.    -- interpret any more than you have?
3        A.    Not being in the accounting department, I
4   do not use the transaction codes, so I would have
5   no idea what they were.
6        Q.    Okay.  Then under the "Premium," the
7   first entry for Catholic Bishop shows a credit of
8   $42, the next one is -- looks like 13,494, and then
9   a 140 and a 30, 284, and then lastly a 383 credit.
10  Given the disparity, do you have an opinion as to
11  what the lesser numbers refer to?
12       A.    Endorsements to the policy, adding
13  something, taking something off, deleting
14  something.
15       Q.    Okay.
16       A.    No idea of what, but that's what the
17  smaller amounts would be.
18       Q.    Now, would the -- did I ask you this
19  already?  Would an SMP include autos?
20       A.    No.
21       Q.    It would not include autos?
22       A.    No.
23       Q.    So if -- but if -- I'm trying to think of
24  a good example of if Catholic Bishop had a policy
25  for which they were paying a premium of 13,000
```

58

```
1   nearly $500, 13,494, what type of example would be
2   a further endorsement that would be 140 bucks worth
3   or 30 bucks worth or 284?
4             MR. MOWBRAY:  Could you read that back?
5             (Reporter read back as requested.)
6             MR. MOWBRAY:  I'd just object to the
7   form.
8
9   BY MR. GROSECLOSE:  (Continuing)
10       Q.    Mr. Robb, can you help me with an example
11  of when an endorsement to an SMP policy would bring
12  about a rate adjustment of -- of another less than
13  1 percent of the -- of the beginning premium?
14       A.    I would have --
15            MR. MOWBRAY:  Object to form there, too.
16            THE WITNESS:  I would have no idea of
17  what the endorsements consisted of, but it could be
18  anything, they sold a location, we took it off the
19  policy.
20
21  BY MR. GROSECLOSE:  (Continuing)
22       Q.    Would a special -- a multiperil policy
23  include the work force, the number in the work
24  force?  Is that factored into the rate?
25       A.    The number in the work force?
```

59

```
1        Q.    Well, let me maybe start with this
2   question:  You worked in making rates as an
3   underwriter in the underwriting part of your work
4   experience with the insurance company, right?
5        A.    Correct.
6        Q.    If I came in as a prospective insured and
7   said, "I want a special multiperil policy," or
8   maybe I wouldn't even start by saying that.  I just
9   would walk in and say, "I want to be covered in a
10  way that's reasonable.  Go from there."  What are
11  the questions you're going to ask me?
12       A.    "What type of coverage do you want?"
13       Q.    I'd like -- and I'll role play here a
14  little bit.  "I'd like fire to cover my buildings
15  and I'd like general liability just to know that if
16  some accident happens, that I'm covered."
17       A.    Okay.  "We can do that under an SMP."
18       Q.    "How much is it going to cost me?"
19       A.    "What's your exposures?"
20       Q.    "Fire."
21       A.    "What kind of limits do you want?"
22       Q.    "What do you recommend?"
23       A.    "Get an agent."
24       Q.    So I wouldn't -- if I asked, and I would
25  probably, "What do you recommend?" your response
```

60

```
1   was then "Get an agent"?
2        A.    That's correct.
3        Q.    Does your company have agents that I
4   should go to or you would then refer me to who you
5   have a relationship with?
6        A.    You would go to an agent, usually an
7   independent agent that has several companies --
8   that he represents several companies.
9        Q.    Okay.
10       A.    And it's his job and his function to help
11  you plan your insurance.
12       Q.    So that's if -- if I assume LaBow Haynes
13  is a broker --
14       A.    Same --
15       Q.    -- that would have been the role --
16       A.    Yes.
17       Q.    -- that LaBow Haynes would have had?
18       A.    Yes.  That's correct.
19       Q.    So the extent to which the Catholic
20  Bishop would have been in touch with Continental
21  was probably very limited?
22       A.    Two letters.
23       Q.    Yeah.  The two letters?
24       A.    Two letters.  We did not deal in
25  generalities -- well, in the majority of the time,
```

Julian Robb                                                                 October 4, 2006
Continental Insurance vs. Catholic Bishop of N. Alaska

61

1  we never dealt with insureds.

2      Q.  All right.  Well, then let me put on my
3  broker role-model hat.  I'm LaBow Haynes.  I call
4  you up.  "The Catholic Church north of the range,
5  Catholic Bishop of Northern Alaska, needs
6  coverage.  They've got 40 locations in rural
7  Alaska," or 25 or 20.  I'm making up the numbers
8  here.  "And they employ less than 100 people.  They
9  need Workers' Comp. coverage, they need fire for
10  their buildings, and they need a good general
11  liability policy."

12      A.  Okay.  "Complete" --

13      Q.  Now I'm the broker.

14      A.  "Complete an application which gives us
15  the name, the address."

16      Q.  Okay.

17      A.  "We need a statement of values for the
18  properties.  We need the types of coverages that
19  you want -- that you desire.  We need to know the
20  occupations of those employees for the Workers'
21  Compensation portion.  We need to know the limits
22  of liability that you -- that you want to insure,
23  what types of coverages that you're looking for
24  besides straight basic liability.  Then we can
25  talk."

62

1      Q.  If I were to throw into the mix they were
2  previously with Catholic Mutual, does that mean
3  anything to you?

4      A.  I forgot loss history.  And that we do
5  need.  And that's the only reason I would worry
6  about any other company, is what kind of losses
7  have they had.

8      Q.  Okay.  The application you've referred
9  to, is that something that still -- oh, I mean, I
10  guess the obvious answer on this, the one submitted
11  by LaBow Haynes for Catholic Bishop exists, I'm
12  assuming not, because it hasn't been produced, but
13  is that type of form still in existence?

14      A.  Again, ISO had a standard form.  Most
15  companies had their own.

16      Q.  Do you know if Continental, in the time
17  that you worked with them, used the ISO form?

18      A.  For SMPs it would have been the ISO form.

19      Q.  Okay.

20      A.  And it would be supplemented by other
21  coverages, depending upon what coverages you want.

22      Q.  To get to a premium of 13,494, is there
23  some rule of thumb that you can educate me on that
24  would explain, for example, what the coverage limit
25  would be to produce a premium at that level?

63

1      A.  No.

2      Q.  Okay.  Are there any assumptions that you
3  can take from knowing the premium was 13,500?

4      A.  No.

5      Q.  Was coverage sold generally on a year
6  basis, or more than a year, or less?

7      A.  Policies are generally one or three at
8  the option of the insured.

9      Q.  And what, generally, of the -- of
10  institutional -- of commercial assureds that I'm
11  assuming was your focus, not the personal lines
12  stuff, right?

13      A.  Correct.

14      Q.  -- was -- did the majority favor one form
15  or the other?

16      A.  I don't know that I can answer that.  It
17  seems to me like we wrote -- probably wrote more
18  three-year policies than one-year policies.

19      Q.  Now, did Continental have to market -- go
20  elsewhere in the market to place coverages?  Maybe
21  is the term "reinsurance," where you were kind of
22  the window or maybe covered the first few risks,
23  and then would go for an excess or a reinsure?

24      A.  Reinsurance is negotiated on a
25  company-wide basis on an overall blanket type, not

64

1  on a specific policy basis.

2      Q.  Okay.  And do you know if Continental did
3  that?  Did they go --

4      A.  Well, I have no recollection.  I mean, I
5  have no idea of what their structure was.  But for
6  catastrophe type of coverages, every company does
7  that.

8          MR. GROSECLOSE:  Okay.  Okay.

9          Well, let me look through my notes.
10  Maybe now would be a good time for a break.

11          (Recess was taken:  12:03 - 12:14.)

12

13  BY MR. GROSECLOSE:  (Continuing)

14      Q.  Mr. Robb, let me hand you what I
15  understand -- well, it's referenced as CIC 03854
16  through 03855.  I believe it's part of your
17  packet.  Or, excuse me, it goes beyond that.  3854,
18  3855, 3856.  Let's take those three first as a --
19  because I'm trying to determine if they are --
20  duplicate the same thing or if they're -- just what
21  they might be.

22          Tell me, to the extent you know, what --
23  what these are?

24      A.  Insurance forms.

25      Q.  Do you know if they're Continental's?

Julian Robb                                                                                          October 4, 2006
Continental Insurance vs. Catholic Bishop of N. Alaska

65

1    A.    These are ISO standard --
2    Q.    And they --
3    A.    -- forms.
4    Q.    It's coded at the -- at least the first
5    page, 3854 is coded in the upper right "MLB 220."
6    Is MLB --
7    A.    That's the ISO number.
8    Q.    I'm trying to find some reference to ISO
9    on this. Do you know that they use the MLB
10   numbers?
11   A.    See that symbol (indicating)?
12   Q.    No. Which one?
13   A.    The symbol up here in the corner
14   (indicating).
15   Q.    Oh, okay.
16   A.    That's an ISO form.
17   Q.    Okay. That little -- that circle with --
18   A.    That's their copyright form.
19   Q.    All right. And then if I'm looking at
20   these correctly, 3855 is the second page following
21   3854, but then --
22   A.    That is correct. That's the back side.
23   Q.    Okay. And this is personal injury
24   liability insurance endorsement, meaning would this
25   be the type of policy that would have an L prefix,

66

1    or what would the prefix be that would come with
2    this type of form?
3    A.    The MLB was a multifunction -- or an SMP
4    type form.
5    Q.    Do you know to what extent an SMP form
6    would vary from this?
7    A.    SMP was the symbol of the policy, special
8    multiperil policy, containing MLB forms.
9    Q.    Okay. So if we had to reconstruct an SMP
10   policy, setting aside for purposes of my question
11   what the coverage limit is, but just the -- the
12   standard phrasing that was commonly encountered in
13   the -- in the mid-'70s, would this approximate that
14   or is there a more specific source you can refer us
15   to?
16   A.    This is only one portion of the policy of
17   the general liability section. This is not the
18   primary general liability coverage.
19   Q.    Okay.
20   A.    This is an extension to it.
21   Q.    Assume you were assigned a scavenger
22   hunt, if you will, to go out -- here we are 33
23   years later, but your mission is to reconstruct an
24   SMP policy of -- of the type commonly seen by you
25   at the Continental office in the mid-'70s. How

67

1    would you go about doing that?
2    A.    Commonly seen by me? Each policy is an
3    individual policy with general conditions, but can
4    be anything, so you can't go out and say,
5    "Construct me an SMP policy," because you don't
6    have any idea what coverages would have been in
7    that policy.
8    Q.    Okay.
9    A.    Now, if you were to try to get the forms,
10   I would assume -- and this is strictly an
11   assumption -- that you would find somebody that's
12   a member of ISO and go back and -- and see if they
13   have copies of forms of 1974. Again, I don't
14   know. I tried.
15   Q.    Oh, you tried in this case to do that?
16   A.    I tried to -- to see what ISO had. And
17   since I'm not a member of ISO, I couldn't get past
18   the first door, so you'd have to be a member of --
19   Q.    Are memberships on an individual basis or
20   company?
21   A.    No. No. Companies.
22   Q.    So presumably, Continental or CNA,
23   whatever form it's known as now --
24   A.    I'm guessing. I don't know.
25   Q.    -- would have access to that?

68

1    A.    I don't even know if they have them, but
2    I would assume that since they had the forms and
3    filed them, that someplace in their archives they
4    would have a particular form. But the problem
5    becomes you don't know what the policy dates are or
6    the form dates. You'll notice the date down here
7    on this MLB form. That's the edition that this
8    particular endorsement was.
9    Q.    That 173?
10   A.    That 173.
11   Q.    Okay.
12   A.    And that could have changed a month
13   later. It could have changed a month prior. So
14   you don't -- unless you have an actual policy in
15   front of you and know what those numbers were, even
16   though they were not attached, they're usually
17   listed somewhere in the policy, you don't really
18   know exactly what that -- so to try to reconstruct
19   insurance meets more than I foreseen.
20   Q.    Would going to the -- well, let me ask
21   this as a foundational question: Did you -- were
22   you involved in transmitting policy forms to the
23   State of Washington, Department of Insurance, or
24   whatever the name might have been, or the State of
25   Oregon, Department of Insurance, whatever the name

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

69

1  might have been?
2      A.   Was I involved in filing forms with the
3  State?  Is that your question?
4      Q.   Right.  Correct.
5      A.   No.
6      Q.   Is it your understanding that someone
7  within Continental, in order to do business in the
8  state, is required to submit some such type form?
9      A.   That's what ISO does, is to develop
10  forms, changing forms as legal climates change, and
11  they file basic form -- or they file the majority
12  of the forms for all companies with the states.
13      Q.   So they're --
14      A.   Now --
15      Q.   Okay.
16      A.   -- if -- if a company decides to do
17  something else and come up with another policy,
18  then, yes, there was a department that -- that took
19  care of the filings with individual states.
20      Q.   So, as far as you know, Continental was a
21  member of ISO, and would have then deputized ISO,
22  tasked it with the job of getting the forms that
23  Continental was going to be using on file with the
24  respective states?
25      A.   Kind of reverse that situation.  ISO

70

1  comes up with the forms from a legal standpoint and
2  files them with the states, and then the companies
3  pay them to use their forms.
4      Q.   Okay.  Okay.
5      A.   So they're the controlling function
6  that -- that does all the legwork for the
7  companies --
8      Q.   So if --
9      A.   -- so they're all fairly consistent in
10  their coverages.
11      Q.   So if the State of Alaska, Department of
12  Insurance, in Juneau, perhaps Anchorage, has
13  records back to the '70s, one might hope that if
14  they found the ISO-submitted forms for that era, we
15  would then have the type of language used for
16  different types of coverage?  We could --
17      A.   That's out of the realm of my
18  expertise --
19      Q.   Okay.
20      A.   -- but, you know, it -- it's possible.
21      Q.   But what I understand you to say is, even
22  if we found that, to put together the SMP policy
23  that Catholic Bishop had would require more than
24  just what the generic form language would be?
25      A.   That's correct.  Because there's so many

71

1  individual forms that could have been used and
2  could have been attached, and the edition dates
3  could have been different and the edition dates
4  would make some difference in the -- in the
5  coverages.  So without knowing exactly which form
6  was used, you could not reconstruct it.
7      Q.   Okay.
8      A.   Or it would be real imposs -- improbable
9  to reconstruct it.
10      Q.   Included in your packet is a document --
11  well, I don't see a number on this one.  Maybe I'm
12  just overlooking it.  It's the --
13      A.   Yes.
14      Q.   I guess we better put a sticker on this
15  one unless it's -- yeah.  I'm not finding it.
16      MR. GROSECLOSE:  So, Madam Court
17  Reporter, if I could -- we'll call this exhibit --
18
19  BY MR. GROSECLOSE:  (Continuing)
20      Q.   What I'm going to do, Mr. Robb, is
21  Exhibit 2 is going to be the notice of deposition
22  that cover the items requested of you, which I
23  understand you have nothing on?
24      A.   I have nothing.
25      Q.   All right.

72

1      MR. GROSECLOSE:  And then Exhibit 3, I
2  will call this particular letter, which we don't
3  have marked.
4      (Deposition notice, EXB. 2, marked.)
5      (Interoffice communication to Ms.
6      Christopher from Mr. Krug dated
7      2-20-75, EXB. 3, marked.)
8
9  BY MR. GROSECLOSE:  (Continuing)
10      Q.   What we've marked as Exhibit 3 refers to,
11  do I understand -- well, let me phrase it this
12  way:  This appears to me -- and I'm asking you to
13  either agree or disagree -- appears to be a
14  Continental Insurance interoffice memo from P.P.
15  Krug to Evelyn Christopher, Seattle to Anchorage;
16  is that right?
17      A.   That is correct.
18      Q.   Did you work with Mr. Krug?
19      A.   Yes.
20      Q.   And I believe I've been informed of his
21  whereabouts, but I forget what the answer was.  Do
22  you know --
23      A.   He's deceased.
24      Q.   Has he passed on?
25      A.   Yes.

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

73

```
1       Q.    Was he your boss?
2       A.    Depends upon which time you're talking
3  about.  Yes, it's possible.  He was superintendent
4  of commercial lines at one time.  I was
5  superintendent at one time.  He was also property
6  expert, so we kind of interchanged and -- and had
7  different divisions.  So at various times he was my
8  boss.  At various times we were equals.
9       Q.    And how about R.E. Collins?
10      A.    He was the production manager, which his
11  unit -- he was in charge of all the outgoing --
12  outside sales representatives, which are not really
13  sales representatives.  They are the company's
14  go-betweens between the agents and the company.
15      Q.    But he was the coordinator for that?
16      A.    He was the -- the superintendent of all
17  of the -- the field reps.
18      Q.    And the field reps, again, were not on
19  the Continental payroll, or they were?
20      A.    Yes, they were.
21      Q.    They were?
22      A.    They were Continental employees that had
23  small offices in various areas, and they went out
24  and appointed agents and closed agents and took
25  care of collection problems, if there was
```

74

```
1  collection problems, tried to stimulate business,
2  became the expert consultant of the company for
3  these agents in the outlying areas.  Like Great
4  Falls is an example, which when -- we had the
5  underwriting unit there.  When they closed that
6  down, they kept two field reps to represent the
7  company in that area.
8       Q.    Do you know if Continental ever had field
9  reps in the way you've described them in Alaska?
10  And, if so, who were they?
11      A.    Evelyn Christopher was one of them.
12      Q.    Okay.
13      A.    And her husband prior to that was also
14  one.
15      Q.    Do you know if she inherited his
16  business?  When you say "prior to that," so it was
17  first --
18      A.    They both worked in Seattle, they got
19  married, and they were both transferred to
20  Anchorage to work, him as a field representative,
21  her as the underwriter.  And then he quit, and she
22  became the field rep in Alaska.
23      Q.    Okay.  The note on the bottom appears to
24  be Evelyn writing to Paul saying, "The policies
25  will be," and then she has three different numbers
```

75

```
1  using a .55 factor.
2       Do you know what that means?
3       A.    That's our rating factor which would be
4  involved in how we price the risk.
5       Q.    And she goes on, "Since our DED" --
6       A.    Deductible.
7       Q.    -- "credit this year can't be 18
8  percent."
9       Did I read that right?
10      A.    That's -- let's see.  "This year can't
11  be" -- I think that's correct, yes.
12      Q.    We -- and then she goes on, "We are using
13  schedule credit" --
14      A.    Yes.
15      Q.    -- "to make up difference."
16      A.    Correct.
17      Q.    "INA" -- I'm struggling with that next
18  word.
19      A.    "Quoted."
20      Q.    Okay.
21      -- "quoted a .57 factor."
22      So does that mean that Continental, in
23  effect, won the bidding war because they came in
24  at .55, and INA, which I assume is a separate
25  company --
```

76

```
1       A.    You're right.
2       MR. MOWBRAY:  Objection; calls for
3  speculation.
4
5  BY MR. GROSECLOSE:  (Continuing)
6       Q.    Is INA a separate company?
7       A.    INA is a separate company.
8       Q.    Okay.  As I read down this memo, the
9  fifth paragraph, "He" -- which I believe is
10  referring to Jim McKeown -- "advises that he will
11  require three policies, one for Anchorage which
12  includes the liability of Juneau, one policy for
13  Juneau section one only, and one policy for
14  Fairbanks coverage."
15      Is this anything, apart from this
16  document, that you have a memory of being involved
17  with or know anything about?
18      A.    I have no recollection of that.  It's an
19  unusual situation.  I don't know what the
20  connection between Fairbanks, Juneau, and Anchorage
21  is.
22      Q.    What's unusual about it?
23      A.    "He will require three policies."  Now,
24  again, I don't have any knowledge of the pecking
25  order of the Archdiocese of Anchorage, and this is
```

Julian Robb                                                    October 4, 2006
Continental Insurance vs. Catholic Bishop of N. Alaska

<br>

77

1    referring to the Archdiocese of Anchorage.
2        Q.    Uh-huh.
3        Do you know if -- if there would be an
4    economy scale, that if the three diocese pooled
5    their insurance needs together and presented them
6    as one, that would serve an economic interest for
7    them?
8        A.    I would have no knowledge of that.  It
9    would depend on the entity.  Premiums sometimes
10    were -- you'd get better credits if you had more
11    premium, yes.  I mean, that's a possibility.
12        Q.    Would the broker have some financial
13    incentive to avoid packaging them together as one
14    and to -- to kind of look at it from the other
15    side, maybe present it as three because their
16    commission of whatever it is --
17        A.    I would have no --
18        Q.    -- is better?
19        A.    -- no input on that.  I would not know,
20    not being and agent or a broker.
21        Q.    The very last sentence, do you have
22    any -- do you understand that?  And, if so, I'm --
23        A.    This is --
24        Q.    -- interested in your explanation.
25        A.    -- an internal memo, as you say, from

<br>

78

1    Paul Krug to Evelyn, and I would assume he's
2    referring to the premium for one, two, or three
3    accounts -- I can't be sure -- is between 150 and
4    $180,000, and that has nothing to do -- for three
5    years.  That has nothing to do with the next
6    statement, which I'm assuming that Evelyn had a
7    total -- a -- a goal of writing $7 million premium
8    for one year.
9        Q.    Okay.  So that's -- that was Evelyn's
10    goal?
11        A.    I -- I'm assuming that that's the case.
12    It makes sense, yes.
13        Q.    Okay.
14        A.    As I say, the $7 million has nothing to
15    do, I don't think, with the Archdiocese of
16    Anchorage.
17        Q.    Do you know John Kohler, if I were to
18    suggest he's an insurance agent in Fairbanks, Rural
19    Alaskan Insurance Company?
20        A.    No.  No.
21        Q.    There's a reference to a Boyden,
22    B-O-Y-D-E-N.
23        Do you know who that might be?
24        A.    No.
25        Q.    If I were to -- I'll represent to you

<br>

79

1    that -- that my client, CBNA, had its insurance
2    coverage in the early '70s -- some of its coverage,
3    maybe all of it -- with Catholic Mutual, and that
4    there was some repackaging and remarketing of the
5    insurance needs it had -- I'm not asking you to
6    agree whether Continental did or didn't, but do you
7    know anything about that history, about what would
8    have led to a non -- a company other than Catholic
9    Mutual handling the insurance coverage for -- for
10    any Catholic organization in Alaska?
11        MR. MOWBRAY:  Objection; foundation.
12        THE WITNESS:  Yeah.  I don't understand
13    the question.
14
15    BY MR. GROSECLOSE:    (Continuing)
16        Q.    Okay.  Fair enough.
17        I'll -- what I'm looking for, Mr. Robb,
18    is any knowledge or input.  And since you earlier
19    indicated that you had no dealings with the
20    Alaska-based Catholic organizations, I accept
21    that.  I'm probing it, I guess, to the extent
22    Catholic Mutual is a -- is based, I want to say, in
23    Omaha, Nebraska, somewhere in the Midwest, whether
24    you had any dealings with Catholic Mutual in your
25    career at all.  I guess I can start with that.

<br>

80

1        A.    No.
2        Q.    Okay.  Well, that makes it simple, then.
3        Okay.  Do I understand that you
4    personally have sought to look for any policy
5    documents that relate to Catholic Bishop of
6    Northern Alaska?  You mentioned trying to get an
7    ISO form and that you weren't a member and you
8    couldn't get it.
9        A.    After 30 years, I just had to refresh my
10    memory, and the best way to do that is to go back
11    and read some of the coverage parts --
12        Q.    Okay.
13        A.    -- so that was the only purpose.
14        Q.    Okay.
15        A.    And trying to find, you know, some of the
16    coverage parts that were in effect at that time,
17    but I found nothing.
18        Q.    CBNA.INS.358.  We can make this Exhibit
19    4.  I'll hang you a sticker.  I'll represent to you
20    this is a letter that was provided, I think, by CNA
21    to me that references finding a policy for the
22    Archdiocese of Anchorage.
23        (Letter to Mr. Gorski from Ms. Smith
24        dated 8-24-04, EXB. 4, marked.)
25    /////

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

81

1  BY MR. GROSECLOSE:  (Continuing)
2      Q.  Do you know anything about locating --
3  CNA's locating this policy?  Are you -- did you
4  have a hand in any of that?
5      A.  I have no contact with anybody at CNA
6  since I left.
7      Q.  In '94?
8      A.  In '94.
9      Q.  Okay.  Are you aware that CNA is
10 represented by Mr. Mowbray's firm?
11         MR. GROSECLOSE:  Did I say your name
12 right?
13         MR. MOWBRAY:  It's Mowbray.
14         MR. GROSECLOSE:  Mowbray.  I'm sorry.
15         MR. MOWBRAY:  It's all right.
16         THE WITNESS:  Yes.  Yes, I'm aware of
17 that.
18
19 BY MR. GROSECLOSE:  (Continuing)
20     Q.  So apart from the --
21     A.  My only connection with CNA at this time
22 is they send me a check every month.
23     Q.  Through retirement?
24     A.  Retirement.
25     Q.  Okay.  Have they retained you in any

82

1  other consulting fashion?
2      A.  No.
3      Q.  And just to complete your employment
4  history, which I think we have as Exhibit A, do I
5  gather that you've -- after retiring in '94, you
6  then went on and worked with Office Depot for what
7  looks to be roughly a year, and then --
8      A.  Just a few months.
9      Q.  -- and then worked for Office Max?
10     A.  Correct.
11     Q.  And I can't quite read your last entry,
12 '97 --
13     A.  1997.
14     Q.  -- transferred to Portland OM?
15     A.  Office Max.
16     Q.  Oh.
17     A.  I started out in Sacramento.  And then
18 the family had problems, and so we moved up here
19 and I transferred from Sacramento to Portland
20 Office Max.
21     Q.  And you're still with Office Max?
22     A.  No.  I quit, what, three years ago, I
23 think, something like that.
24     Q.  So you're retired --
25     A.  I'm retired completely now.

83

1      Q.  -- in the full sense of the word?
2      A.  Yes, I am.
3      Q.  Okay.  Well, let me just review my
4  notes.  I think we're --
5      A.  I was too old for all the other insurance
6  companies.
7      Q.  Well, now, there's a law out there that
8  protects people like you.
9      A.  I know, but you try to prove it or try to
10 sue them.
11     Q.  Do you know at the time you were in
12 underwriting, was -- were religious organizations
13 treated differently in terms of rate structure or
14 marketing or anything?
15     A.  Differently than --
16     Q.  Well, differently than for-profit
17 businesses, different than --
18     A.  Only from the standpoint of their
19 exposures were a little different from an example
20 of, normally we wouldn't write a commercial policy
21 and put a comprehensive personal on it, which is
22 for an individual.  And some of the churches did
23 have those because they were -- you know, they
24 didn't have anything else.  So the exposures would
25 be different.

84

1      Q.  So explain that maybe so I -- try it one
2  more time so I have a better chance of
3  understanding it.
4         So the -- you'd -- you'd write a
5  commercial property policy, but not put, what did
6  you call it, comprehensive personal?
7      A.  Comprehensive personal liability.
8      Q.  Meaning?
9      A.  Which is an individual liability
10 coverage.  Like you have a homeowner's that
11 includes comprehensive personal.
12     Q.  Okay.  So if I'm out there raking the
13 yard and --
14     A.  Hit somebody over the head or --
15     Q.  Yeah.  Or --
16     A.  -- throw the --
17     Q.  In Alaska we can burn our grass on our
18 yards, which carries a downside if you --
19     A.  Yes.
20     Q.  -- burn your neighbor's.
21     A.  Okay.  Good example.
22     Q.  So if I'm burning my grass and burn my
23 neighbor's house, my homeowner's, presumably --
24     A.  Would cover it.
25     Q.  -- would cover that.

Julian Robb                                                                    October 4, 2006
Continental Insurance vs. Catholic Bishop of N. Alaska

85

1          So what your saying is, if I'm --
2     A.    Some religious personnel do not have a
3   home or liability or own anything, so the church
4   provides them with comprehensive personal.
5     Q.    Oh, I see.  Okay.
6     A.    Just an extension, but it's -- it's
7   something that is different, on particularly
8   Catholics, because they don't own anything, the
9   fathers, the members.
10    Q.    Right.
11    A.    And those kind of things would be the
12  only difference that -- that we would do separately
13  for nonprofit organizations.
14    Q.    Okay.  And what would they be called,
15  then?  How would you pack -- or how would that type
16  of coverage -- how would it be phrased if it's sold
17  as part of an institution's coverage?
18    A.    It would be an additional endorsement,
19  and we'd either name them or say a blank coverage
20  for all, whatever.  Depends upon what they want.
21    Q.    So if the priest is outside his living
22  quarters burning the grass --
23    A.    Something that's nonchurch function,
24  correct.
25    Q.    And has the same problem that I've

86

1   described in my other hypothetical -- okay --
2     A.    But, again, all of them didn't have
3   that.  That's just -- but that's the one thing
4   that -- or that's the only type of underwriting
5   that we would, you know, do differently.  It's --
6   it's -- otherwise they're just a -- a nonprofit
7   organization.
8     Q.    Do you know to what extent were -- was
9   the risk of clergy abuse, abuse by clergy members,
10  church volunteers, church agents --
11    A.    From an underwriting standpoint, it was
12  never a -- at that time was never even considered
13  because it was an intentional act and, therefore,
14  not covered by the policy itself, and that
15  continued until court decisions reversed true,
16  normal underwriting.
17    Q.    By the time you left in '94, were those
18  being approached differently with underwriting?
19    A.    Again, as I said previously, ISO changes
20  their forms and formats and -- and coverages as
21  dictated by court decisions and legal decisions,
22  and they did come out with an exclusion for the
23  abuse.
24    Q.    Okay.  All right.
25          Let me just review some -- in your

87

1   packet, you should have a CIC 03906 document, which
2   is a -- which looks like this is a LaBow Haynes --
3     A.    What's the number?
4     Q.    03906.  In fact, why don't we just mark
5   this the next number in order when you find it
6   because it kind of deals with the one we earlier
7   called Exhibit 4, or I think it does.  That's my
8   representation on that.  I can give you another
9   copy if it's --
10    A.    Okay.
11          (LaBow Haynes memo, EXB. 5, marked.)
12          THE WITNESS:  Okay.
13
14  BY MR. GROSECLOSE:  (Continuing)
15    Q.    Was there a practice that you recall of
16  LaBow Haynes or other brokers copying Continental
17  on transmittals or -- my question is focused upon:
18  How did this end up in a Continental file, if you
19  know?  And don't -- you know, I'm not trying to
20  rule out that -- but I don't think this came from
21  CBNA to Continental and then back to us.
22    A.    Well, this is a note from LaBow Haynes.
23  I don't know who it's to, and I'm not really
24  certain what the writing is, so I don't know.  I
25  would have no idea.

88

1     Q.    Okay.  Well, before we leave that, let's
2   look at -- at Exhibit 4, which I think you might
3   have in your packet, but you can look at my copy of
4   it here, too.
5     A.    Okay.
6     Q.    Does -- did -- I'm trying to -- looking
7   at the handwriting on Exhibit 5 and looking at the
8   way Mr. -- that Paul, or whoever signed this on
9   Exhibit 4 --
10          MR. MOWBRAY:  Bob, let me just interrupt
11  you.  I think that's Exhibit 3.
12          MR. GROSECLOSE:  Oh, is this 3?
13          MR. MOWBRAY:  I think, yeah.  That's 4
14  (indicating).
15          MR. GROSECLOSE:  Oh, I'm sorry.  You're
16  right.
17          MR. MOWBRAY:  So it's --
18          MR. GROSECLOSE:  So, yeah.  Thank you.
19
20  BY MR. GROSECLOSE:  (Continuing)
21    Q.    So we're comparing 3 and 5 and the
22  handwriting portion.  I don't know if you saw
23  enough of Paul Krug's handwriting to know if -- if
24  the handwriting we see on Exhibit 5, whether you
25  have an opinion as to that being similar to his.

22 (Pages 85 to 88)

Julian Robb                                                                    October 4, 2006
Continental Insurance vs. Catholic Bishop of N. Alaska

89

1    A.    I'm not a handwriting expert, but it does
2  look similar.  It could be his.
3    Q.    Okay.  Let me show you what might be
4  another document there in your packet, and we can
5  call this Exhibit 6, I guess, just to keep them in
6  some kind of frame of reference.  It's CIC 03943.
7              (Telephone request dated 2-6-75,
8               EXB. 6, marked.)
9
10 BY MR. GROSECLOSE:  (Continuing)
11   Q.    Does this form look like one used by
12 Continental --
13   A.    Yes.
14   Q.    -- the form itself, now, not the
15 handwriting?
16   A.    Yes.
17   Q.    And does it also appear to be Paul -- is
18 it Krug?
19   A.    Krug.
20   Q.    -- Krug's handwriting?
21   A.    If I had to make a guess, I would say
22 it's very similar to his, yes.
23   Q.    I don't want you to guess.
24   A.    I can't do anything else.  I don't know.
25 I cannot guarantee that that's his handwriting.

90

1    Q.    I understand.
2              But let me maybe put it this way:  If I
3  were to ask you what color is my car, I suspect
4  you'd be guessing, because, as far as I know,
5  you've never seen my car.  But if I ask you how
6  long this table is, you could probably give me an
7  estimate based on your frame of reference.  So I
8  guess, in the context of that sort of example,
9  is -- does this document 6, without,
10 understandably, guaranteeing that it's Paul Krug's
11 handwriting, do you have reason to believe it's
12 similar to his handwriting?
13   A.    Yes.
14        MR. MOWBRAY:  Objection; foundation.
15
16 BY MR. GROSECLOSE:  (Continuing)
17   Q.    Mr. Krug was an office mate with you for
18 a number of years?
19   A.    Pardon?
20   Q.    Was he an office mate?  In other words,
21 you worked together?
22   A.    We worked together, yes.
23   Q.    He'd write to you; you'd write to him,
24 things would go back and forth in the office?
25   A.    Most of the time it was verbal.

91

1    Q.    When did you last work with Mr. Krug?
2    A.    I have no recollection.  Probably -- I
3  think he retired maybe about the time I went to
4  Sacramento.
5    Q.    Let's see.  Exhibit 1 had your --
6    A.    '89, maybe.  I'm guessing, but he did not
7  go to Sacramento with us, so he must have retired
8  about that time because that's the time the office
9  was diminished down to a smaller office and we went
10 down to regional.
11   Q.    He was in Seattle?
12   A.    He was in Seattle.
13   Q.    Okay.  And so would you -- would he have
14 been in Seattle while you were there in the --
15 starting in '66 to '76?
16   A.    I can't recall when he was there.  He was
17 originally out of San Francisco, and so I worked
18 with him in -- from long distance in San Francisco,
19 and then he was transferred to Seattle, and I do
20 not recall when he was transferred or when he
21 retired.
22   Q.    Well, one thing I can correct myself on
23 is, if I accept the truth of Exhibit 3, I believe
24 we've called this --
25        MR. GROSECLOSE:  Right?

92

1        MR. MOWBRAY:  Right.
2
3  BY MR. GROSECLOSE:  (Continuing)
4    Q.    -- that he was in Seattle on February 20
5  1975, there would have at least been the overlap in
6  the time he was there until you left in -- sometime
7  in -- in June of '76, was it?
8    A.    Correct, well, whatever is there.
9    Q.    Or -- excuse me -- yeah.  It's June on
10 your Exhibit A.  I'm sorry.  We're calling this
11 Robb Exhibit 1.  We've been calling it -- or I've
12 been calling it A.  What have we been calling it?
13        MR. MOWBRAY:  I think you only called it
14 "A" just now, but --
15        MR. GROSECLOSE:  Sorry.
16
17 BY MR. GROSECLOSE:  (Continuing)
18   Q.    You left Seattle June of '76, from your
19 note here.
20   A.    Uh-huh.
21   Q.    All right.  So --
22   A.    No.  No.  I left Seattle in '89,
23 transferred to Sacramento.
24   Q.    Oh.  Oh, I see.  Okay.
25        So you left -- I'm sorry.  But you left

Julian Robb                                                                                    October 4, 2006
Continental Insurance vs. Catholic Bishop of N. Alaska

93

1  CN -- you left Continental in Seattle?
2      A.  I left CN in '76.
3      Q.  You abbreviated it CTL.  What is that?
4      A.  Continental.
5      Q.  And then you were with Home Insurance for
6  six years, roughly?
7      A.  Correct.
8      Q.  When you came back to Continental, was it
9  initially in Seattle?
10     A.  Yes.
11     Q.  And then for another seven years in
12  Seattle before going to Sacramento?
13     A.  Correct.
14     Q.  And you believe Krug was there when you
15  came back in '82?
16     A.  Yes.
17     Q.  And, I'm sorry, you -- your last memory
18  of him was '84?  Is that what you said?
19     A.  When we disbanded the office, reduced it
20  down, is when I was transferred.  And the people
21  who didn't retire or didn't have a job weren't -- I
22  lost my train of thought -- didn't get transferred
23  to Sacramento.  Then I thing he retired at that
24  time.  He had that much time in.  So --
25     Q.  So that was '89?

94

1      A.  That was '89.
2      Q.  Okay.  All right.
3          In the packet there, you'll see
4  CBNA.INS.351, 352, and 353 -- well, 354 and 355,
5  which I'll represent to you are not Continental
6  documents but do appear to be Kohler Insurance.  My
7  question of you is just with regard to that
8  document 352, which is this one (indicating).
9      A.  I don't have --
10     Q.  It's the first few pages there marked at
11  the top.
12     A.  Okay.  All right.
13     Q.  So go to the -- what is 352.  I just --
14  this is a form -- what appears to be a form -- my
15  question is whether this is a form that is similar
16  to one that Continental used as part of an
17  application process it might have used?
18     A.  No.  We had our own form of this nature.
19     Q.  Okay.
20     A.  We would not have used this form.
21     Q.  Okay.
22     A.  I believe that this is an ISO form.
23     Q.  And you --
24     A.  I'm guessing, but --
25     Q.  You say that -- do you see that little

95

1  logo?
2      A.  No, I don't see the logo on this.  No.
3  It isn't an ISO form.
4      Q.  And you say that because it doesn't have
5  the logo?
6      A.  Well, that.  But down here, it says
7  "Insurance with emphasis," and they never would
8  use that.
9      Q.  Okay.  All right.
10         In the time you were with Continental
11  prior to '94, were computers -- I'm presuming
12  computers were used, but was e-mail used, or to
13  what extent were computers used?
14     A.  There was no e-mail.  At that time
15  computers were massive units kept only in the home
16  office or later in the departmental office.
17     Q.  How about microfilming -- was
18  microfilming, to your knowledge, used for --
19     A.  We used microfiche mostly and -- mostly
20  microfiche.
21     Q.  And when would a hard copy become a
22  microfiche document in terms of what kind of --
23     A.  I don't believe that we --
24     Q.  -- time line?
25     A.  -- put any documents on microfiche.  They

96

1  were mainly used for reading purposes and for
2  affiliates that -- that we would be concerned with,
3  like the Oregon Insurance Rate Bureau and those
4  kind of things.
5      Q.  Where they had some resource tool that
6  was on microfiche that you'd consult?
7      A.  Right.  Yes.  And the home office may
8  have, you know, used some, but I'm not aware of
9  any.
10     Q.  Maybe what I could -- do you -- were you
11  consulted --
12         MR. GROSECLOSE:  Is any of the
13  information that Continental provided in their
14  answers to discovery, is that something I need to
15  ask him about?  Was he a source of any of this?
16         MR. MOWBRAY:  Can we go off the record?
17         MR. GROSECLOSE:  Yeah.
18            (Recess was taken:  1:02 - 1:08.)
19            (Letter to Mr. Robb from Father
20            Mueller dated 2-28-74, EXB. 7,
21            marked.)
22            (Accounting forms, EXB. 8, marked.)
23
24  BY MR. GROSECLOSE:  (Continuing)
25     Q.  All right.  Mr. Robb, while we were off

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

97

1  the record, I reviewed with you the discovery
2  answers I received from Continental through their
3  counsel and some of the references there as to
4  computer systems and file locations and the names
5  of witnesses.  That was -- basically, I understood
6  you to say that those were not matters you had any
7  significant involvement with?
8        A.   That is correct.
9        Q.   And just as a housekeeping matter with
10  your deposition, we've used as Exhibit 1 your time
11  sheet of significant employment-related dates, and
12  then we have the other exhibits we've referred to
13  already through the transcript, except for Exhibit
14  7, we've put together that group that -- that we
15  covered earlier as CBNA.INS.362, 363, and 365
16  and -- oh, excuse me.  That was Exhibit 8.  Exhibit
17  7 was the correspondence you had with Father
18  Mueller, 345 and 347.
19             MR. GROSECLOSE:  Thank you, sir.
20             That's all the questions I have.
21             MR. MOWBRAY:  All right.
22
23  EXAMINATION BY MR. MOWBRAY:
24        Q.   Mr. Robb, earlier you indicated that you
25  received a check every month from CNA.  That's

98

1  related to retirement, right?
2        A.   Yes.  That is retirement.
3        Q.   Okay.  And you've never been hired to do
4  any consulting work for CNA?
5        A.   No.  That is correct.
6        Q.   Okay.  And just so I'm clear, you don't
7  recall having any interaction with the Catholic
8  Bishop of Northern Alaska despite seeing the
9  correspondence?
10        A.   When -- no, I do not.  When you first
11  called me, I would have almost sworn that I had
12  never even written to them.  I just have no
13  recollection of that.
14        Q.   And you recall having interactions with
15  LaBow Haynes of Seattle, but not LaBow Haynes of
16  Alaska; is that right?
17        A.   I can't guarantee I never dealt with
18  them, but I had very little contact with Alaska
19  LaBow Haynes.
20        Q.   Okay.  Is it fair to say that every
21  policy is different?
22        A.   It's fair to say that every policy has --
23  the primary coverages are the same, and then from
24  there on, you get whatever coverages or whatever
25  things that you want.  So not every policy is

99

1  different, but not every policy is the same.
2        Q.   Right.
3             So it -- in order to know what was
4  covered under a policy, you would need to see the
5  policy?
6        A.   That is correct.
7        Q.   When you were referring to ISO forms,
8  tell me if this is correct, you wouldn't have a
9  sample policy; you would have forms that you would
10  use to create the policy, but the forms you would
11  use would be dependent on the coverages sought by
12  the insured?
13        A.   That is correct.  There is no such thing
14  as a sample or a template-type policy.
15        Q.   So depending on what types of coverages
16  the insured wants, you would get different forms
17  and then create the policy?
18        A.   That is correct.
19        Q.   Did policies have standard sets of
20  limits?
21        A.   They have generally used -- or -- let's
22  rephrase that.  No, to answer the question.  They
23  have typical types of coverages, but you could go
24  anywhere from one to 100 different formats or
25  limits.

100

1        Q.   Earlier you mentioned that there was an
2  ISO application form for when an insured is seeking
3  coverage and they're filling out an application?
4        A.   As I recall -- I can't picture it in my
5  mind, but, as I recall, there was an SMP or a --
6  ISO number MLB, I believe, of a SMP policy, but
7  I -- you know, I -- I think so, but I can't really
8  recall it.
9        Q.   When you're writing or underwriting a
10  policy, do you look at -- you look at the risks of
11  the entity seeking insurance, right?
12        A.   We look at the exposures for that
13  particular entity, yes.
14        Q.   So in writing the policy, it's very
15  dependent upon the exposures of the particular
16  insured?
17        A.   Correct.
18        Q.   Earlier you said that policy terms were
19  generally one or three years, is that right, for
20  SMPs?
21        A.   In this time frame, yes, for SMPs, yes.
22        Q.   But to know how long a policy was for a
23  particular insured, you would need to see the
24  policy?
25        A.   Correct.

25 (Pages 97 to 100)

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

101

1    Q.   Do you recall how long Continental kept
2    ·olicies back in the '70s?
3         A.   Not specifically.  I know at one time we
4    were keeping fire policies for three years,
5    liability policies for seven years, but I don't
6    know exactly the time frame since it was
7    established.  They may have been in the '50s and
8    the '60s.  After that time, policies were then
9    transferred to other units to be stored.  So from
10   that time on, I don't know.
11        Q.   Okay.  Do you ever recall any policies
12   being put onto microfiche?
13        A.   We had no facilities in any of the
14   offices that I've been in to put things on
15   microfiche.
16        Q.   So --
17        A.   I have no recollection.
18        Q.   All right.  I want to go through a few of
19   the documents that Mr. Groseclose showed you.  I
20   guess it's probably best to work from the exhibits
21   now.  I thing it's your Exhibit No. 7, the
22   correspondence between you and Father Mueller.
23        A.   Yes.
24        Q.   Okay.  And I'm specifically looking at
25   ·he February 28th, 1974, letter.

102

1         A.   Yes.
2         Q.   Is there anything in this letter that
3    suggests that Continental issued the Catholic
4    Bishop of Northern Alaska general liability
5    coverage?  And, actually, for this question, since
6    earlier we discussed that maybe the card was
7    attached to the bottom of the page and the letter
8    was at the top, just stick to the top portion of
9    the page.
10        A.   This recommendation is for property only
11   and there is no indication that there would be
12   liability coverage or that there was liability
13   coverage.
14        Q.   Would you look at the letter from -- I
15   guess it's the March 11th, 1974, letter.
16        A.   Yes.
17        Q.   Is there anything in this letter that
18   suggests that Continental issued CBNA general
19   liability coverage?
20        A.   No.
21        Q.   What type of coverage does it look like
22   was provided?
23        A.   It's referring to flammable paints, which
24   is a fire hazard, so it would be liability
25   coverage.

103

1         Q.   Could you take a look at Exhibit No. 3.
2         A.   Okay.
3         Q.   Is there anything on this document that
4    suggests that Continental provided the Catholic
5    Bishop of Northern Alaska with general liability
6    coverage?
7         A.   The handwriting or the letter itself?
8         Q.   Any part of it.
9         A.   It would indicate that an SMP is referred
10   to, and an SMP contains liability coverage.
11        Q.   And where are you referring to the -- the
12   SMP that refers to --
13        A.   That was a note written by Evelyn to
14   Paul.
15        Q.   The -- at the bottom of the page?
16        A.   At the bottom of the page.
17        Q.   And does anything in that portion
18   reference the Catholic Bishop of Northern Alaska?
19        A.   No.
20        Q.   So do you believe that portion refers to
21   general -- or suggests that there's general
22   liability coverage for the Catholic Bishop of
23   Northern Alaska?
24        A.   The question again?
25        Q.   The bottom portion of the page where you

104

1    referred -- where it refers to the SMP, is there
2    anything in this portion, the handwritten portion,
3    that suggests that Continental issued a policy that
4    contained general liability coverage to the
5    Catholic Bishop of Northern Alaska?
6         A.   No.
7         Q.   Is there anything that suggests what the
8    limits would have been if they had issued it?
9         A.   No.
10        Q.   And I'm sorry to go back.  I -- on
11   Exhibit 7, again, the two letters, the February
12   28th letter.
13        A.   Yes.
14        Q.   Is there anything to suggest what the
15   limits would have been for any policies that
16   Continental may have issued CBNA?
17        A.   No.
18        Q.   Is there anything that suggests the dates
19   of any policies?
20        A.   No.
21        Q.   For the March 11th letter, is there
22   anything that suggests the limits of liability --
23        A.   No.
24        Q.   -- of any policies issued?
25             And what about dates?

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

**Page 105**

1    A.   No.
2    Q.   Can you take a look at Exhibit 8.  I
3 think that's the one with the collection of what
4 you describe as accounting forms.
5    A.   It would be an internal accounting
6 record, yes.
7    Q.   Okay.  Did you frequently see documents
8 of this type when you were working for Continental?
9    A.   Not frequently, no.
10    Q.   Did you ever create documents of this
11 type?
12    A.   No.
13    Q.   So when you were providing information
14 regarding what the different category headings were
15 or the types of information captured in the
16 different fields, what were you basing that on?
17    A.   On other records and reports that we
18 would have that would use the same terminology as
19 of effective dates, as of the type of policy
20 transactions.
21    Q.   You suggested that perhaps the effective
22 dates -- there are a number of them for --
23 actually, on the first page, CBNA.INS.362.  There
24 are two entries for the Catholic Bishop of Northern
25 Alaska, and then there are different effective

**Page 106**

1 dates.  I believe you said that those possibly
2 could be endorsements; is that correct?
3    A.   That is correct.
4    Q.   Is there any way to tell what was
5 contained in those endorsements, what was changed
6 in the policy?
7    A.   There is not.
8    Q.   Is there any way to tell what was
9 originally in the policy from this document?
10    A.   There is not.
11    Q.   Can you gather the limits of liability
12 from this document?
13    A.   No.
14    Q.   Or the policy dates?
15    A.   No.
16    Q.   If you take a look at the next page, it
17 was CBNA.INS.363 --
18    A.   Yes.
19    Q.   -- it's the same -- same type of
20 document, it appears, as 362; is that correct?
21    A.   Yes.
22    Q.   Would any of your answers to the
23 questions I asked you for 362 be different for 363?
24    A.   No.
25    Q.   If you could take a look at Exhibit 5,

**Page 107**

1 please.
2    A.   Okay.
3    Q.   When you were looking at this document,
4 you were also looking at, I believe it was, Exhibit
5 3, so if you could kind of look at both of them.
6    A.   Yes.
7    Q.   And you indicated that this possibly was
8 Paul Krug's handwriting; is that correct?
9    A.   That is correct.
10    Q.   You're not a handwriting expert, are you?
11    A.   I am not.
12    Q.   Did you recognize the handwriting as Paul
13 Krug's or did --
14    A.   It looks familiar.
15    Q.   Did you recognize it as Paul Krug's
16 handwriting?
17    A.   I would have to say, if I was to guess,
18 that it would be Paul's, yes.
19    Q.   Exhibit 5, who do you believe authorized
20 this document?
21    A.   Who authorized the document?
22    Q.   Right.  Or what --
23    MR. GROSECLOSE:  The typed part or the
24 handwritten?
25    MR. MOWBRAY:  Sorry.  The -- the typed

**Page 108**

1 part.
2    THE WITNESS:  I would guess -- I would
3 not have any knowledge of where it was generated.
4 But since it's on LaBow Haynes letterhead, I would
5 assume that LaBow Haynes generated it.
6    MR. MOWBRAY:  Let's go off the record.
7    (Discussion held off the record.)
8    (Personal injury liability insurance
9    endorsement, EXB. 9, marked.)
10
11 BY MR. MOWBRAY:  (Continuing)
12    Q.   Mr. Robb, while we were off the record,
13 we added document CBNA.INS.369 to Exhibit 8, and we
14 also marked as Exhibit 9 CIC 039 -- I'm sorry.
15 That was the wrong number -- CIC 03854 through CIC
16 3856.
17    MR. GROSECLOSE:  Correct.
18
19 BY MR. MOWBRAY:  (Continuing)
20    Q.   So could you look at Exhibit 9.
21    A.   Yes.
22    Q.   You indicated earlier that this is an ISO
23 form; is that correct?
24    A.   That is correct.
25    Q.   Now, if you had this -- took this

109

1  document from ISO, would it also have -- like if
2  you look across from A, false arrest, and then
3  there's a dollar sign and "Included."  Would the
4  word "included" have been on the -- does that --
5  does that look like something that would have been
6  typed in later or would that have been on the ISO
7  form?
8       A.   That would have been typed in later.
9       Q.   Okay.
10      A.   The ISO form is blank.
11      Q.   And if you go down a little bit and you
12  see "Limits of liability:  N/A."  In that blank
13  there, would something have been typed in there?
14      A.   Yes.
15      Q.   And then "Each person aggregate," another
16  dollar sign, a blank, and "$300,000."  Would
17  that -- $300,000, would that have been added?
18      A.   That's correct.
19      Q.   So the limits of liability would not
20  already be on the form.  That would be something
21  that's added later on when the insured is
22  requesting coverage?
23      A.   That is correct.
24      Q.   Would you take a look at CIC 03856, which
25  's the last page of Exhibit 9.

110

1       A.   (Complied.)
2       Q.   And you see where it says, "Bodily injury
3  liability and property damage liability"?
4       A.   Yes.
5       Q.   And then there's amounts in the blanks
6  next to each occurrence and aggregate?
7       A.   Yes.
8       Q.   Are those also numbers that would be
9  added in once the insured requested coverage?
10      A.   That is correct.
11      Q.   So there was no standard limit for bodily
12  injury liability or property damage liability
13  right?
14      A.   No.
15           MR. MOWBRAY:  We can go off the record.
16           (Discussion held off the record.)
17
18  EXAMINATION BY MR. GROSECLOSE:
19      Q.   Mr. Robb, one page that I inadvertently
20  omitted to add but what we've since added to I
21  believe it's Exhibit 8, is the very last page,
22  CBNA.INS.369.  And am I correct that this form is
23  also a Continental Insurance Company
24  accounting-type form or is this -- would this be
25  different than the other ones that preceded it as

111

1  under Exhibit 8?
2       A.   Again, not being in the accounting
3  department, I -- I can't really say for sure, but
4  this to me would be the note -- the billing that
5  the insured -- that the agent would get as opposed
6  to the previous one, which was the -- Continental's
7  internal billing or internal papers.
8       Q.   And this -- this includes both SMP
9  policies for Catholic Bishop of Northern Alaska,
10  does it not?  Look at the top --
11      A.   Would you re --
12      Q.   It -- it --
13      A.   -- repeat that, please.
14      Q.   Yeah.  I'm sorry.
15           The tabulation that this represents --
16      A.   Uh-huh.
17      Q.   -- 369 includes a Catholic Bishop of
18  Northern Alaska SMP policy 2390621, which is
19  referenced in two places on the upper part of that
20  sheet, right?
21      A.   Correct.
22      Q.   The first reference has an effective date
23  of 2-74, there's an invoice number, and then an
24  invoice date of 3-19, and we can't -- I can't make
25  out what that last column is, something G-R-P-R-E.

112

1       A.   This is only a portion of the form, and
2  that would have been cross premium, I'm sure.
3       Q.   Okay.
4       A.   But that's, again, an assumption that I
5  can't recall.
6       Q.   Maybe we already have this, then, in.  Do
7  you have the actual Exhibit 8 still there?  Maybe
8  we can -- maybe this already shows up on the
9  earlier page.
10           MR. MOWBRAY:  Here's the preceding page.
11           MR. GROSECLOSE:  Well, let me see.
12
13  BY MR. GROSECLOSE:  (Continuing)
14      Q.   So, Mr. Robb, were you able to determine
15  whether what is cut off on Page 369 appears in the
16  earlier pages that we looked at?
17      A.   That was a question?
18      Q.   Yes.
19      A.   What was the question?
20      Q.   If you have Exhibit 8 there in front of
21  you --
22      A.   Yes.
23      Q.   -- if I could come around and look.
24      A.   Yes, I do.
25      Q.   So Exhibit 8 in it's entirety --

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

113

1    A.    Those are a different form than these
2  two.
3    Q.    Okay.  So 362 is different than 363.  All
4  right.
5          So what -- on page 369, it appears that
6  it's cut off before it quotes the full premium; is
7  that right?
8    A.    That's correct.
9    Q.    So I recall at one point we talked about
10  a premium of 13,400-and-something.  This -- this is
11  this page under that column starts with a 135, and
12  then is cut off; is that right --
13    A.    Yes.
14    Q.    -- under --
15    A.    Looks that way.
16    Q.    -- Catholic Bishop?
17          And then down -- on the lower part of the
18  page, there's a tabulation of three references to
19  an L policy, which I understood from you earlier
20  was a general liability policy?
21    A.    Yes.
22    Q.    Okay.  Referring back again to Exhibit 3,
23  you were asked, I believe, if this referenced any
24  liability policy for the benefit of the Catholic
25  Bishop of Northern Alaska.  If I represent to you

114

1  that CBNA is the corporate operative form of the
2  Fairbanks Diocese, would the reference to Fairbanks
3  coverage be consistent with a liability policy
4  going to the -- to Fairbanks?  And I can refer you
5  here to the typed --
6    A.    Would you ask that question again,
7  please?
8    Q.    Sure.
9          In the "types" part of Exhibit 3, fourth
10  paragraph, the record coming from Mr. Krug to --
11  who you indicated was the -- or it says who he is
12  here, too, he was the superintendent of
13  Continental's Seattle office -- to Evelyn
14  Christopher, the Anchorage agent for Continental.
15  Krug is reporting on McKeown of LaBow Haynes
16  advising that he's going to require three policies;
17  is that right?
18    A.    That would appear to be correct, yeah.
19    Q.    And then he goes on to say one is for
20  Anchorage, which includes the liability of Juneau,
21  and then one policy for Juneau section one only,
22  and one policy for the Fairbanks coverage.  First
23  of all, section one only, do -- do you know what
24  that means?
25    A.    Section one would be property coverage.

115

1    Q.    And how would you then interpret the
2  reference to Fairbanks coverage?  Would it be
3  property or would it be liability or would it be a
4  combination?
5    A.    There's no way to tell from this and
6  there's no way to determine what Fairbanks coverage
7  is as respects to the Archdiocese of Anchorage?
8    Q.    Okay.  Because, in your mind, you don't
9  know the geographic twists between what the
10  Archdiocese of Anchorage includes?
11    A.    That is correct.
12    Q.    Okay.  And then if we looked at -- but if
13  we know from the typed part that there are three
14  policies, we know from Evelyn's note to Paul that
15  there are three policies with SMP prefixes; is that
16  true?
17          MR. MOWBRAY:  Object to form and
18  foundation.
19
20  BY MR. GROSECLOSE:  (Continuing)
21    Q.    Is that right, Mr. Robb?
22    A.    That would appear to be three policies.
23    Q.    Okay.  You mentioned that although you --
24  each policy can be different, that there were
25  patterns -- maybe that's not the word you used.

116

1  I'm trying to recall how you phrased it as to
2  coverages.  In the mid-'70s, is it fair for me to
3  assume that underwriting a risk to a church was a
4  relatively safe undertaking compared to other
5  assureds that can walk in the door?
6    A.    A safe underwriting?
7    Q.    Well --
8          MR. MOWBRAY:  Object to the form.
9
10  BY MR. GROSECLOSE:  (Continuing)
11    Q.    In terms of risk rating when you would
12  rate -- rate the insurability of someone, would --
13  would you go through the risk analysis?  Was a
14  church not on -- on the lower end of the scale
15  of -- in terms of the risk the carrier would
16  undertake?
17    A.    Religious institutions have their own
18  problems from the standpoint of various things that
19  they're involved in, every one of them being
20  different.  So from that standpoint, they would
21  have been underwritten more carefully than, say,
22  the Joe's Grocery next door.
23    Q.    Okay.  How much of that risk analysis
24  would you task yourself with on the fire side?  And
25  by that I mean, I can understand and appreciate

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

117

1   where, if you're providing fire insurance coverage
2   'n wooden structures in rural Alaska, some -- some
3   warning flags would be going up, right?
4        A.   That is correct.
5        Q.   Did you involve yourself in that risk
6   analysis?
7        A.   The underwriter's job is to involve
8   himself in all risk analysis for writing a specific
9   insured, yes.
10       Q.   As you look back from what fragmentary
11  evidence we have here, is there -- do you have a
12  sense of -- of the SMP package that -- that would
13  have been -- that might have crossed your desk, how
14  much of that would have been a fire analysis versus
15  some other kind of analysis fire risk?
16            MR. MOWBRAY:  Object to -- object to
17  form.
18            THE WITNESS:  I still don't quite get the
19  question.
20
21  BY MR. GROSECLOSE:  (Continuing)
22       Q.   Okay.  Fair enough.  It's not a
23  reflection on you.  It's a reflection on me, so it
24  just means I've got to ask it better, and I'll try.
25            I understood you earlier to explain that

118

1   an SMP policy can be a combination of what might,
2   through a different form of packaging, be isolated
3   as a fire insurance policy, a liability policy, a
4   boiler policy, and maybe even a Workers' Comp.
5   policy, right?
6        A.   Yes, except for the Workers' Comp.
7        Q.   Oh, except for the Workers' Comp.?
8        A.   Does not cover automobile or Workers'
9   Comp.
10       Q.   Okay.  And you, as an underwriter, then,
11  would have the ultimate say, and do you want to
12  commit your company to take on the risks that may
13  come with this particular proposal?
14       A.   That's correct.
15       Q.   And you then would go through a risk
16  analysis, I'm assuming, of something -- of some
17  sort?
18       A.   Yes.
19       Q.   You'd refer to actuarial tables maybe?
20       A.   No.
21       Q.   Or insurance-compiled risk factors?
22       A.   No.
23       Q.   "No"?
24       A.   No.  We would use our experience in what
25  we had done in the past and base our -- our

119

1   underwriting criteria on the locations of the risk,
2   speaking of a fire standpoint on the lowest of
3   risk, the fire protection of the risk, how close it
4   is to a fire hydrant, how close it is to the fire
5   station, the quality of the fire people, and how
6   old the buildings are and whether they're
7   susceptible to wind damage or lightning.  In the
8   case of lightning problems, do they have lightning
9   rods.  All of those things would be involved in
10  each particular specific location.
11       Q.   And that information would come to you
12  initially through an application form from the
13  broker?
14       A.   We would either get that information from
15  the broker, from the -- from the insured through
16  the broker, or we would send out our -- our
17  engineers to inspect the risk.  Usually that was
18  done after the fact, but not always.  If it was a
19  serious enough problem and we were concerned about
20  it, we would do it prior to.
21       Q.   And the one exchange that we've
22  identified, your letter to Father Mueller and his
23  letter to you, you don't know from that that an
24  engineer from Continental had already been in the
25  field, do you?

120

1        A.   I'm assuming by -- because the function
2   of that letter was usually an engineering
3   responsibility, that we took on an outside
4   inspector to do that for us --
5        Q.   Okay.
6        A.   -- an independent inspector.
7        Q.   Apart from the fire hazard of structures
8   in rural Alaska, which I'll represent to you are --
9   could take any form from log to wood to a lot of
10  things, and fire hydrants are not plentiful in many
11  of the communities?
12       A.   Correct.
13       Q.   So that type of a risk might have
14  attracted some attention; is that fair to say?
15       A.   Definitely.  Definitely.
16       Q.   But apart from that, were religious
17  organizations at that point in time, from a -- from
18  a liability -- from a slip-and-fall or tortious
19  conduct kind of frame of reference, looked at as
20  being a risky proposition?
21       A.   Risky proposition as opposed to --
22       Q.   Representing a -- or providing insurance
23  for a bar might be an example I can use in contrast
24  or --
25       A.   Because of the hazards that could be

Julian Robb
Continental Insurance vs. Catholic Bishop of N. Alaska

October 4, 2006

121

1   involved in each particular religious institution,
2   they were looked at a little bit more carefully,
3   but they weren't something that was a no-no.
4       Q.   Okay.  Were they considered good
5   business?
6       A.   In basic -- yes.
7       Q.   Okay.  And when you say a "no-no," was
8   there kind of a list of, you know, the dirty dozen
9   that you don't want to kind of --
10      A.   Fireworks factories.
11      Q.   There you go.
12      A.   Don't laugh.  We had one, but they were
13  not what we'd normally call mainstream business.
14      Q.   All right.  Okay.
15           And in the '70s was there a -- a
16  commonly-considered coverage level that was
17  recommended?  And if you don't know in terms of
18  what the broker was recommending, what do you know
19  from the underwriting standpoint was commonly
20  placed for businesses?
21      A.   The underwriter wouldn't make any
22  recommendations as far as limits are concerned
23  and --
24      Q.   I'm sorry.  Would or would not?
25      A.   Would not.

122

1       Q.   Would not.  Okay.
2       A.   Date-wise, I could not tell you.  As
3   things progressed, limits got higher and higher, as
4   you know they are today.  Originally, coverages
5   started out as basically 100, 300, then they went
6   up to 500 to 1,000 -- or 500,000 to a million, and
7   they just kept progressing.  So I don't -- there is
8   no real suggested limit that you'd have.  It's
9   whatever the insured -- however the insured's
10  financial situations as to how much he feels he's
11  going to get sued for, basically.
12      Q.   One of the letters in the packet -- and I
13  didn't draw your attention to it earlier because
14  it's not a Continental letter, but it's -- I may
15  just invite your -- your assessment -- if
16  Mr. Kohler -- and this is in the upper right-hand
17  corner, 350, and it's part of the document I think
18  you might have --
19      A.   Yes.  I have it.
20      Q.   -- seen earlier, 351.  If he at that time
21  was packaging a general liability policy of $2
22  million in the mid-'70s, and I use that frame of
23  reference from Mueller's note on the bottom of 350,
24  would that be within the realm of reason --
25  reasonableness from your frame of reference or was

123

1   that --
2       A.   The limit?
3       Q.   Yes.  I mean to be suggesting that CBNA
4   have a general liability coverage of $2 million?
5       A.   Excuse me.  I'm looking at the wrong form
6   here.  Okay.  Now I'm with you.
7       Q.   Yeah.
8            And here, I'll come around, if that
9   helps.  Yeah.  So --
10      A.   Okay.  Now, your question again.
11      Q.   All right.  So Mr. Kohler's agency, at
12  least as of a point in time that that -- I'll
13  represent to you is the mid-'70s, was putting
14  together a package of $2 million general liability
15  for CBNA, is -- is that -- do you have reason to
16  think that was either -- that that was
17  unreasonable?
18           MR. MOWBRAY:  I'll object to form.
19           THE WITNESS:  I cannot say at that time
20  because I -- you know, that's 30 years ago.  I
21  don't remember.
22
23  BY MR. GROSECLOSE:  (Continuing)
24      Q.   Okay.  And if I were to ask is it
25  reasonable --

124

1       A.   It's not unreasonable --
2       Q.   Okay.
3       A.   -- let's put it that way.  But now I'm
4   going from a later point of view.  I mean, now five
5   million wouldn't be.  At that time, I can't really
6   recall.  It may have been high, but I don't know.
7       Q.   All right.
8       A.   And he also had an excess umbrella, too.
9       Q.   Well, yeah.  What does that mean?
10      A.   I spoke too much.
11           He says general liability two million,
12  excess liability, umbrella.
13      Q.   That is over and above the coverage?
14      A.   It would be in excess of the $2 million.
15      Q.   But we don't know what those limits are?
16      A.   No.  It does not say from this letter.
17      Q.   Okay.
18           MR. GROSECLOSE:  Okay.  That's all I
19  have.
20           Thank you.
21
22  BY MR. MOWBRAY:  (Continuing)
23      Q.   On this document, it has "General
24  liability, $2 million excess liability."  Does it
25  seem -- do you read the $2 million as modifying the

Julian Robb                                                                October 4, 2006
Continental Insurance vs. Catholic Bishop of N. Alaska

125

1  excess liability in describing the policy as a $2
2  illion policy or do you read it as --
3        A.    From a pure English standpoint, I would
4  say general liability with a $2 million excess
5  liability.
6        Q.    Okay.  So you're saying that there's
7  no -- it doesn't say the limit for the general
8  liability?
9        A.    That is correct.
10       Q.    It's saying that the excess liability
11  policy is two million; is that right?
12       A.    That is the way I would interpret the
13  letter, yes.
14       Q.    Okay.  Just a couple other follow-ups.
15             On Exhibit 3 --
16       A.    Yes.
17       Q.    -- and the paragraph starting, "He
18  advises he will require three policies" and ending
19  with, "One policy for the Fairbanks coverage."
20       A.    Yes.
21       Q.    Does that suggest that a policy was
22  actually issued or just that someone was seeking a
23  policy?
24             MR. GROSECLOSE:  Object to the form.  I
2'  hink you said he recommended, didn't you?  It

126

1  says, "He will require."
2             MR. MOWBRAY:  If I misspoke, I'm sorry.
3
4  BY MR. MOWBRAY:  (Continuing)
5        Q.    "He advises that he will require three
6  policies."
7        A.    That would be an indication that
8  negotiations had been pretty much completed and a
9  policy was being -- going to be issued.
10       Q.    Okay.  Does it -- does anything in this
11  paragraph suggest what the limits of liability
12  would be for the policy?
13       A.    No.
14       Q.    Does it suggest what types of coverage
15  would be included in the policy?
16       A.    Only from the standpoint of the verbiage
17  of section one, which is property.
18       Q.    And that -- the portion where it refers
19  to section one is referring to a Juneau policy?
20       A.    Correct.
2        Q.    Just one other general question I missed
22  earlier.
23             When a policy was issued, what would
24  happen?  Would a policy be sent to the insured or
25  the broker or what happened?

127

1        A.    All the policies would go to the broker
2  or agent who requested them.
3             MR. GROSECLOSE:  Okay.  All right.  Well,
4  that's all the questions I have.
5             Do you have any more follow-ups?
6             MR. MOWBRAY:  I don't.
7             MR. GROSECLOSE:  All right.  Mr. Robb, I
8  think you're off the hook.
9             Thank you very much.
10             (Deposition concluded at 1:53 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

128

1  STATE OF OREGON       )
                         )  ss.
2  COUNTY OF MULTNOMAH )
3
4        I, Amy A. Dalton, Court Reporter and
5  Notary Public, do hereby certify that JULIAN ROBB
6  personally appeared before me at the time and place
7  mentioned in the caption herein; that the witness
8  was by me first duly sworn under oath and examined
9  upon oral interrogatories propounded by counsel;
10  that said examination, together with the testimony
11  of said witness, was taken down by me in stenotype
12  and thereafter reduced to typewriting; and, that
13  the foregoing transcript, pages 1 to 127, both
14  inclusive, constitutes a full, true, and accurate
15  record of said examination of and testimony by said
16  witness, and of all other oral proceedings had
17  during the taking of said deposition, and of the
18  whole thereof.
19        Witness my hand and notarial stamp at
20  Portland, Oregon, this 19th day of October, 2006.
21
22  _____
    Amy A. Dalton
23  My commission expires 5-27-08
24  I certify this original/duplicate original is
    valid only if it bears my stamp.
25  Amy Dalton